JH

CERTIFIED COPY

In the

# United States Court of Appeals

## For the Seventh Circuit

FILED
FEB 23 2005
Feb 23 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

No. 04-1443

GENISE HART, *et al.*,

*Plaintiffs-Appellants*,

*v.*

MICHAEL SHEAHAN, SHERIFF OF COOK COUNTY, and COOK COUNTY,

*Defendants-Appellees*.

Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.
No. 03 C 1768—**James B. Zagel**, *Judge*.

ARGUED NOVEMBER 30, 2004—DECIDED FEBRUARY 1, 2005

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges*.

POSNER, *Circuit Judge*. This is an appeal from the dismissal, for failure to state a claim, of a suit by female inmates of the Cook County Jail in Chicago against the jail's superintendent and the County. The plaintiffs are pretrial detainees who complain that the defendants, by gratuitously exposing them to dangerous and degrading conditions of confinement, are depriving them of their liberty without due process of law and thus violating the Fourteenth Amendment. They seek an injunction and damages.

We begin with a difficult question of appellate jurisdiction. The plaintiffs appealed within 30 days of the denial of their postjudgment motion under Fed. R. Civ. P. 59(e) for reconsideration of the judgment dismissing their case. But whether the appeal brought up for review not only the denial of the motion but also—what is much more important given the limited scope of appellate review of a denial of a Rule 59(e) motion—the dismissal of the suit depends on whether the motion was filed within 10 days after the entry of the judgment. Fed. R. App. P. 4(a)(4)(A)(iv). The judgment was entered on December 19, 2003. The Rule 59(b) motion was filed on January 7, which, because of the exclusion of Christmas and weekend days, was the eleventh day after the filing of the motion unless December 26 is also excluded from the computation—and it is excluded only if it was a "legal holiday" within the meaning of Fed. R. Civ. P. 6(a)

That rule provides that "when the period of time prescribed or allowed [by a Federal Rule of Civil Procedure] is less than 11 days, intermediate . . . legal holidays shall be excluded in the computation," "legal holiday" being defined in the rule to include not only Thanksgiving, Christmas, and other holidays enumerated in the rule but also "any other day appointed as a holiday by the President or the Congress of the United States, or by the state in which the district court is held." The day after Christmas is not one of the enumerated holidays. But on December 9, 2003, President Bush had issued Executive Order 13320, § 3, 68 Fed. Reg. 69,295, which states, so far as pertinent here, that "Friday, December 26, 2003, shall be considered as falling within the scope of Executive Order 11582 of February 11, 1971, and of 5 U.S.C. 5546(b)." So we go to Executive Order 11582, § 2(a), 36 Fed. Reg. 2,957 (Feb.



11, 1971), and find that it specifies how federal employees are to be compensated on legal holidays or "any other calendar day designated as a holiday by Federal statute or Executive order." Section 5546(b) of Title 5 likewise specifies compensation for "an employee who performs work on a holiday designated by Federal statute [or] Executive order." (The President's authority to declare legal holidays is implied by this provision and also by 5 U.S.C. § 6104(3), as well as by joint resolutions that were eventually codified in these statutes. J. Res. 5, 23 Stat. 516 (Jan. 6, 1885); J. Res. 551, 52 Stat. 1246 (June 29, 1938).)

The defendants argue that because Executive Order 13320, on which the plaintiffs rely for the proposition that December 26 of 2003 was a legal holiday, does not *say* that the President has declared December 26 to be a holiday, the plaintiffs' Rule 59(e) motion was untimely. In support they cite our decision in *Latham v. Dominick's Finer Foods*, 149 F.3d 673 (7th Cir. 1998). The deadline for filing a Rule 59(e) motion in that case was December 26, 1997, also a Thursday. But the court was closed that day, and the closure order said that motions due that day didn't have to be filed until the following Monday. We held that because the plaintiff couldn't have filed on December 26, he was excused. But not because December 26 was a legal holiday; for we reasoned that while President Clinton had ordered the executive branch of the federal government closed that day, he had not declared a legal holiday; nor had he ordered the federal courts closed. The closure order had come from the chief judge of the district court, who of course is not the President and did not purport to be declaring a legal holiday and anyway lacked the authority to do so. *Garcia-Velazquez v. Frito Lay Snacks Caribbean*, 358 F.3d 6, 9 (1st Cir. 2004). We analogized the

closure order to an order closing the court because of bad weather, noting that Rule 6(a) excludes the last day to file if "weather or other conditions have made the office of the clerk of the district court inaccessible" *on that day*. Because of the last-day limitation in this rule on which we were basing our decision by analogy, we said that our decision had no application to a case in which the clerk is inaccessible on an intermediate day. Whether the appeal in this case flies or falls, therefore, depends entirely on whether December 26, 2003, was a legal holiday.

Our statement in *Latham* that the corresponding day in 1997 was not a legal holiday was a dictum—for whether that day was or was not a holiday, the appeal was timely by virtue of the chief judge's closure order—and so does not bind us in this case. The dictum was rejected in *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1098-99 (D.C. Cir. 2003). At issue in that case was an earlier executive order by President Bush materially identical to the one at issue in this case, as well as to President Clinton's 1997 order. The court in *Mashpee* thought the fact that the executive order expressly incorporated provisions governing compensation of federal employees on legal holidays was a sufficient indication that the President had declared December 26 a holiday. We had not considered this possible interpretation of Clinton's (=Bush's) executive order in *Latham*. We own to finding the D.C. Circuit's interpretation persuasive. It is true that that court bolstered its analysis by pointing out that one of the litigants was a federal agency, which would be closed on December 26; but the court did not make that observation the linchpin of its analysis. It would have been odd had it done so; it would have meant that the opposing litigants in the case had different filing deadlines, since the plaintiff was not a federal agency.



*Mashpee* is supported by the natural understanding of what the President is doing when he closes the executive branch on the day after Christmas: he is extending the Christmas holiday. It would be positively Grinch-like for the President to say, "you can have December 26 off, but don't think it's a legal holiday." It would mean, among other things, that federal employees who had to work that day (such as air controllers) would not receive the double pay that they are entitled to for working on a holiday. 5 U.S.C. § 5546(b). Realistically, moreover, when Christmas falls on a Thursday it is pretty hard to get employees to put in a serious day's work on Friday. This is true for the private sector as well as for the public sector. So that's a lost day, and with the time for preparing and filing a Rule 59(e) motion already compressed to only 10 days, it makes practical sense to interpret the Presidential closure order as declaring a legal holiday.

The clincher is the superior simplicity of a rule that says that when the President closes the government for celebratory or commemorative reasons (see, e.g., Executive Order 13343, 69 Fed. Reg. 32,245 (June 6, 2004), closing the government for a day of commemoration of President Reagan), rather than because of a budgetary crisis (see "Federal Workers Bear Brunt of Budget Shutdown," Nov. 14, 1995 http://www.cnn.com/US/9511/debt_limit/11-13/employees/index.html), or for a snow emergency, terrorist act, or some other *force majeure*, the presumption is that he has declared a legal holiday. The presumption has not been rebutted.

So we can turn to the merits of the appeal. Had the plaintiffs been convicted, their challenge to the conditions of their confinement would be governed by the "cruel and unusual punishments" clause of the Eighth Amendment,

which has been interpreted to require proof that the convicts' custodians were deliberately indifferent to a serious hazard created by those conditions. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Riccardo v. Rausch*, 375 F.3d 521, 525-26 (7th Cir. 2004). These plaintiffs, however, have not been convicted of a crime. It would be odd, to say the least, if by reason of *not* having been convicted they had fewer rights than convicts; and of course they don't. The "liberty" that the due process clauses secure against deprivation without due process of law includes not only the right to be free, which pretrial detainees do not have, but also the right to bodily integrity, which they do. *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997); *Rochin v. California*, 342 U.S. 165, 172 (1952); *Doe v. Taylor Independent School District*, 15 F.3d 443, 450-52 (5th Cir. 1994) (en banc). They don't need the Eighth Amendment to be able to complain about conditions that would violate their Eighth Amendment rights if they were convicted criminals rather than pretrial detainees.

In the ruling case of *Bell v. Wolfish*, 441 U.S. 520 (1979), the Supreme Court said that the proper question to guide determination of the constitutionality of restrictive conditions in pretrial detention was "whether those conditions amount to punishment of the detainee." *Id.* at 535 (footnote omitted). We doubt that the Court meant that the plaintiff has to show that the jail officials *meant* to punish him, though that is the construction placed on the decision by the dissenting Justices. *Id.* at 565, 584-86. The majority did say that "loading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that



could be accomplished by so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish." *Id.* at 539 n. 20. But why proof of a punitive *purpose* should be necessary is unclear. The jail officials might simply be preoccupied with making sure that none of the inmates caused trouble in the jail, or escaped. Punishment is not the only possible motive for brutal treatment. But whatever the motive is, if the brutal treatment is gratuitous, due process in its substantive sense has been violated. *May v. Sheahan*, 226 F.3d 876, 884 (7th Cir. 2000); *Rapier v. Harris*, 172 F.3d 999, 1005 (7th Cir. 1999); *Lyons v. Powell*, 838 F.2d 28, 30-31 (1st Cir. 1988) (per curiam); cf. *Demery v. Arpaio*, 378 F.3d 1020, 1029-32 (9th Cir. 2004).

"Punishment" in such a case is really just a name for unreasonably harsh treatment meted out to inmates who have not yet been convicted of any crime. As we said in *May v. Sheahan*, *supra*, 226 F.3d at 884, another case about the conditions in which inmates are held in the Cook County Jail, "the use of bodily restraints constitutes punishment in the constitutional sense if their use is not rationally related to a legitimate non-punitive government purpose or they appear excessive in relation to the purpose they allegedly serve." See also *Block v. Rutherford*, 468 U.S. 576, 583-85 (1984); *Bell v. Wolfish*, *supra*, 441 U.S at 537-39; *Zarnes v. Rhodes*, 64 F.3d 285, 291 (7th Cir. 1995); *Collazo-Leon v. U.S. Bureau of Prisons*, 51 F.3d 315, 317-18 (1st Cir. 1995). Even Eighth Amendment cases no longer require proof of a punitive purpose; callous indifference will do, *Farmer v. Brennan*, *supra*, 511 U.S. at 834-36; *Haley v. Gross*, 86 F.3d 630, 641-42 (7th Cir. 1996); *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002) (per curiam),

even if it is not intended to augment the prisoner's punishment.

Another way to interpret the cases, however, is that they understand the Eighth Amendment's term cruel and unusual "punishments" to refer to the character of the act rather than to the intention in inflicting it. If the act involves the gratuitous infliction of pain or suffering it is deemed to be punishment, and as long as the act was intended it is a violation of the prisoner's constitutional right even if the act was not intended as punishment.

On either understanding of the Eighth Amendment's use of the word "punishments," the standards applicable to complaints by convicts and by pretrial detainees about unsafe conditions of confinement merge. See, e.g., *Zentmyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir. 2000); *Burrell v. Hampshire County*, 307 F.3d 1, 7 (1st Cir. 2002); *Gibbs v. Grimmette*, 254 F.3d 545, 548-49 (5th Cir. 2001); *Barrie v. Grand County*, 119 F.3d 862, 868-69 (10th Cir. 1997). Although some cases prefer to say that the rights of pretrial detainees are "at least" as great as those of convicts, e.g., *County of Sacramento v. Lewis*, 523 U.S. 833, 849-50 (1998); *Washington v. LaPorte County Sheriff's Department*, 306 F.3d 515, 517 (7th Cir. 2002); *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002); *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1040 (7th Cir. 1998), they do not indicate what greater rights the pretrial detainees might have. They do have some: they cannot be punished (except for infractions of jail rules or other offenses committed in the jail, *Rapier v. Harris*, *supra*, 172 F.3d at 1003; *Collazo-Leon v. U.S. Bureau of Prisons*, *supra*, 51 F.3d at 318-19) even in a nonbrutal fashion, because punishment requires a conviction. *Id.* But when the issue is whether brutal treatment should be assimilated to punishment, the interests of the



prisoner is the same whether he is a convict or a pretrial detainee. In either case he (in this case she) has an interest in being free from gratuitously severe restraints and hazards, while the detention facility has an interest in protecting the safety of inmates and guards and preventing escapes.

We have now to apply the standard. Our only source of facts is the complaint. The following are its essential allegations. The jail, or at least the part where the women are held, is divided into a number of tiers. Each tier contains cells, each of which houses two inmates. Each tier also has a day room where the inmates can socialize and watch television, and adjacent to the day room are shower stalls. The tiers are separated by locked doors, at each of which a guard is stationed. From his station he can see what is going on in the day room but cannot see inside the cells. Once a month the jail is locked down, meaning that all the inmates are confined to their cells to enable the guards to search the entire facility for weapons and contraband. The lockdown lasts from Friday afternoon to Sunday afternoon—48 to 50 hours—and during that entire time the inmates are confined to their cells. They are fed, but they are not under the observation, or even within hailing distance, of the guards, who are busy with the searches. If during this protracted period of sequestration two inmates sharing a cell get into a fight, as they not infrequently do, or experience some other crisis, such as giving birth, they often can't get the attention of a guard, and injuries, sometimes serious, result. The custodian of the jail, Sheriff Sheahan, is well aware of all this. (We emphasize that at this stage in the litigation these are merely allegations and not proven facts.)

These consequences might not condemn the administration of the jail if there were no other way to conduct the

lockdown. But given the allegation that the tiers are separated by a locked door, it is unclear why, when the guards have finished searching one tier, which apparently takes less than an hour, they cannot let the inmates of that tier out of their cells so that they can enter the day room and thus be in sight and hearing of a guard and therefore be able to summon him should trouble erupt. Of course while the tier is being searched all the inmates in that tier have to be locked in their cells. If they were roaming around, an inmate whose cell hadn't been searched yet could slip a weapon or contraband to an inmate whose cell had been searched and was now in the day room with access to the grates in the doors of all the other cells. But unless inmates can go between tiers, once a tier has been searched there is no apparent reason why the inmates in that tier can't be let out of their cells. There may well be a reason of which we're unaware, but the case is in the pleading stage and we have no evidence that would enable us to identify and evaluate such a reason.

The defendants point us to a paragraph in the complaint which states that during a lockdown one of the plaintiffs was attacked by her cellmate and yelled for help but "it took approximately 10 minutes for an inmate worker to get the attention of a correctional officer." The defendants argue that the quoted passage pleads the plaintiffs out of court by alleging that an inmate (the "inmate worker") had managed to enter the tier, thus showing that there is traffic between tiers and it is therefore necessary for the entire jail to be locked down. The argument fails. The incident occurred during a lockdown, when according to the defendants themselves all the inmates are locked in their cells, so what was this "inmate worker" doing? There are a number of possible answers—all consistent with the plaintiffs' claim. Some inmates may be trusted. Some, who



may not be trusted, may nevertheless be needed to work during lockdowns and maybe they are searched when they pass from a searched tier to a tier that hasn't been searched yet. Or maybe the plaintiff's tier had been searched and inmate workers are allowed into a tier as soon as the search of that tier has been completed.

The district judge misunderstood the plaintiffs' claim, though forgivably since it is not well articulated. He thought they were arguing only "that the searches could be performed faster and that detainees could then be immediately released from their cells." Were that their argument, it could well be found not to state a claim, as it would be ridiculous for judges to be placing time limits on the search of a jail cell. Cf. *Lunsford v. Bennett*, 17 F.3d 1574, 1581-82 (7th Cir. 1994); *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994). But the heart of the plaintiffs' claim, with enough merit to withstand a motion to dismiss, is that the jail is subjecting them to a risk of serious harm by an unreasonably protracted detention of them out of sight and hearing of guards.

So the judgment must be reversed. We offer several observations for guidance on remand. First, the judge dismissed the suit without ruling on whether, as the plaintiffs requested, the case should be certified as a class action. That should be the first order of business on remand. Fed. R. Civ. P. 23(c)(1)(A); cf. *Nelson v. Murphy*, 44 F.3d 497, 500 (7th Cir. 1995); *Koch v. Stanard*, 962 F.2d 605, 607 (7th Cir. 1992); *Watkins v. Blinzinger*, 789 F.2d 474, 475 n. 3 (7th Cir. 1986). Second, the judge should define the issues carefully to comport with the analysis in this opinion, in effect pruning the overlong complaint of untenable charges. Third, to the extent that damages as well as injunctive relief are sought, the judge should promptly address issues of immunity and municipal liability.

One loose end remains to be tied up. The defendants object to the plaintiffs' having referred in their reply brief to the report of a grand jury investigation into abuses at the Cook County Jail. To present new evidence at the appeal stage is improper and in appropriate cases sanctionable. *Youker v. Schoenenberger*, 22 F.3d 163, 169 (7th Cir. 1994). But a party is free to cite academic or other studies that may be factual in nature, provided the facts are "legislative" rather than "adjudicative" in character, that is, provided they are facts that help a court formulate a rule, as distinct from facts specific to the case that help the trier of fact decide whether the rule applies to the case. *Indiana Harbor Belt R.R. v. American Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990); *Daggett v. Commission on Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999); *United States v. Hernandez-Fundora*, 58 F.3d 802, 810-12 (2d Cir. 1995). The report of an investigation could be either. But the plaintiffs have made clear that they want to use the grand jury report as a source of adjudicative facts. They argue that the findings in it are evidence, and appeal to the public-records exception to the hearsay rule, Fed. R. Evid. 803(8)(c), which is pertinent only when hearsay is sought to be used as evidence, rather than merely as background; only proof of adjudicative facts is governed by the rules of evidence.

But in objecting to what the plaintiffs have done, the defendants overlook the procedural posture. This is an appeal from the grant of a motion to dismiss for failure to state a claim, a grant that is proper only if there is no state of facts consistent with the complaint that would entitle the plaintiffs to relief. In submitting the report of the grand jury investigation, the plaintiffs were merely indicating that, yes, there may well be facts they could prove that would show they had a claim. There was no impropri-



ety, e.g., *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704 (7th Cir. 2004); *Trevino v. Union Pacific R.R.*, 916 F.2d 1230, 1239 (7th Cir. 1990); *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 912 (7th Cir. 1985), and so there is no occasion for the imposition of sanctions.

REVERSED AND REMANDED.

A true Copy:

Teste:

*Clerk of the United States Court of Appeals for the Seventh Circuit*