# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FILED
9-13-05
SEP 1 3 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| GENISE HART, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 03 C 1768 |
| | ) | |
| MICHAEL SHEAHAN, SHERIFF OF COOK | ) | Judge James B. Zagel |
| COUNTY, et al,. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS MICHAEL SHEAHAN, SHERIFF OF COOK COUNTY, AND THE COUNTY OF COOK'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

HINSHAW & CULBERTSON LLP
222 NORTH LASALLE STREET, SUITE 300
CHICAGO, ILLINOIS 60601-1081
(312) 704-3000
*Attorneys for Michael Sheahan,*
*Sheriff of Cook County*

OFFICE OF THE STATE'S ATTORNEY
OF COOK COUNTY
500 RICHARD J. DALEY CENTER, ROOM 575
CHICAGO, ILLINOIS 60602
(312) 603-5365
*Attorneys for Cook County*

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................... i

TABLE OF AUTHORITIES ............................................................................... ii

I.   INTRODUCTION ................................................................................. 1

II.  LEGAL STANDARD FOR SUMMARY JUDGMENT ............................... 3

III. FACTS ENTITLING DEFENDANTS TO SUMMARY JUDGMENT .............. 3

    A. BACKGROUND INFORMATION ON THE COOK COUNTY JAIL ............................. 3

    B. THE COUNTY JAIL IS NO LONGER HOLDING WEEKEND LOCKDOWNS ................. 6

    C. PURPOSE OF WEEKEND LOCKDOWNS ................................................. 6

    D. REASON THE LOCKDOWNS WERE HELD ON WEEKENDS ............................. 7

    E. MOVEMENT OF CONTRABAND AT THE JAIL............................................ 7

    F. PRISONERS ARE LOCKED IN THEIR CELLS AT LEAST HALF OF
       EACH DAY UNDER NORMAL CONDITIONS ........................................... 8

    G. THE MANNER IN WHICH WEEKEND LOCKDOWNS WERE HELD ........................... 9

    H. ESSENTIAL SERVICES WERE PROVIDED DURING A WEEKEND
       LOCKDOWN WHICH RESULTED IN PRISONER MOVEMENT
       OUT OF THEIR CELLS.................................................................. 10

    I. PRISONERS WERE NEVER OUT OF THE SIGHT OR HEARING OF
      CORRECTIONAL OFFICERS FOR AN EXTENDED PERIOD DURING
      WEEKEND LOCKDOWNS ............................................................... 12

    J. REASONS WHY TIERS WERE NOT TAKEN OFF OF LOCKDOWN
      AFTER SEARCH OF THE TIER WAS COMPLETED.................................... 13

    K. PROGRAMS OFFERED TO FEMALE PRISONERS AT THE JAIL ............................. 15

    L. STAFFING ISSUES DURING WEEKEND LOCKDOWNS................................... 16

    M. NUMBER OF CORRECTIONAL GUARDS AT THE JAIL................................... 16

IV.  LEGAL ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT ........................ 17

    A. BECAUSE PLAINTIFFS WERE NEVER OUT OF THE SIGHT OR HEARING
      OF CORRECTIONAL OFFICERS FOR AN EXTENDED PERIOD OF
      TIME PLAINTIFFS HAVE NO VALID CLAIM UNDER SEVENTH
      CIRCUIT'S DECISION IN *HART*.................................................... 17

    B. PLAINTIFFS LACK STANDING TO OBTAIN INJUNCTIVE RELIEF
      AND THEIR CLAIMS FOR INJUNCTIVE RELIEF ARE MOOT................... 18

    C. WEEKEND SEARCHES FOR CONTRABAND HAD
      A LEGITIMATE PURPOSE .............................................................. 19

D. EXISTENCE OF DIFFERENT OR PURPORTEDLY BETTER
   POLICIES IS IRRELEVANT....................................................................21

E. MERELY BECAUSE PLAINTIFFS WERE KEPT IN THEIR CELLS
   LONGER THAN UNDER NORMAL CONDITIONS DOES NOT ESTABLISH
   A CONSTITUTIONAL VIOLATION ........................................................21

F. PRISONERS WERE NOT EXPOSED TO GRATUITOUSLY BRTUAL
   TREATMENT AND LOCKDOWNS WERE NOT EXCESSIVE IN
   RELATION TO THEIR PURPOSE ............................................................23

G. ASSERTIONS ABOUT ASSAULTS AND A LACK OF CARE DO NOT
   ESTABLISH PLAINTIFFS WERE EXPOSED TO SYSTEMIC GRATUITOUSLY
   BRUTAL TREATMENT AS A RESULT OF LOCKDOWNS.........................24

   1. NO CONSTITUTIONALLY RECOGNIZED CLAIM FOR FEAR FOR
      PERSONAL SAFETY. ....................................................................24

   2. PLAINTIFFS HAVE FAILED TO ESTABLISH A FAILURE TO
      PROTECT CLAIM...........................................................................25

H. PLAINTIFFS' DENIAL OF MEDICAL CARE ALLEGATIONS DO NOT
   ESTABLISH A CONSTITUTIONAL VIOLATION .....................................26

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

*Abrams v. Walker,* 307 F.3d 650 (7th Cir. 2002) ...............................................3

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) .......................................3

*Babcock v. White,* 102 F.3d 267 (7th Cir. 1996)................................................24

*Bank Leumi Le-Isreal, B.M. v. Lee,* 928 F.2d 232 (7th Cir. 1991) ....................3

*Bell v. Wolfish,* 441 U.S. 520 (1979) ...............................................19, 20, 21, 23

*Board v. Farnham,* 394 F.3d 469 (7th Cir. 2005).............................................25

*Buck v. Lake County Sheriff,* 2004 WL 2983966 (N.D. Ill. 2004)....................21

*Buttera v. Cottey,* 285 F.3d 601 (7th Cir. 2002) ..................................17, 18, 25

*Caldwell v. Miller,* 790 F.2d 589 (7th Cir. 1986) ............................................21

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ...................................................3

*Chapman v. Keltner,* 24 F.3d 842 (7th Cir. 2002) ...........................................26

*City of Los Angeles v. Lyons,* 461 U.S. 95 (1983) ...........................................18

*Davis v. Jones*, 936 F.2d 971 (7th Cir. 1991) ...............................................................26

*Dial v Coler*, 791 F.3d 78 (7th Cir. 1986) ...................................................................19

*Doe v. Welborn*, 110 F.3d 520 (7th Cir. 1997) ............................................................24

*Echols v. Skipper*, 2001 WL 936128 (N.D. Ill. 2001) ................................................24

*Farmer v. Brennan*, 511 U.S. 825 (1994) ...................................................................25

*Frake v. City of Chicago*, 210 F.3d 779 (7th Cir. 2001) ............................................21

*Green v. Mansour*, 474 U.S. 64 (1985)........................................................................19

*Hadi v. Horn*, 830 F.2d 779 (7th Cir. 1987) ...............................................................22

*Hart v. Sheahan*, 396 F.3d 887 (7th Cir. 2005) .................................................. *passim*

*Henderson v. Sheahan*, 1965 F.3d 839 (7th Cir 1999) ...............................................24

*Higgason v. Farley*, 83 F.3d 807 (7th Cir 1996) .........................................................19

*Holly v. Woolfolk*, 415 F.3d 678 (2005).......................................................................20

*Hutto v. Finney*, 437 U.S. 678 (1978) ..........................................................................21

*Johnson v. California*, __ U.S. __, 125 S.Ct. 1141 (2005) .........................................19

*Jones v. N.C. Prisoner's Labor Union, Inc.*, 433U.S. 119 (1977)................................22

*Lucien v. Godinez*, 814 F. Supp. 754 (N.D. Ill. 1993) ................................................26

*Mayoral v. Sheahan*, 245 F.3d 934 (7th Cir. 2001) ..............................................23, 25

*McDonald v. Village of Winnetka*, 317 F.3d 992 (7th Cir. 2004)...................................3

*Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) ...........................................21

*Perry v. Village of Arlington Heights*, 186 F.3d 826 (7th Cir 1999) ...........................18

*Potter v. Clark*, 497 F.2d 1206 (7th Cir. 1974)...........................................................21

*Rapier v. Harris*, 172 F.3d 999 (7th Cir. 1999) ..........................................................25

*Robinson v. City of Chicago*, 868 F.2d 959 (7th Cir. 1989) ........................................17

*Russell v. Richards*, 384 F.3d 444 (7th Cir 2004)........................................................20

*Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004)..............................................................19

*Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998)..........................................................27

*Turner v. Safley*, 482 U.S. 78 (1987) ........................................................................................20

*Weiss v Cooley*, 230 F.3d 1027 (7th Cir. 2000) .........................................................................25

*Whitnack v. Douglas County*, 16 F.3d 954 (8th Cir. 1994) ........................................................20

*Zentmeyer v. Kendall County, Ill.*, 220 F.3d 805 (7th Cir. 2000) ...............................................23

# I.    INTRODUCTION

In its review of plaintiffs' Second Amended Complaint which challenged the constitutionality of the Cook County Department of Corrections' (hereinafter "Cook County Jail" or "jail") former practice of holding periodic weekend lockdowns to search a division of the jail for weapons and contraband, the Seventh Circuit assumed the truthfulness of plaintiffs' allegations that:

> The lockdown lasts from Friday afternoon to Sunday afternoon – 48 to 50 hours – and during that entire time, the inmates are confined to their cells. They are fed, but they are not under the observation, or even within the hailing distance, of the guards, who are busy with the searches.

*Hart v. Sheahan*, 396 F.3d 887, 893 (7th Cir. 2005).   Based upon that assumed scenario, the court concluded that a claim had been stated because prisoners were allegedly out of the sight and hearing of correctional officers for an unreasonable period of time during those lockdowns:

> But the heart of the plaintiffs' claim, with enough merit to withstand a motion to dismiss, is that the jail is subjecting them to a risk of serious harm by an unreasonably protracted detention of them out of sight and hearing of the guards.

*Id.* at 894.   However, the assumed set of facts which led to the Seventh Circuit's decision in *Hart* has no basis in reality at the jail.

During the weekend lockdowns now at issue, correctional officers checked on the status of prisoners every 30 minutes while the lockdown was in effect (R. 203,205).[1]   Correctional officers also make "head counts" of prisoners in their cells three times a day at the jail.   Those counts were made while the lockdowns were in effect (R. 210-212).   Additionally, correctional officers either delivered meals to the prisoners in their cells or accompanied a "living unit worker" who delivered those meals during a lockdown (R. 213-215).   Moreover, because the cells in Divisions III and IV had to be manually locked by correctional officers, every time a prisoner returned to her cell while a weekend lockdown was in effect, a correctional officer had to walk that prisoner to her cell in order to lock the cell door (R.216-219).   As explained below, prisoners were allowed to be out of their cells for various reasons during the lockdowns at issue. These operational practices not only presented multiple opportunities for correctional officers to

---

[1]    All factual assertions made in his Memorandum of Law are taken from defendants' Rule 56.1 Statement of Undisputed Facts which is attached.   Specific paragraphs from that Rule 56.1 Statement are cited as "R___" accompanied by the Rule's corresponding paragraph number.

check on the status of prisoners in their cells but also for prisoners in their cells to speak to correctional officers during those weekend lockdowns (R. 212, 215-219). Thus, prisoners were not out of the sight or hearing of correctional officers for an "unreasonably protracted" period of time during those weekend lockdowns. On that basis alone, defendants are entitled to summary judgment. Additionally, because weekend lockdowns no longer are being held at the jail – they stopped in the men's divisions well over a year ago, and were stopped in the women's divisions long before that (R. 273-276), plaintiffs have no basis to seek injunctive relief in this matter.

The factual underpinnings for the cause of action recognized in *Hart* simply did not exist during the weekend lockdowns in question. While some prisoners were out of their cells longer than others, no prisoner remained in her cell for the entirety of a weekend lockdown as alleged in plaintiffs' complaint. To insure the safety of correctional officers when they were searching the cells, prisoners on a tier were removed from their cells while cell searches were in progress (R. 168-173,176). Prisoners in Division IV were moved into the tier's dayroom and prisoners in Division III were moved into a first floor recreation room while the cells on a particular tier were being searched (R. 170-171).

Additionally, prisoners were permitted out of their cells and moved off of their tier for a variety of reasons during a weekend lockdown. If a prisoner had a prearranged visit with family or friends scheduled during a lockdown weekend, the prisoner was removed from her cell and the visit was permitted (R. 134-35,137). The jail also permitted unscheduled visits to occur on a lockdown weekend when the visitor traveled over 150 miles to make the visit (R. 136). If an attorney either had a prearranged meeting or appeared at the jail while the lockdown was in effect, the attorney-client meeting was also allowed (R. 138). Two of the named plaintiffs, Caprice Morales and Genise Hart, received visitors during the course of a weekend lockdown (R. 147-149).

Prisoners also left their cells and moved off of their tiers to receive certain types of medication and medical care that could not be provided at their cells (R. 150-153). Two of the other named plaintiffs acknowledged receiving medical attention from nursing staff during a lockdown of their division in their interrogatory answers and one of them (Ms. Gandy) was out of her cell and received that care at the division's nursing station (R. 156-57). Prisoners were removed from their cells during weekend lockdowns for psychiatric screenings (R. 159-162).

-2-

Prisoners were also allowed out of their cells and moved off tier to work (R. 177-188), to be discharged from the jail or when transferred to another division (R. 194-95).

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when there is "no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When summary judgment is sought, a court is obligated to examine the facts presented in the light most favorable to the plaintiffs and draw all reasonable inference in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a court is "not required to draw every conceivable inference from the record" in plaintiff's favor, "only those inferences that are reasonable." *Bank Leumi Le-Isreal, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991). "Inferences that are supported by only speculation or conjuncture will not defeat a summary judgment motion." *McDonald v. Village of Winnetka*, 317 F.3d 992, 1001 (7th Cir. 2004).

"The mere existence of some alleged factual dispute between the parties," is not sufficient to defeat summary judgment. *Anderson*, 477 U.S. at 247. "Only disputes over facts that might affect the outcome of the suit under the governing law will property preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Abrams v. Walker*, 307 F.3d 650, 653 (7th Cir. 2002). A factual dispute must also be "genuine." A dispute is not genuine unless "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Where plaintiffs' evidence "is merely colorable, or is not significantly probative," summary judgment should be entered. *Id.* at 249-50.

## III.    FACTS ENTITLING DEFENDANTS TO SUMMARY JUDGMENT

### A.    BACKGROUND INFORMATION ON THE COOK COUNTY JAIL.

The Cook County Jail is the largest single-site jail in the country (R. 13). It currently houses slightly more than 1000 female prisoners (R. 16), and has a total population of between 10,000 and 10,500 prisoners (R. 15). The exact number of prisoners varies from day-to-day depending upon the number of prisoners admitted to, discharged or transferred from the jail (R. 17). The total number of prisoners at the jail was slightly higher in 2001 and 2002 when the weekend lockdowns in Divisions III and IV were held than the current number of prisoners at the jail (R. 17). Approximately 100,000 prisoners are admitted to the jail on an annual basis (R.19).

The jail is comprised of ten (10) divisions. Each division has its own separate building and operates semi-autonomously under the administrative direction of its own superintendent and supervisory staff with the exception of Division III (for women) and Division VIII (for men) which share the same superintendent and supervisory staff (R. 19). Located on the jail's grounds is a stand alone health-care facility (Cermak), two third-party educational departments (Chicago Board of Education and Chicago City Colleges), as well as a privatized food service and commissary agency (R. 22,23). Female prisoners are held in two separate divisions of the jail, Divisions III and IV (R. 20). Division IV has sixteen (16) separate tiers with 352 cells or living units (R. 21). Division III has six tiers with 180 cells or living units (R. 22).

Each new prisoner admitted to the jail has his or her level of security risk evaluated by jail staff (R. 39). Prisoners are classified as either a minimum, medium or maximum security risk (R. 40). The security risk evaluation accomplished through a point system which among other things considers any prior convictions of the prisoner, the nature of those convictions, the nature of the pending criminal charge(s), the prisoner's age, any known gang affiliation, the stability of the prisoner's prior living arrangements and whether the prisoner was involved in any prior institutional escapes or had any prior disciplinary problems (R. 41). Currently 34% of all prisoners at the jail are classified as maximum security (R. 42). Approximately 18% of female prisoners at the jail have a maximum security classification (R. 43). The same approximate percentages of male and female prisoners at the jail were classified as maximum security in 2001 and 2002 when the weekend lockdowns in Divisions III and IV were being held (R. 44).

During the intake process at the jail, each new prisoner is medically and psychologically evaluated and screened by an independent team of trained medical and mental-health personnel who were either employed by or under contract with Cermak Health Services (hereinafter "Cermak personnel") (R. 45). Female prisoners with special medical needs such as substance abuse or who are pregnant, depending upon the state of the pregnancy are housed in Division III of the jail (R. 46). Prisoners in Division III are grouped together on tiers based on the nature of their medical need. For example, the jail attempts to house all prisoners receiving methadone on the same tier in Division III (R. 47). The Cermak personnel performing the medical and psychological evaluations and screenings of new prisoners at the jail determine if a female prisoner should be assigned to Division III, Division IV or should be sent to Cermak's stand-alone health facility located on the jail's grounds (R. 48).

-4-

Additionally during the intake process, the Cermak personnel will assess whether a new prisoner suffers from any physical or mental condition which requires the administration of medication (R. 49). If Cermak personnel determine that a prisoner will require medication while at the jail, the type of medication as well as its dosage and frequency of administration will be noted in the prisoner's medical chart which will then be sent to the medical dispensary for the division to which that prisoner is assigned (R. 50).

In Division IV, female prisoners with a maximum security classification are generally segregated by tier from prisoners with a medium or minimum security classification (R. 51). Division IV also has several "program tiers." On those program tiers, prisoners are not segregated by their security classification but rather, are grouped together by virtue of their enrollment in a specific program at the jail such as the jail's "school program," the "dare to be different program" which focuses on drug avoidance, respect for life, self-dignity and religious believes or the "Gateway program" which focuses on drug rehabilitation (R. 52). To gain entry into such a program tier in Division IV, prisoners must request admission and be accepted into the program (R. 53).

Divisions III and IV each have their own nursing station which includes a medical dispensary stocked with various medications. Those stations are also equipped with medical equipment to evaluate and to provide care to prisoners in those divisions (R. 32). During the weekend lockdowns that formerly occurred in Divisions III and IV, nurses who were either employed by or under contract with Cermak Health Services were stationed at those nursing stations around the clock ("24 x7") and were available to assess a prisoner's condition and provide medication, medical care and treatment at all times while those divisions were on lockdown (R. 102). Additional medical and/or mental health services were available and were provided to prisoners during the weekend lockdowns that occurred in Divisions III and IV at Cermak's stand-alone healthcare facility on the jail's grounds or at an outside hospital facility (R. 33, 150-53).

The Cook County Jail is currently accredited by the American Correctional Association (ACA) and was accredited by the ACA during the time when the weekend lockdowns in Divisions III and IV were being held (R. 37). The Cook County Jail is the largest jail in the United States to receive accreditation by the ACA (R. 38).

**B.** THE COUNTY JAIL IS NO LONGER HOLDING WEEKEND LOCKDOWNS.

The type of weekend lockdowns which are the subject of plaintiffs' lawsuit are no longer being conducted in either the men's or women's divisions of the jail (R. 273). The former executive director of the jail, Callie Baird, stopped the practice of holding periodic weekend lockdowns in the men's divisions of the jail well over one year ago (R. 274). The jail stopped holding weekend lockdowns of the women's divisions even before the lockdowns of the men's divisions were stopped (R. 275). The current acting director of the jail has no intention of reinstituting weekend lockdowns at the jail (R. 276). In paragraph 1 of their Third Amended Complaint, plaintiffs asserted that "the Jail has not conducted a weekend lockdown in either Division Three or Four" (the women's divisions) since approximately March 12, 2003.

**C.** PURPOSE OF WEEKEND LOCKDOWNS.

Weekend lockdowns of an entire division of the jail were held to make a thorough search for weapons, drugs or contraband throughout all areas of a division of the jail (R. 62). The purpose of those weekend lockdowns was not to punish a particular detainee or group of prisoners at the jail (R. 63). Rather, their purpose was to search, find and confiscate drugs, weapons or other items of contraband inside the jail before a violent outbreak or incident occurred (R. 64). Emergency lockdowns of an entire division have also been held at the jail following a violent outbreak or disturbance, but plaintiffs are not contesting the need to conduct emergency lockdowns at the jail (R. 70; Ex. A, ¶23).

Contraband is any object or thing that a prisoner is not permitted to have in the jail; any object or item that is used in a fashion other than its intended purpose or anything found in a location of the jail where it is not permitted (R. 54). Common objects that prisoners are allowed to have in their cells such as toothbrushes or pens have been converted into crude weapons by sharpening down their edges or by inserting a pen, paperclip or sharp object into one of its ends (R. 55). Weapons and contraband can be fashioned out of virtually anything inside a prisoner jail (R. 56). For example, cardboard toilet paper holders have been converted into crude pipes for smoking drugs by carving out or cutting out a portion of cardboard and then inserting tinfoil into the opening. Toilet paper will then be wrapped around it in an attempt to prevent its discovery (R. 57). Extra bedding sheets can be torn into strips to form a rope (R. 58). Small thin metal objects can be used to pick locks (R. 59). Prisoners at the jail have broken off pieces of metal from plates or grates in the walls or even from the sides of risers in the jail's gymnasiums.

They then have sharpened or bent the piece of metal so that it has a point and thereby fashion a home-made weapon which is referred to as a shank (R. 60).

The discovery and confiscation of weapons, drugs or items of contraband in the jail makes it a safer and more secure facility not only for correctional staff, but also for prisoners housed in the jail (R. 66). Weapons, drugs and contraband have been found during division-wide searches that occurred during weekend lockdowns that were held at the jail (R. 67). Photographs of weapons discovered inside the jail are attached as Group Exhibit No. 1 to the Declaration of Scott Kurtovich (R. 68-69).

**D.    REASON THE LOCKDOWNS WERE HELD ON WEEKENDS.**

Division-wide lockdowns occurred on weekends at the jail because during weekdays, the Sheriff transports up to *1,000 prisoners* per day to and from various courthouses throughout Cook County (R. 85). Additionally, from Monday through Thursday of each week, between 50 and 350 male and/or female prisoners are transported by the Sheriff to the Illinois Department of Corrections (R. 86). The only courts that are typically in session during a weekend are bond courts and correctional staff at the jail do not have to transport prisoners to court as a result on the weekend (R. 87). Because there was no movement of prisoners from the jail to court or to the IDOC, the division-wide lockdowns were held on weekends (R. 88).

**E.    MOVEMENT OF CONTRABAND AT THE JAIL.**

Anytime a prisoner moves from location to another within the jail or even with a division of the jail, the potential exists that a weapon, drugs or an item of contraband can be moved to a different location, transferred to another prisoner or secreted in a hiding place (R. 71). Female prisoners have secreted small weapons or items of contraband in the soles of their shoes, in the braids of their hair, in their bras, in their panties and in their vaginal area (R. 75).

Weapons or items of contraband can be secreted on the underside of surfaces through the use of gum, toothpaste or other substances in any areas of the jail that a prisoner has access to (R. 84). Contraband or weapons can also be secreted in food trays or garbage bags or in mops and cleaning buckets used and moved by prison workers during weekend lockdowns (R. 76).

The jail has discovered that prisoners have passed items into and through vents or ducts located in jail cells and in various common areas of the jail which lead directly to ventilation shafts which run between various floors of a division of the jail (R. 80-81). Various items of contraband have been discovered by correctional officers when searching the openings of those

vents or ducts (R. 81). This means that prisoners have attempted to pass weapons or items of contraband to other prisoners on tiers above or below them (R. 82). Prisoners on the tier above lower string through the vent or duct to a prisoner below who would then tie the string around a weapon or an item of contraband and pull it up through those vents or shafts (Id). Prisoners have also attempted to lower items of contraband through the vents or ducts to prisoners below them in a similar fashion. (Id.) The jail has also discovered that prisoners have attempted to pass small weapons or items of contraband wrapped in cellophane through the plumbing pipes of the jail (R. 83).

For fire safety reasons, the tier interlock door is not the only means by which a prisoner can exit or leave a tier in Divisions III or IV in the event of an emergency. Each tier in Divisions III and IV also have a fire door which is normally kept locked which opens onto a common stairwell (R. 77). The common stairwells in Divisions III and IV which the fire doors open onto are used to move prisoners between floors of those divisions. The jail has had instances where prisoners have slid items of contraband under a fire door into a common stairwell which would allow an item of contraband to be picked up by another prisoner walking up or down that stairwell (R. 77-79).

## F.   PRISONERS ARE LOCKED IN THEIR CELLS AT LEAST HALF OF EACH DAY UNDER NORMAL CONDITIONS.

Normally during each day at the jail, prisoners are locked in their cells at approximately 1:30 p.m. for several hours to obtain a "head count" of prisoners in the division and to permit a shift change of correctional officers to safely occur (R. 28). Prisoners are also locked in their cells at night from approximately 9:00 p.m. until approximately 7:00 a.m., except for approximately thirty (30) minutes in the morning when they receive their breakfast (R. 29). Thus, under normal conditions, prisoners are locked in their cells for at least half of each day (R. 30). During the time when prisoners are locked in their cells, they can read their mail, write letters, or read paperback books, magazines or religious reading materials which they are allowed to have in their cells. If they are in school at the jail, prisoners can read any school books or work on school projects in their cells. They can do crossword puzzles or play cards which are available through the jail's commissary (R. 31).

**G.    THE MANNER IN WHICH WEEKEND LOCKDOWNS WERE HELD.**

The weekend lockdown searches of Divisions III and IV were manually completed. The jail did not have any portable magnetometers, fluoroscopes or other electronic equipment available to use during those searches (R. 94). Administrators at the jail attempted to vary the interval between the weekend lockdowns of a specific division of the jail so that the lockdown searches did not occur under any recognizable pattern so that prisoners housed in a particular division could not predict when a weekend lockdown was likely to occur (R. 95). The jail varied the time intervals between the weekend lockdowns in an attempt to increase the effectiveness of the searches that were made during those lockdowns (R. 96). Many of the weekend lockdowns that occurred in Division III began on Saturday morning, not Friday afternoon (R. 97-99). There was no set time when the weekend lockdown was to end on a Sunday (R. 124). Once the search of the entire division was completed, the lockdown was lifted (R. 125).

During the weekend lockdown, all areas of the division on lockdown were searched (R. 106). Weekend lockdown searches of a division were different than other searches of a cell or a tier that occur at the jail. They were more intense and more comprehensive than those other searches (R. 107). The jail's policy was that during a weekend lockdown search, correctional officers were to check the integrity of the outside walls of the cell, to search for extra bedding or clothing in the cell, and to check the cell's electrical fixtures. In addition, the areas around, under, inside of or behind any mirror or objects on the wall, including any vents, ducts or grates in the wall were to be searched as well as the toilet and sink areas and any mattresses, pillows or bed frames in a jail cell (R. 108). Every object in the cell was to be searched including all items of personal property. The tops of containers were removed and correctional officers were to look inside of anything in which a weapon or item of contraband could be hidden (R. 115). While the prisoners' cells on a tier were being searched during a weekend lockdown, prisoners were removed from their cells (R. 129).

The weekend lockdown searches included all hallways, common areas, shower rooms, clothing rooms, recreation rooms, dayrooms, libraries, chapels, visitation rooms, storage rooms, classrooms, gymnasiums, lobbies, beauty shops as well as any other area in a division where a weapon or item of contraband could be hidden (R. 109). All objects in any area searched, in which or under which a weapon or item of contraband could be hidden had to be opened and examined (R. 110). This meant desk drawers, tables, chairs, books, clothing bags, jars and board

games had to be searched (R. 111). There are a large number of books in classrooms and libraries that can be a hiding place for drugs, a weapon or contraband which were searched during the weekend lockdowns (R. 112). Some of the common areas of the division would be searched at night while the prisoners were asleep (R. 114).

The length of time it would take to search an area during the weekend lockdown would depend upon the number of correctional officers involved, the thoroughness of an individual officer's search, the number of objects or items that had to be opened, looked under or examined and the nature of anything seized during the search (R. 118). The discovery of a weapon or drugs in a prisoner's cell would lengthen the time it took to complete the search of a tier because correctional staff had to properly inventory the item recovered and investigate which prisoner was responsible for possession of the contraband (R. 119).

There were no set or specific number of correctional officers assigned to search the living units or common areas of a division during a weekend lockdown. The number of officers varied depending upon the number of correctional officers then available (R. 120). Correctional officers who were assigned to search the division during a weekend lockdown were frequently pulled off of the search assignment to perform other tasks such as transporting prisoners to Cermak or to the division's medical dispensary for treatment, which impacted the time to complete the search of an area (R. 121).

During the weekend lockdowns in Divisions III and IV, correctional officers would not search a prisoner's cell or a tier during the time when prisoners on that tier were eating a meal (R. 122). There was also a three-hour time frame during each shift when one-third of correctional staff in the division was at lunch and during that time frame, searches could not be performed (R. 123).

## H.   ESSENTIAL SERVICES WERE PROVIDED DURING A WEEKEND LOCKDOWN WHICH RESULTED IN PRISONER MOVEMENT OUT OF THEIR CELLS.

Essential services were provided to prisoners during weekend lockdowns including medical care (R. 22, 102). At all times during the weekend lockdowns, nursing staff were stationed at the nursing stations in Divisions III and IV and were available to evaluate, triage, treat and provide care to prisoners during those weekend lockdowns (R. 102-04, 226, 228). During the lockdowns, nurses from the division's medical dispensary would periodically visit the tiers to deliver and administer medication to prisoners at their cells (R. 103, 227). Nursing staff

also responded to calls from correctional officers when medical assistance was requested on a tier during a weekend lockdown (R. 104).  Certain types of medications and medical care could not be delivered or administered to prisoners in their cells.  When that situation arose during a weekend lockdown, prisoners were escorted to the division's medical dispensary for additional care (R. 105, 231-232).  Nurses' visits to various tiers in Divisions III and IV while on lockdown were documented in Officers Living Unit Logs, examples of which are attached as Group Exhibit 3 to the Declaration of the acting director of the jail (R. 230).  Several plaintiffs have admitted seeing the division's nurse and receiving medical care during weekend lockdowns (R. 156-57).  One plaintiff (Ms. Gandy), admitted that she was released from her cell and moved off of her tier during a weekend lockdown to receive that care (R. 156).

During weekend lockdowns, prisoners were also taken to the Cermak Health facility on the jail's grounds for the administration of medication and medical care that could not be provided at the prisoner's cell (R. 150-153, 233-34).  Prisoners were taken to Cermak for x-rays, testing and emergency care, among other things, during a weekend lockdown when nursing staff felt such care was required (R. 234).  If additional care was required, prisoners were transported to an outlying hospital during the weekend lockdowns (R. 235).  Prisoners were also taken off their tier for psychiatric evaluations when necessary during those lockdowns(R. 159-164, 166, 236-38).

Meals were delivered to prisoners in their cells while a weekend lockdown was in effect on the regular meal schedule (R. 213).  Correctional officers either delivered those meals to prisoners in their cells or accompanied a living unit worker as she delivered the meals (R. 214).

Prisoners were allowed to be out of their cells and off of their tiers for 30 minute visits with family and friends if a visit had been previously scheduled in accordance with the jail' rules and regulations or where the visitor had traveled more than 150 miles (R. 134-137).  Visits for an unlimited period of time with an attorney were also permitted during the weekend lockdowns (R. 138).  Those visits are documented in visitation logs which are attached as Group Exhibits 5 through 47 to the Declaration of the jail's acting director (R. 143-146).  Two of the named plaintiffs were allowed out of their respective cells to receive a visitor during a weekend lockdown of their division (R. 147-49).  These visits were allowed because either the wholesale cancellation of prearranged visits or the wholesale denial of visits for prisoners in a division on a particular weekend would alert prisoners in that division that a lockdown was likely to occur

which would provide them with an opportunity to move or secrete contraband elsewhere in that division or elsewhere in the jail (R. 134).

Prisoners were discharged from the jail during weekend lockdowns upon the completion of their sentence, upon placement in a furlough program or after their bond was paid (R. 194, 200). Additionally, a significant number of prisoners served as "living unit workers" and "building workers" who were permitted to be out of their cells for extended periods of time during the lockdowns to assist in the delivery of food and to clean the jail's common areas (R. 177-180, 184, 186-188, 200). Building workers moved between tiers when performing their services (R. 178-183). Prisoner movement out of their cell and off tier during the weekend lockdowns that occurred in Divisions III and IV were recorded in Movement Logs which are attached as Group Exhibits 48 through 86 to the Declaration of the acting director of the jail (Ex. B) (R. 196-200).

Prisoner movement out of their cells and off of their tiers was not eliminated during the weekend lockdowns because the essential services described above were provided to prisoners during the lockdowns (R. 91-93, 127). It was impossible to eliminate prisoner movement outside their cells and/or off their tiers during a weekend lockdown because of the provision of those services (R. 91-93, 127-128). During the weekend lockdowns that formerly occurred in Divisions III and IV, no prisoner remained in her cell the entirety of the weekend lockdown (R. 129-30, 168-72, 176).

I.    **PRISONERS WERE NEVER OUT OF THE SIGHT OR HEARING OF CORRECTIONAL OFFICERS FOR AN EXTENDED PERIOD DURING WEEKEND LOCKDOWNS.**

Prisoners were not out of the sight and hearing of correctional guards for an unreasonable length of time during the weekend lockdowns at issue because during those lockdowns, correctional officers checked on the prisoners' status every half hour (R. 203). Additionally, correctional officers at the jail are required to make "head counts" of prisoners on their tiers three times a day and those counts were made during weekend lockdowns. (R. 210). Correctional officers would make those 30 minute status checks and head counts by walking the hallway outside of each cell and verbally or visually checking on the status of prisoners in their cells (R. 205, 211). Those 30 minute checks were documented in Officer's Living Logs, examples of which are attached to the Declaration of the jail's acting director Group Exhibit 3 to Ex. B (R. 207-209).

-12-

Every time a prisoner returned to her cell after having left it for the various reasons noted above, a correctional officer had to manually lock the prisoner's cell door (R. 218). While correctional officers could open jail cells electronically from the tier monitoring station, the cells had to be manually locked (R. 216-17). This provided the correctional officers with another opportunity (in addition to the 30-minute security checks, head counts and at meal delivery) to determine the status of the prisoners in their cells (R. 219). Thus, there was ample opportunities for prisoners while they were in and out of their cells to communicate their concerns or problems with correctional staff during the course of those lockdowns (R. 219, 215, 212).

## J.   REASONS WHY TIERS WERE NOT TAKEN OFF OF LOCKDOWN AFTER SEARCH OF THE TIER WAS COMPLETED.

There were several reasons why a tier was not taken off of lockdown after a search of the tier was completed. First, not all prisoner movement off of the tiers was eliminated (R. 128, 253-54). At various times during the weekend lockdowns at issue, prisoners were permitted out of their cells and moved off of their tiers for visits with attorneys, family members or friends; to serve as building workers, for visits to the division's medical dispensary, for visits to Cermak or an outlying hospital, for psychiatric screenings, when discharged from the jail or when transferred to a different division of the jail (R. 127, 135-138, 145-154, 159, 169-172, 177-188, 194-95, 254). While it is the jail's policy to pat-down a prisoner whenever she was permitted out of her cell during a weekend lockdown in Divisions III or IV, jail administrators recognized that this did not eliminate the possibility that a small item of contraband or a weapon could be missed or that another prisoner could pass an object to the prisoner after she had been patted down when a correctional officer was not looking (R. 72-75, 255-56).

Contraband or weapons can also be moved through food trays or garbage bags that were collected and moved by building workers or in the mops and cleaning buckets used by those workers (R. 76, 257). As a result, building workers who moved between different tiers of the division could either willingly or be forced to unwillingly move a weapon or an item of contraband to a different location in the division after it had been searched during the weekend lockdown (R. 258). Building workers have been found in possession of contraband at the jail (R. 193). Thus, it would be wrong from a correctional and security perspective to assume that simply because living unit and building workers had a minimum security classification, that they

would not either willingly participate or that they could not be forced to participate in the trafficking or movement of weapons, drugs or contraband at the jail (R. 192).

Additionally, there are fire doors for each tier in Divisions III and IV which open up onto a common stairwell that is used for prisoner movement during weekend lockdowns (R. 259-61). Correctional staff at the jail have found items of contraband that have apparently been slid under a fire door into a stairwell so that it could be picked up another prisoner who was walking up or down that stairwell (R. 260). If prisoners were released from their cells after a search of the tier was completed during the lockdowns that occurred in Divisions III and IV, prisoners could slide contraband under the fire door which could then be retrieved by another prisoner who was walking up or down that common stairwell (R. 262). By keeping prisoners in their cells during the weekend lockdowns after the tier had been searched, correctional staff attempted to eliminate that means of moving contraband onto or off of a tier during a weekend lockdown (R. 264). Prisoners have also attempted to pass items into and through vents or ducts located in jail cells and in various common areas of the jail by the use of string to prisoners on tiers above or below them (R. 265).

Because correctional staff at the jail wanted to make the search for weapons and contraband as effective as possible during a weekend lockdown, in view of the prisoner movement off of the tiers that occurred during those weekend lockdowns and the ability to pass items through vents or shafts or under fire doors, correctional staff felt it was imperative to keep the division on lockdown and not release prisoners from their cells into the dayrooms until the search of the entire division was completed (R. 266).

Additionally, permitting prisoners to have access to the dayroom area after a tier had been searched would permit a prisoner to potentially transport a weapon or item of contraband into the dayroom where not just one or two other prisoners from that cell were located, but where an entire tier of prisoners could mingle and interact. If such an operational practice were permitted, a prisoner could transfer possession of a weapon or item of contraband to any other prisoner on the tier if she was so inclined, to use a weapon against another prisoner in the dayroom or to hide the weapon or contraband in the dayroom after it had been searched (R. 267). It was the opinion of the jail's administration that such an operational practice – permitting prisoners to be out of their cells after the search of the tier was completed – should not be permitted because the typical weekend staffing pattern in the division could not be followed

-14-

during the weekend lockdowns because a number of correctional officers were pulled from their normal posts and assigned to a team that searched other areas of the division (R. 268).

Further, because the number of correctional officers assigned to a division was less on a weekend than a weekday and because correctional officers were pulled from their usual assignments to participate in searches that occurred during a weekend lockdown, it was the opinion of jail administrators that allowing a group of potentially violent prisoners to mingle in dayrooms and other similar areas for an extended period of time during a weekend lockdown could be more dangerous to staff and prisoners should a disturbance occur in a dayroom and that the prisoners would be safer if they remained in their cells during weekend lockdowns (R. 268-69). If a disturbance occurred in a jail cell, only two or perhaps three prisoners who were assigned to that cell would have to be controlled (R. 270). If prisoners were allowed out into the dayroom after a search of the tier was completed, between 30 and 50 prisoners would potentially have to be controlled if a disturbance occurred in the dayroom during a weekend lockdown (R. 270-71). This concern was especially heightened on those tiers where large numbers of gang members or prisoners with maximum security classifications were housed together (R. 272).

## K.  PROGRAMS OFFERED TO FEMALE PRISONERS AT THE JAIL.

Historically, the Sheriff has offered various programs to female prisoners in Divisions III and IV of the jail (R. 277). Any female prisoner under the age of twenty-one (21) who does not have a high school diploma is eligible to participate in the York Alternative School at the jail which offers a high school education program sponsored by the Chicago Board of Education (R. 278-79). Special education is also offered to prisoners up through the age of twenty-two (22) through an inclusion model at the jail (R. 280). The jail also makes college-level courses available through the City colleges (R. 281).

The jail has contracted with Gateway to provide substance abuse treatment in its various divisions including Divisions III and IV (R. 282). The services of Alcoholics and Narcotics Anonymous are also available in each division of the jail (R. 283). The jail also provides prenatal classes and classes on problem pregnancies to female prisoners with information on nutrition, safe sex, parenting skills, exercise and personal hygiene for detainees (R. 289). The American Correctional Association in its last certification of the Cook County Jail commended the jail on the number and variety of programs which are offered to the prisoners there (R. 292).

L.   **STAFFING ISSUES DURING WEEKEND LOCKDOWNS.**

During the weekend lockdowns that occurred in Divisions III and IV, all essential posts in a division had to be staffed by correctional officers at all times while the lockdown remained in effect (R. 239). Security posts which had to be staffed at all times included all entrances and exits to the division, the division's security office, the front lobby, the main interlock into the division, the tunnel area through which access into the division can be gained and the various tier monitoring stations (R. 240). Each division of the jail has its own separate clothing and storage rooms where a prisoner's personal belongings, as well as jail uniforms, pillows, sheets, blankets and mattresses are stored. Those rooms had to remain open during weekend lockdowns so that discharged prisoners could return their jail uniforms, mattresses, blankets and pillows from their cell and obtain their personal clothing and belongings and so that new prisoners could obtain the items before being escorted to their cells by a correctional officer (R. 241). The division's clothing, storage rooms and visiting areas also had to be staffed during a weekend lockdown by correctional officers (R. 242).

Generally, there are less correctional officers working at the jail on weekends than during weekdays because prisoners are not transported to county courtrooms or to the IDOC on weekends (R. 249-250). A higher number of correctional staff also call in sick or take a lot of "comp time" on weekends during the weekdays which impacts the total number of correctional officers available for a division during a weekend lockdown (R. 251). Weekend staffing patterns that were typically followed in Divisions III and IV were not followed on lockdown weekends because officers were pulled from their normal assignments to search areas of the division (R. 252). Correctional officers were not pulled from other divisions of the jail to perform the weekend lockdown searches that occurred in Divisions III and IV. The jail did not have extra correctional officers working on the weekends and that type of temporary reassignment could create staffing issues and possible operational risks in other divisions of the jail because officers would have to be pulled from their regular assigned posts or duties (R. 296). Additionally, a routine temporary reassignment during a weekend lockdown would violate the terms of a collective bargaining agreement entered into between the Sheriff and the bargaining unit for correctional officers at the jail (R. 293-94).

**M.**   **NUMBER OF CORRECTIONAL GUARDS AT THE JAIL.**

In 1995, there was 2,496 correctional officers at the jail (R. 297). From 1996 through 1998, there were 2,446 correctional officers at the jail (R. 298). From 1998 through 2001, the number of correctional officers at the jail was 2,426 (R. 299).

The Sheriff can recommend it has no direct control over his annual budget at the jail which by statute is set by the Cook County Board of Commissioners (R. 300). The maximum number of correctional officers that can work at the jail, and their pay is capped on a yearly basis by that annual budget (R. 301).

**IV.**   **LEGAL ARGUMENTS IN SUPPORT OF SUMMARY JUDGMENT**

**A.**   **BECAUSE PRISONERS WERE NEVER OUT OF THE SIGHT OR HEARING OF CORRECTIONAL OFFICERS FOR AN EXTENDED PERIOD OF TIME PLAINTIFFS HAVE NO VALID CLAIM UNDER SEVENTH CIRCUIT'S DECISION IN *HART*.**

The cause of action specifically recognized by the Seventh Circuit in its *Hart* opinion focused on the essence of plaintiffs' claim – that plaintiffs' constitutional rights under the Fourteenth Amendment were allegedly being violated because during the weekend lockdowns, "the jail [was] subjecting [plaintiffs] to a risk of serious harm by an unreasonably protracted detention out of the sight and hearing of the guards." *Hart*, 396 F.3d at 894.

However, as defendants have demonstrated above, during the course of those lockdowns, 30 minute security checks were made (R.203-09), and three (3) additional "head counts" were made each day (R. 210-12). Those security checks and head counts were made by a correctional officer visually or verbally checking on the status of prisoners in their cells (R. 205, 211). Additionally, correctional officers either delivered meals to prisoners in their cells or accompanied a "living unit worker" when those meals were delivered while a lockdown was in effect (R. 213-15). Furthermore, every time a prisoner returned to her cell during a lockdown, a correctional officer had to accompany the prisoner to her cell because the cell doors in Divisions III and IV had to be manually locked (R. 216-19). Those operational practices establish as a matter of law, that prisoners were not out of the sight and hearing of correctional staff for an unreasonable period of time during the weekend lockdowns at issue.

*Butera v. Cottey*, 285 F.3d 601 (7th Cir. 2002), concluded that the Sheriff of Marion County Indiana had taken appropriate precautionary measures against violence in his jail. In support of that conclusion, the *Butera* court pointed to the fact that the officers patrolled the

-17-

cellblock "once per hour and during meals." *Butera*, 285 F.3d at 608. *Butera* observed that during those times, detainees could bring to a guard's attention the fact that a detainee was having problems with his cellmate. *Id.*

Here, correctional officers made security checks twice as often than in *Butera* (every 30 minutes). Correctional officers also made head counts three times each day a lockdown was in effect and, as in *Butera*, they were also present when meals were delivered to prisoners in their cells. Because the cells in Divisions III and IV had to be manually locked, a correctional officer had to walk all prisoners back to their cells. During the weekend lockdowns at issue, there were numerous when correctional officers checked on the status of their prisoners in their cells and numerous opportunities for prisoners to bring problems or concerns to the attention of correctional staff. Thus, following *Butera*, the Sheriff took more than appropriate measures to ensure the safety of the prisoners during the course of the weekend lockdowns and defendants are entitled to summary judgment as a matter of law.

**B.**   **PLAINTIFFS LACK STANDING TO OBTAIN INJUNCTIVE RELIEF AND THEIR CLAIMS FOR INJUNCTIVE RELIEF ARE MOOT.**

Plaintiffs' claim for injunctive relief is moot. The jail is no longer holding weekend lockdowns of the type at issue and the current Acting Director of the jail has no intention of reinstituting them (R. 273-76). In fact, plaintiffs asserted in the very first paragraph of their Third Amended Complaint that since approximately March 2003, the jail has stopped holding weekend lockdowns in the women's divisions of the jail. Accordingly, plaintiffs lack "standing" to seek injunctive relief. Standing to bring a claim is an essential element "of the case-or-controversy requirement of Article III of the constitution." *Perry v. Village of Arlington Heights*, 186 F. 3d 826, 829 (7th Cir. 1999). To establish standing, plaintiffs must "show that [they 'have] sustained or [are] immediately in danger of sustaining' some direct injury as a result of the challenged official conduct, and that the injury or threat of injury must be both 'real and immediate,' not 'conjectural or hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). Past exposure to allegedly illegal conduct does not grant a party standing to obtain injunctive relief. *Id. Lyons* held that plaintiffs lacked standing to obtain injunctive relief because they could not show that they would be subjected to a choke hold by members of the City's police department.

Where an issue has been rendered moot for purposes of pending litigation, plaintiffs are precluded from obtaining injunctive relief that a part's past practices purportedly violated federal law. *Green v. Mansour*, 474 U.S. 64, 69-73 (1985). If there is no continuing conduct that allegedly violated federal law, an Article III court lacks the authority to enter injunctive relief. *Dial v. Coler*, 791 F.3d 78, 80 (7th Cir. 1986). For the aforementioned reasons, plaintiffs lack standing to obtain injunctive relief in this matter.

Plaintiffs cannot avoid their lack of standing or dodge the mootness doctrine by speculating that they "could" again be subjected to a weekend lockdown search at some point in the future if they happen to be arrested again *and* if the jail happens to reinstitute its now discarded practice of holding weekend lockdown searches. "The capable of repetition doctrine applies only in exceptional situations and generally only where the named plaintiff can make a reasonable showing that he will again be subject to the alleged illegality." *Higgason v. Farley*, 83 F. 3d 807, 811 (7th Cir. 1996). Simply put, plaintiffs cannot make such a showing, and there claims for injunctive relief should be summarily rejected based upon the authorities cited above.

**C.     WEEKEND SEARCHES FOR CONTRABAND HAD A LEGITIMATE PURPOSE.**

Defendants submit that no further analysis is required of the claim recognized by the Seventh Circuit in this matter in light of the legal and factual arguments noted above. However, in light of the pendency of defendants' Motion to Strike and Dismiss plaintiffs' Fourth Amended Complaint, to the extent that plaintiffs view their claim to be any broader than the specific cause of action recognized by the Seventh Circuit in *Hart*, defendants submit the following additional argument and authorities in support of their summary judgment motion.

The purpose of the weekend lockdowns formerly held at the jail was not to punish the detainees at the jail, rather they were to search for weapons and contraband before a violent outbreak at the jail occurred (R. 62-64). The discovery and confiscation of weapons, drugs or items of contraband makes the jail a safer and more secure facility for both staff and prisoners (R. 66). No one can dispute the legitimacy of that purpose. Indeed the Seventh Circuit has recognized that "[a]n inmate in possession of a weapon can pose a threat to prison employees, other inmates and the surrounding community itself." *Spiegla v. Hull*, 371 F.3d 928, 936 (7th Cir.2004). In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Court similarly noted that jail officials "must be able to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees." *Id.* at 540. In a slightly different context, the Supreme Court

recently reaffirmed that the "necessities of prison security and discipline" supply a compelling governmental interest. *Johnson v. California*, __ U.S. ___, 125 S. Ct. 1141, 1150 (2005).

The constitutionality of the weekend lockdowns depend upon whether the conditions during the lockdowns "amount to punishment of the detainee." *Bell*, 441 U.S. at 535. "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination" turns on whether those lockdowns were rationally connected to that purpose (the search for weapons and contraband) or were excessive in relation to that purpose. *Id.* at 538.

Since security related problems at correctional facilities are not susceptible to easy solutions, the Supreme Court has cautioned that correctional officials should be afforded wide-ranging deference in the adoption and execution of policies and practices, that in their judgment are needed to preserve order and maintain security. *Id.* at 547-48. That is especially true for a facility as large and complex as the Cook County Jail (R. 13-14). Recently, the Seventh Circuit described the jail as having the population "of a town," *Holly v. Woolfolk*, 415 F.3d 678, 679 (2005), and recognized the dangerousness of the jail's general population. *Id.* Indeed, the jail admits approximately 100,000 persons annually (R. 19), 34% of whom are classified as "maximum security" (R. 42).

"The fit between the jail's legitimate interests and its policy need not be perfect in order to survive scrutiny, it need only be rational." *Russell v. Richards*, 384 F.3d 444, 448 (7th Cir. 2004). *Bell* explained that a particular restriction or condition would not be reasonably related to a legitimate goal "if it is *arbitrary or purposeless*." 441 U.S. at 539. (emphasis added). In an analogous context, the Supreme Court explained that "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner v. Safley*, 482 U.S. 78, 89-90 (1987). When a condition is found to be arbitrary or purposeless, *Bell* explained that "a court permissibly may infer that the purpose of the governmental action is punishment that may not be constitutionally inflicted." *Id.*

In the case at bar, the weekend lockdowns where not arbitrary or purposeless. There is no dispute that they were intended to increase the safety of the jail. Contraband was found during the weekend lockdowns of the jail (R. 67-69). Clearly, discovery of contraband and weapons in the jail made it a safer and more secure facility for both correctional staff and the prisoners housed there (R. 66). Thus, there was a rational relationship between the weekend

lockdowns and the jail's legitimate interests in maintaining security at the jail and attempting to prevent detainees from having weapons or items of contraband.

**D.    EXISTENCE OF DIFFERENT OR PURPORTEDLY BETTER POLICIES IS IRRELEVANT.**

Before turning to the second part of *Bell's* two-prong test – whether the weekend lockdowns were "excessive in nature" – one point bears mentioning.   The Seventh Circuit has repeatedly held "the 'existence or possibility of other policies which might have been used does not mean that the [jail officials were] being deliberately indifferent.'" *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003), quoting *Buttera*, 285 F.3d at 605; *see also Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2001).   Thus, the fact that plaintiffs believe that there may have been other or better ways to search for contraband at the jail or another way the weekend lockdown searches could have been run does not establish that the way the lockdowns violated the constitution.

**E.    MERELY BECAUSE PLAINTIFFS WERE KEPT IN THEIR CELLS LONGER THAN UNDER NORMAL CONDITIONS DOES NOT ESTABLISH A CONSTITUTIONAL VIOLATION.**

In its *Hart* opinion, the Seventh Circuit did <u>not</u> hold that a cause of action was stated merely because prisoners were locked up over a weekend.   Rather, a claim was stated because they were allegedly out of the sight and hearing of the correction officers during the entirety of a weekend lockdown. *Hart*, 396 F.3d at 894.   Conspicuous by its absence was any suggestion by the Seventh Circuit in   *Hart* that the length of a lockdown was in and of itself violative of the Constitution.

In *Hutto v. Finney*, 437 U.S. 678, 687 (1978), the Court observed that conditions may "be tolerable for a few days and intolerably cruel for weeks or months."   Thus, while there may come a point in time when a challenged condition crosses the constitutional threshold by virtue of its continued existence, periodically keeping prisoners in their cells over a portion of a weekend does not suffice.   *See, e.g., Caldwell v Miller*, 790 F.2d 589, 600 (7th Cir. 1986) (being confined to cell 24 hours a day for a month did not violate the constitution); *Potter v. Clark*, 497 F.2d 1206, 1208 (7th Cir. 1974) (holding a pretrial detainee's placement in isolation on four occasions totaling eight days did not constitute punishment and finding the confinement was brief); *Buck v. Lake County Sheriff*, 2004 WL 2983966 *5-6 (N.D. Ill. 2004) ("Punishment requires something more than routine discomfort.   Punishment in a constitutional sense requires allegations of extreme deprivations of an extended period of time").

The fact that plaintiffs were allegedly locked in their cells for 48 to 50 hours, even if true, (and as demonstrated above it is not), would not establish a constitutional violation. Nor could it, because an acceptable correctional practice is to lock prisoners in their cells at night and at other times during the day. In fact, under "normal conditions" plaintiffs were locked in their cells at night and during afternoon shift changes (R. 28-30). *Hart* does not suggest that the Sheriff or any other jailer could not lock prisoners in their cells at night or at other times.

Following a prison disturbance, a lockdown of the jail or one of its divisions may be necessary to search for weapons. Plaintiffs do not contest the need to conduct that type of emergency lockdown (Ex. A, ¶27). The very same conditions and risks that *supposedly* existed during the weekend lockdowns would be present whenever plaintiffs were locked in their cells at night or at other times. Whenever they were locked in their cells, according to the logic of their legal theory, plaintiffs would have been out of the sight and hearing of correctional officers at the tier monitoring station. If such a practice is constitutionally acceptable when prisoners are locked in their cells at night or following a prisoner disturbance, then the weekend lockdowns at issue should be constitutionally permissible in view of the security checks, head counts and other operational practices that were followed during the lockdowns through which correctional officers routinely checked on the status of prisoners in their cells.

Moreover, if a lockdown of the jail of a similar duration to search for weapons would be permissible following a riot or disturbance, why wouldn't the same lockdown be constitutionally permitted to search for weapons or contraband before the disturbance occurred? Indeed, the Seventh Circuit has held that "prison officials need not wait for a problem to arise before taking steps to minimize security risks." *Hadi v. Horn*, 830 F.2d, 779, 784 (7th Cir. 1987). See also *Jones v. N.C. Prisoner's Labor Union, Inc.*, 433 U.S. 119, 132-33 (1977) ("responsible prison officials must be permitted to take reasonable steps to forestall a threat" before it occurs).

In the case at bar, given the fact that: (1) all prisoners on a tier were permitted out of their cells while those cells were being searched; (2) that prisoners with prearranged visits with family or friends or visits with an attorney – whether prearranged or not – were permitted to leave their cells for those visits (including two of the named plaintiffs); (3) that prisoners were permitted out of their cells to receive necessary medical or psychiatric care or treatment (including another one of the plaintiffs); and (4) that sizeable number of prisoners were permitted out of their cells to work during those "lockdowns," the incremental amount of additional time that plaintiffs were

kept in their cells during a weekend lockdown over the jail's "normal conditions" did not violate plaintiffs' constitutional rights under the circumstances.

**F.     PRISONERS WERE NOT EXPOSED TO GRATUITOUSLY BRUTAL TREATMENT AND LOCKDOWNS WERE NOT EXCESSIVE IN RELATION TO THEIR PURPOSE.**

*Hart* elaborated that where the issue involves whether a pretrial detainee is being allegedly punished by virtue of the conditions of her confinement, "the standards applicable to complaints by convicts and by pretrial detainees about unsafe conditions of confinement merge."[2]  *Id.*  *Hart* explained that when the issue involves the allegedly "brutal treatment" of inmates, the "interests of the prisoner is the same whether he is a convict or a pretrial detainee." *Id.* at 893.  Both a convicted prisoner and a pretrial detainee have "an interest in being free from gratuitously severe restraints and hazards, while the detention facility has an interest in protecting the safety of inmates and guards preventing escapes."  *Id.*  *Hart's* requirement that a plaintiff allege a "gratuitously severe" restraint is analogous to *Bell's* "clearly excessive" prong.

In the case at bar, the manner in which the weekend lockdowns were held did not expose prisoners to gratuitously brutal treatment.  Essential services were provided to them at all times during those lockdowns (R. 91-93).  Nursing staff was available at all times to provide, evaluate, treat and care for the prisoners during a lockdown (R. 102).  Nurses visited the tiers to provide medication and care (R. 103).  If medication or treatment could not be provided at a prisoner's cell, the prisoner was transported to the division's nursing station for care and then to Cermak or some other hospital facility if a higher level of care was felt by the nurse to be necessary (R. 105, 150-53).  In the event a psychiatric referral was needed for a prisoner during a weekend lockdown, prisoners were sent for such evaluation (R. 159-162).

Prisoners were also allowed to have visits with family and/or friends during a weekend lockdown where a visit was previously scheduled (R. 134-37, 143-49).  Attorney visits were also permitted on lockdown weekends (R. 138).  Meals were delivered (R. 213), correctional staff checked on the status of prisoners every 30 minutes and made head counts three times each day during a lockdown (R. 203-212).  There were ample opportunities for prisoners to speak to

---

[2]      As reiterated by *Hart,* where a prisoner challenges the conditions of his confinement, the standard applicable under the Fourteenth and Eighth Amendments is identical.  *See, e.g., Mayoral v. Sheahan,* 245 F.3d 934, 938 (7th Cir. 2001) (applying deliberate indifference standard to a pretrial detainee's claim that correctional officers failed to protect him from another inmate's assault); *Zentmeyer v. Kendall County, Ill.,* 220 F.3d 805, 810 (7th Cir. 2000) (applying deliberate indifference to a claimed denial of medical care and noting "the Fourteenth Amendment protects pretrial detainees under the same standard as the Eighth Amendment.

correctional staff about their problems and concerns (R. 212, 215, 219). Indeed, every time food was delivered, a prison worker returned to her cell or any other prisoner was returned following a visit, receipt of medical care or a psychiatric screen, correctional officers would walk the prisoner to her cell which allowed other prisoners to speak to the guard (*Id.*).

## G.   ASSERTIONS ABOUT ASSAULTS AND A SUPPOSED LACK OF CARE DO NOT ESTABLISH PLAINTIFFS WERE EXPOSED TO SYSTEMIC GRATUITOUSLY BRUTAL TREATMENT AS A RESULT OF LOCKDOWNS.

### 1.   NO CONSTITUTIONALLY RECOGNIZED CLAIM FOR FEAR FOR PERSONAL SAFETY.

Ordinary tort elements of injury and causation apply to plaintiffs' §1983 claim. Plaintiffs must demonstrate that they have suffered from an "actual present injury and a causal connection between that injury and the deprivation of a constitutionally protected right." *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999). Plaintiffs cannot state a constitutional claim for damages attributable to their fears for their personal safety and well-being.

*Babcock v. White*, 102 F.3d 267, 272 (7th Cir. 1996) explained "it is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment." In so holding, *Babcock* rejected a claim where the plaintiff "allege[d] that he suffered severe psychological distress as a result of finding himself in the proximity of those who would kill him." *Id.* at 271. While not condoning lapse security practices that may lead inmates to fear for their safety, the Seventh Circuit held that "*Babcock's* claim of psychological injury" was not actionable. *Id.* at 272.

Similarly, *Doe v. Welborn*, 110 F.3d 520 (7th Cir. 1997), held that "[a]n allegation that prison officials exposed a prisoner to a 'risk of violence at the hands of other inmates,'" was not actionable. *Id.* at 524. *Doe* rejected plaintiff's claim despite the fact that plaintiff claimed that he was subjected to "terror, psychological harm and deterioration, and suicide attempts that come from living with the constat threat of death." Thus, allegations that the lockdowns were unpleasant, humiliating or even terrifying, which caused plaintiffs to experience great emotional distress does not make their claim compensable. Rather, plaintiffs must assert some form of compensable harm before their claim becomes actionable.[3]

---

[3]   Plaintiffs Hart and Morales do not claim that they were physically injured or were denied medical care during weekend lockdowns (R. 302-04). Ms. Gandy did not experience any physical trauma or injury (other than shortness of breath allegedly due to asthma for which she was treated R. 156) during a weekend lockdown (R. 305), and she has not obtained any type of care, counseling or treatment for any

**2.   PLAINTIFFS HAVE FAILED TO ESTABLISH A FAILURE TO PROTECT CLAIM.**

Only plaintiffs Koss and Gelco claim that they suffered any physical trauma from a cellmate during a weekend lockdown (see footnote 3 below and Ex. A, ¶¶12, 49 for Ms. Morales). As explained below, even those assertions fail to state a cause of action under a failure to protect theory and thus, lend no credence to the claim that they or any other plaintiff was subjected to gratuitously severe conditions during the lockdowns.

To establish deliberate indifference, "a defendent must both be aware of facts from which the inference can be drawn that a substantial risk of harm exists, and he must also draw that inference." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Mayoral*, 245 F.3d at 938. Allegations that a defendant simply "knew or should have known" of a particular hazard is insufficient to state a claim. *Steidl v. Gramley*, 151 F.3d 739, 740 (7th Cir. 1998). *Rapier v. Harris*, 172 F.3d 999, 1006 (7th Cir. 1999), explained that "to violate a pretrial detainee's due process rights, prisoner officials would have to intend him to die or to suffer grievously, or they would have to act indifferently to a known risk that he would die or suffer grievously." It then reiterated "any act with a state of mind less than intent or criminal recklessness, such as negligence or gross negligence does not amount to punishment." *Id.  See also, Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) ("conduct is 'deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, 'the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so'").

While advanced knowledge of every detail of a putative assault is not necessary to meet the deliberate indifference threshold, a claim "cannot be predicated merely on knowledge of general risks in prison." *Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000). Because prison officials cannot be held vicariously liable under a theory of *respondeat superior*, demonstrating that correctional officers knew about a risk without more, will not impute knowledge to the officer's superiors. *Butera v. Cottey*, 285 F.3d 601, 607 (7th Cir. 2002). Unfortunately, despite the best efforts of administrators and staff, the risk of inmate assault is ever present at many prisons and correctional facilities around the country.

---

type of psychological, mental or emotional problem following the weekend lockdowns (R. 307). While Ms. Gelso claims he was struck by her cellmate and received an unspecified injury to her jaw during a lockdown, she never sought care or treatment for that alleged injury to her jaw when she was released from the jail less than two weeks later (R. 308-09).

Against this backdrop, plaintiffs have not pled nor have they proven that the Sheriff (or anyone else for that matter) was aware of the violent propensity of Ms. Koss and/or Ms. Gelco's cellmates, or was aware of any threat which their respective cellmates posed either to them or to those detainees during weekend lockdowns. Knowledge of general risks does not suffice. Accordingly, Ms. Koss and Gelco's allegation would not establish a claim under a failure to protect theory even if it had been pled, and do not support a claim that they individually or plaintiffs collectively were deliberately exposed to gratuitously brutal conditions by the defendants.

## H.   PLAINTIFFS' DENIAL OF MEDICAL CARE ALLEGATIONS DO NOT ESTABLISH A CONSTITUTIONAL VIOLATION.

Plaintiffs' allegations concerning the purported denial of medical care similarly fail to establish that they were exposed to gratuitously brutal treatment during a weekend lockdown. In order to establish a denial of medical care, plaintiffs must assert that the Sheriff was deliberately indifferent to their medical needs. *Chapman v. Keltner*, 24 F.3d 842, 845 (7th Cir. 2002). Liability is only triggered by conduct that is intentional or criminally reckless. *Id.* Thus, plaintiffs must assert that: (1) they had an objectively serious injury or medical need; and (2) that the Sheriff knew the risk of injury was substantial, but nevertheless failed to take reasonable measures to prevent it. *Id.* Additionally, the constitution does not require immediate administration of non-emergency medical care during a lockdown. *Lucien v. Godinez*, 814 F. Supp. 754, 757 (N.D. Ill., 1993). In *Lucien*, Judge Shadur held that the delay of a little over two weeks for non-emergency treatment of pain in the plaintiff's knee and jaw during a lockdown did not rise to the level of a constitutional violation.

In light of the foregoing, plaintiffs' contentions concerning a purported denial of medical treatment during the lockdowns not only fail to state a claim, they do not establish that the conditions during the weekend lockdowns were "gratuitously severe." While Ms. Gelco claims that she was struck in the jaw by a cellmate (Ex. A, ¶49), she does not allege that she requested medical attention, nor does she allege that it was denied to her (R. 308-09). Her allegations also do not establish a serious medical need that required immediate attention. *See Lucien* and *Echols v. Skipper*, 2001 WL 936128 *5 (N.D. Ill. 2001), (bruises, scrapes and a small cut do ot approach the level of constitutional concern); *Davis v. Jones*, 936 F.2d 971, 972-73 (7th Cir. 1991) (a detainee's scraped elbow and one-inch cut in his temple were not objectively serious injuries and

the failure to offer medical care was not improper).   The same can be said of Ms. Koss' allegations (Ex. A, ¶¶52 and 18).  While it is unfortunate that she alleged suffered them, there is no treatment for a black eye, a bloody nose or a cut lip or having a clump of hair pulled out. Ms. Koss does not allege that the purported denial of treatment for those injuries resulted in any worsened condition.   As noted above, several plaintiffs did not suffer any injury or trauma necessitating treatment and two plaintiffs acknowledged receiving medical care during a lockdown (R.305-05, 307, 156-57).

While several of the plaintiffs allege that they were pregnant and were purportedly denied prenatal care, they do not explain what purported care they requested or what care was denied. Women go for weeks at a time without seeing their physician during various stages of their pregnancy.  Thus, because plaintiffs' do not allege what care was supposedly requested, to whom they made their request or what care they requested, they have failed to demonstrate that prenatal care was required during the weekend lockdowns and thus, have failed to establish a claim against the Sheriff.   While Ms. Koss claims that during a lockdown she was pregnant and experienced labor pains (Ex. A, ¶18), she admitted in her interrogatory answers that she was seen by a nurse and given medication for those pains (R. 157).  As noted above, nursing staff was available 24 x 7 during the course of the weekend lockdown (R. 102-06, 150-53) and therefore, plaintiffs' claim fails as a result.

Several plaintiffs claim that they were denied medication.  However, nursing staff as a matter of routine administered medication to prisoners during weekend lockdowns on the tiers and at the division's medical dispensary (*Id.*).  Even assuming plaintiffs' contention is true, it establishes nothing more than an isolated failure by a nurse to provide medication rather than some broad based practice that occurred as a result of a weekend lockdown.

In summary, there are no facts to establish that the Sheriff knew and consciously disregarded the fact nursing staff failed to provide plaintiffs with medication during the lockdowns.  Plaintiffs simply allege that "Defendant SHEAHAN knew or should have known that female inmates are subjected to unreasonable non-emergency weekend lockdowns," which "serve no legitimate penological purpose and violate Plaintiffs' constitutional rights" (Ex. A, ¶52).  Allegations that a defendant "should have known" about an alleged constitutional violation amount to mere negligence. *Steidl*, 151 F.3d at 740.  In light of the evidentiary materials

-27-

provided by defendants, plaintiffs have failed to establish gratuitously brutal treatment by the defendants during the weekend lockdowns in question.

WHEREFORE, defendants pray that this Honorable Court enter judgment in their favor and against the plaintiffs on their Motion for Summary Judgment.

Respectfully submitted,

Dated:  September 13, 2005

By:_____

ONE OF THE ATTORNEYS FOR DEFENDANTS,
MICHAEL SHEAHAN, SHERIFF OF COOK
COUNTY

By:_____

ASSISTANT STATE'S ATTORNEY,
PATRICK DRISCOLL,
CHIEF CIVIL ACTIONS BUREAU,
OFFICE OF THE STATES ATTORNEY
OF COOK COUNTY

Steven M. Puiszis
James C. Vlahakis
HINSHAW & CULBERTSON LLP
222 North LaSalle Street
Suite 300
Chicago, Illinois 60601-1081
(312) 704-3000