# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| GENISE HART, CARMEN FELICIANO, ANN FRANCIS GELSO, HELEN KOSS,CAPRICE MORALES and MICHELLE GANDY, Individually and on behalf of a class, | ) ) ) ) |
| Plaintiffs, | ) ) Case No. 03 C 1768 ) |
| vs. | ) Judge James B. Zagel ) ) Magistrate Judge Martin C. Ashman |
| THOMAS DART, SHERIFF OF COOK, COUNTY, in his official capacity, | ) ) ) |
| Defendants. | ) ) ) |

## DECLARATION PURSUANT TO 28 U.S.C. §1746

1.      My name is Scott Kurtovich.  I was the Acting Director of the Cook County Department of Corrections (hereinafter "Cook County Jail" or "jail") and currently am an Assistant Executive Director at the jail.  I have been employed in various capacities at the jail for approximately twenty years, including as a correctional officer, sergeant, lieutenant, shift commander, division superintendent and as the Assistant Executive Director.  I am also certified by the State of Illinois as an instructor on several topics in the field of corrections.

2.      I have been asked to provide the court with information concerning the Cook County Jail and the procedures used at the jail when the lockdowns which are the subject of the plaintiffs' lawsuit were used.  Periodic lockdowns of an entire division of the jail that formerly occurred over a portion of the weekend to search for weapons and contraband (hereinafter "weekend lockdowns") are no longer being conducted in either the men's or the women's divisions at the jail.  A former Executive Director of the jail, Callie Baird, stopped the practice of running periodic weekend lockdowns of the type now at issue in the men's divisions of the jail well over three years ago.  Weekend lockdowns in the women's divisions had been stopped even

before then.  As the former Acting Executive Director and current Assistant Executive Director of the jail, I can assure the Court that I have no intention to direct that weekend lockdowns of the type involved in plaintiffs' lawsuit be reinstituted at the jail.

3.     The Cook County Jail was accredited by the American Correctional Association (ACA) during the period when weekend lockdowns of the type involved in plaintiffs' lawsuit took place.  The jail was also accredited by the ACA during the time when the weekend lockdowns in Divisions III and IV were being held.  The ACA is an international corrections association formed in 1870 and is located in Lanham, Maryland.  The purpose of the ACA is to improve correctional practices in jails and prisons in the United States and Canada.  Among other things, the ACA promulgates standards applicable to the operational practices of prisons and jails and the training requirements for correctional staff.  The ACA also inspects and audits correctional facilities for compliance with its standards.  The Cook County Jail is the largest jail in the country that is accredited by the ACA.

4.     The Cook County Jail is the largest single-site jail in the United States.  It is located in an approximate ten (10) square block area (96 acres) of Chicago, near the Cook County Criminal Courts Building at 2600 South California Avenue.  The Cook County Jail currently houses between 10,000 and 10,500 male and female prisoners.  The exact number of prisoners varies from day to day depending upon the number of prisoners the jail takes in and the number that are discharged or transferred from our custody each day.  Currently, the jail has slightly more than 1,000 female prisoners.  The total number of prisoners and the number of female prisoners at the jail was slightly higher in 2001 and 2002 than our current numbers. Approximately 100,000 persons are admitted to the Cook County Jail on an annual basis.

5.     The Cook County Jail is comprised of ten (10) divisions.  Each division has its own separate building on the jail's grounds and operates semi-autonomously under the

5902478v2 826296

administrative direction of its own superintendent with the exception of Division III (for women) and Division VIII (for men) which share the same superintendent and supervisory staff. Each division has its own visiting area, medical dispensary, law library, chapel, or multi-purpose room, Correctional Rehabilitation Worker (CRW) office, beauty or barber shop, classrooms utilized by the education department as well as clothing and storage rooms. Also located on the jail's grounds is an independently run health services facility (Cermak), two third-party education departments (Chicago Board of Education and Chicago City Colleges), a privatized food service and commissary agency.

6.     Female prisoners are housed in two separate divisions of the jail, Divisions III and IV. There are currently approximately 352 cells or living units in Division IV and approximately another 180 cells in Division III. While many of the women housed in those divisions during the time when weekend lockdowns were being held were awaiting a preliminary hearing or trial, a number of them were serving their sentences following a conviction on a misdemeanor charge. Some of the female prisoners in our custody in those divisions had been convicted of misdemeanors or felonies and were awaiting sentencing. Others were temporarily housed in the jail after having been returned to the jail from the Illinois Department of Corrections where they were serving a sentence following a felony conviction. Still other prisoners were in our custody for probation or parole violations. Therefore, a number of the women who were in Divisions III and IV when weekend lockdowns were held were not "pretrial detainees."

7.     Any time a prisoner is admitted to the jail, the prisoner's level of security risk evaluated by jail staff. Each new prisoner at the jail is classified as either a minimum, medium or maximum security risk. The jail's security risk evaluation process is accomplished through a point system which, among other things, considers the prisoner's criminal history, any prior convictions and the nature of those convictions, any prior disciplinary problems at the jail, the

nature of the pending criminal charge(s), the prisoner's age, any known gang affiliation, the stability of the prisoner's prior living arrangements, whether the prisoner has a history of alcohol or drug abuse, is a suspected drug trafficker or has been involved in any prior institutional escapes. Approximately 34% of all (male and female) prisoners and approximately 18% of the female prisoners at the jail currently have a maximum security classification. Those percentages were approximately the same in 2001 and 2002.

8.      At the time of intake into our jail, each new prisoner is medically examined and psychologically screened by an independent team of trained medical and mental health personnel who are either employed by or who are under contract with Cermak Health Services. Female prisoners who have special medical needs such as substance abuse or who are pregnant, depending on the state of their pregnancy are assigned to Division III. The Cermak Health Services personnel performing those medical and psychological screenings will determine if a female prisoner should be assigned to Division III, Division IV or should be sent to the Cermak Health facility located on the jail's grounds.

9.      At the time of intake, the Cermak Health Services medical personnel will also assess whether a new prisoner suffers from any physical or mental condition which requires the administration of medication. If at the time of intake, the Cermak Health Services personnel determine that a prisoner will require medication during his or her stay at the jail, the type of medication as well as its dosage and frequency of administration will be noted in the prisoner's medical chart, which will be sent to the medical dispensary for the division to which that particular prisoner is assigned.

10.     In Division IV, we generally segregate maximum security female prisoners from medium and minimum security female prisoners by tiers. However, we also have several "program tiers" on Division IV. Several of the programs which the Sheriff has historically

-4-

offered to female prisoners include a school program (York Alternative School, offering a high school education sponsored by the Chicago Board of Education), our "dare to be different program" (focusing on drug avoidance, respect for life, self dignity and religious beliefs) and our program with Gateway (focusing on drug rehabilitation). To gain entry into those program tiers, prisoners must request admission and be accepted into the program. On those program tiers, female prisoners are not segregated by their security classification. In Division III, we group prisoners together on specific tiers by the nature of the prisoner's medical need. For example, we attempt to house all prisoners receiving methadone on the same tier.

11.   Various programs and services (are currently and) were offered to prisoners at the jail during the timeframe when the weekend lockdowns of Divisions III and IV formerly occurred. Any prisoner under the age of 21 who does not have a high school diploma is eligible to participate in our high school program. The jail has partnered with the Chicago Board of Education and thereby makes available 75 teachers and 10 support personnel including social workers, speech pathologists, psychologists and a principal who develop an educational curriculum specific to the needs of the detainee. Special Education is offered to prisoners up to age 22 through an inclusion model. The jail also makes college level courses available through the Chicago City Colleges.

12.   Other programs and services which the jail provides are targeted at dealing with substance and alcohol abuse. The jail has contracted with Gateway to provide substance abuse treatment. The services of Alcoholics and Narcotics Anonymous are also made available in each division of the jail. The Human Resource Development Institute Impact (HRDI) Program is offered at the jail to prisoners designated by correctional staff or mandated by a circuit court judge. That program provides a therapeutic community medical treatment service model for drug and alcohol addicted prisoners. Several years ago, the HRDI program was evaluated by the

5902478v2 826296

Egan Urban Center of DePaul University which concluded that prisoners who participated in that program were learning to feel good about themselves without the need for drugs or alcohol and had expressed confidence that they could remain drug and alcohol free upon their release.  The Sheriff further offers the services of Genesis House to female prisoners which provide hospitality and information to women who are involved in prostitution to assist them in making a free choice about their lifestyle and to provide appropriate support and services to prisoners who choose to leave that illegal line of work.  Companions is a program offered in conjunction with Aunt Mary's Storybook Project which allows female prisoners to create an audio cassette tape of children's stories for their children.  The Chicago Legal Advocacy for Incarcerated Mothers (C.L.A.I.M.S.) provided legal services and education at the jail to help families of female prisoners remain intact. Prenatal classes and classes on problem pregnancies have been available to female prisoners which provides information on nutrition, safe sex, parenting skills, exercise and personal hygiene for detainees.  The Doula Project is also available to female prisoners in Division III and is designed to assist them with their birth experience and postpartum maternal infant interaction while in jail.  The Healthy Start Program offering prenatal and postpartum services is also available at the jail. An art therapy program is also available to those prisoners who are mentally challenged in order to find new ways to achieve individual self-esteem.  The ACA in its last certification of the jail commended us on the number and variety of programs are offered to prisoners at the Cook County Jail.

13.    In the past, an entire division of the jail was placed on lockdown status over the course of a weekend to make a thorough search of all areas of that division for weapons, drugs and/or contraband.  These were the weekend lockdown searches about which plaintiffs complain.  The purpose of the weekend lockdown searches which are the subject of the plaintiffs' lawsuit was not to punish a particular detainee or group of prisoners.  Rather their purpose was to search,

-6-

find and confiscate weapons, drugs and other contraband inside the jail before a violent outbreak or incident occurred. The only way contraband in a facility the size and complexity of the Cook County Jail can be controlled is to be constantly on the alert and to be thorough and systematic when searching an area of the jail.

14.     The discovery and confiscation of weapons, drugs and/or other items of contraband in the jail makes it a safer and more secure facility, not only for correctional staff, but also for the prisoners who had been remanded to our custody.

15.     An entire division of the jail has also been placed onto an "administrative" or "emergency" lockdown status after a gang fight or a stabbing occurs. I understand that plaintiffs are not contesting the lawfulness of those emergency lockdowns which are instituted for an entirely different reason than the weekend lockdowns now at issue.

16.     Those division-wide searches occurred on weekends because during weekdays, the Sheriff is responsible for transporting over 1000 prisoners per day to and from various courthouses throughout Cook County. From Monday through Thursday, the jail also typically ships anywhere from 50 to 350 male and/or female prisoners daily to the Illinois Department of Corrections (IDOC) following their sentencing on felony charges.

17.     Typically, the only courts in session over a weekend are bond courts and on the weekends, correctional staff at the jail did not transport prisoners to court or the IDOC, rather we would only process new prisoners into the jail who failed to make their bond. On weekends, new prisoners were admitted to Divisions III and IV at various times during the daytime and evening while a weekend lockdown was in effect. The time a newly admitted prisoner remained in her cell during a weekend lockdown depended upon, among other things, when her processing into the jail was completed, and when the lockdown ended.

5902478v2 826296

18.     We attempted to vary the intervals between the weekend lockdowns of a specific division of the jail so that the lockdown searches did not occur under any recognizable pattern and so that prisoners housed in a particular division of the jail could not predict when a weekend lockdown was likely to occur.  This was done in an effort to increase the effectiveness of the searches that were made during the weekend lockdowns.  The weekend lockdown searches were manually completed.   We had no portable magnetometers, fluoroscopes or other electronic equipment that can be used during the search.

19.     Contraband is any object or thing that we do not permit a prisoner to have in the jail, any object or item that is used in a fashion other than its intended purpose or anything found in a location of the jail where it is not permitted.  Common objects such as toothbrushes or pens which prisoners are permitted to have in their cells have been converted into crude weapons by sharpening down their edges or by inserting a pin, paper clip or a sharp object into one of their ends.  Weapons and contraband can be fashioned out of virtually anything found in a prison or jail.  Cardboard toilet paper holders have been converted into a crude pipe for smoking drugs by carving or cutting out a portion of the cardboard and then inserting tin foil into the opening.  Toilet paper will be then wrapped around it in an attempt to prevent its discovery.  Extra bedding sheets can be torn into strips to form a rope.  Small thin metal objects can be used to pick locks.

20.     Our correctional staff has discovered home-made weapons, drugs and contraband during various weekend lockdown searches at the jail.  Attached to my Declaration as Group Exhibit No. 1 are true and correct copies of photographs taken of some of the weapons and contraband recovered in various divisions during searches of the jail.  Those photographs truly and accurately depict the weapons and items of contraband recovered during various searches of the jail.  Items similar to those depicted in Group Exhibit No. 1 have been discovered in the jail during weekend lockdown searches.

-8-

21.     It also has been our experience at the jail, that prisoners will break off pieces of metal from vent plates or grates, or from the sides of the risers in our gymnasiums for example. They will then sharpen or bend the piece of metal so that it has a point and thereby fashion a home-made weapon which is referred to as a shank. Examples of several shanks made in the jail by our prisoners are shown in Group Ex.No.1.

22.     The use of the term weekend lockdown search is probably a misnomer, because as explained below, the female prisoners held in Divisions III and IV of the jail were not kept locked in their cells during the entire course of those weekend lockdowns. Additionally, not all movement of prisoners in those divisions was eliminated during those weekend lockdowns. Essential services were provided to our prisoners during the weekend lockdowns which necessitated some controlled movement of prisoners while a division was on weekend lockdown status.   Because the purpose of those lockdowns was to search for weapons, drugs and contraband, we attempted to limit prisoner movement within a division while it was on lockdown status, but in light of those services described below which we provided to our prisoners during those weekend lockdowns, it was impossible to eliminate all prisoner movement outside of their cells.

23.     Anytime a prisoner moves from one location to another within the jail or even within a division of the jail (including during the weekend lockdowns), the potential exists that a weapon, drugs or an item of contraband could be either moved to a different location, transferred to another prisoner or secreted in a hiding place in the jail. For that reason, we restricted prisoner movement as much as possible while a division was being searched during those weekend lockdowns.   However, essential services were provided the prisoners over the course of a weekend while the division was on lockdown and some controlled movement of the female prisoners by necessity did occur during those weekend lockdowns as a result.

24.   Because we held weekend lockdowns on varying weekends in an attempt to increase the effectiveness of those searches, and because prisoners may have had a prearranged visit scheduled with family and friends on a weekend when a lockdown of that prisoner's division was scheduled to occur, and because either the wholesale cancellation of weekend visits for prisoners in a division or the wholesale denial of visits for prisoners in a division on a particular weekend would alert the prisoners in that division that a lockdown of the division was likely to occur which would provide them with an opportunity to move or secrete a weapon or an item of contraband elsewhere within the division or the jail, we permitted prisoner visits to occur during those weekend lockdowns.   Prisoners were permitted to leave their cells and were escorted off their tier for a 30 minute visit with family and friends during a weekend lockdown, if such a visit had been previously scheduled in accordance with the jail's rules and regulations. We also permitted unscheduled prisoner visits during a weekend lockdown if the visitor had traveled over 150 miles to make the visit.   If a prisoner had more than one visit scheduled and the visitors arrived at different times, the prisoner would be removed from her cell on multiple occasions for visitation.

25.   Prisoners were also removed from their cells, allowed to move off of their tiers and were allowed to meet for an unlimited period of time with their attorney during a weekend lockdown whenever the attorney appeared at the jail and requested such a meeting or had such a meeting prearranged with his or her client.

26.   Each division of the jail has its own visiting room or area.   When prisoner visits occurred with family, friends or attorneys during a weekend lockdown, a correctional officer from that division would either accompany the prisoner from her tier to the division's visiting room and back again when the visit had concluded or depending on staffing issues, our correctional officers would keep prisoners under observation as they moved from location to

-10-

location or from security post to security post in the division. Another correctional officer from that division was stationed in the visiting area while those visits occurred. The correctional officers who either accompanied or observed the prisoners and those who were posted in the visiting areas were not available to search various areas of the division while performing those tasks.

27.     During the weekend lockdowns in Divisions III and IV, prisoners who experienced medical problems which could not be treated at their cells were removed from their cells, moved off their tier and were provided necessary medical care or treatment either at the division's medical dispensary by Cermak Health Services nursing staff stationed at the dispensary, or when the Cermak nursing staff believed that a prisoner's condition warranted it, prisoners in Divisions III and IV were transported to Cermak or to a hospital outside of the jail's grounds during the weekend lockdowns.

28.     During the weekend lockdowns in Divisions III and IV, diabetic inmates for example were taken to the division's medical dispensary where nurses employed by Cermak would provide them with their insulin shots; prisoners who were asthmatic and required a breathing treatment would be brought to the medical dispensary for nebulizer treatments and inmates who were receiving methadone were taken to Cermak to receive their medication.

29.     Divisions III and IV each has its own medical dispensary, stocked with various medications, and a nursing station where various items of medical equipment to evaluate and treat prisoners are located. Nursing staff, employed by or under contract with Cermak Health Services, were stationed around the clock in the medical dispensaries for both Divisions III and IV during weekend lockdowns. Those nurses were available at all times to evaluate, triage, treat and provide medical care to our prisoners in Divisions III and IV during those weekend lockdowns.

-11-

30.     Our correctional officers were trained and instructed that should a medical problem or issue arise with a female prisoner during a weekend lockdown in Division III or IV which potentially necessitated medical treatment, that they should call the nurse at the division's medical dispensary and request that the nurse respond to evaluate the prisoner.  During the weekend lockdowns in Divisions III and IV, those nurses responded to calls from correctional staff when medical assistance was requested.

31.     Cermak Health Services has a stand-alone medical facility on site at the jail where additional medical and/or mental health services is available, and was provided to our prisoners during weekend lockdowns.  During the weekend lockdowns in Divisions III and IV, prisoners were taken to Cermak for among other things, x-rays, testing, and emergency care when nursing staff felt such care was required.  Additionally, during weekend lockdowns in Divisions III and IV, prisoners in those divisions have been transferred to Provident Hospital, Stroger (County) Hospital and to other various specialty facilities or hospitals when a prisoner's medical condition warranted such care.

32.     During the weekend lockdown of Divisions III and IV, nursing staff would visit the tiers to deliver and administer certain medication to prisoners, to evaluate a prisoner's condition and to provide certain types of medical care to prisoners in their cells.  Certain types of medication and medical care could not be administered by nursing staff at a prisoner's cell, and when that scenario arose during the course of a weekend lockdown, prisoners were escorted off tier by our correctional officers to where that medication or care was provided.

33.     Whenever a prisoner from either Division III or IV was taken to the division's medical dispensary or transported, to Cermak or to some other hospital during a weekend lockdown, a correctional officer from that division accompanied that prisoner and would remain

5902478v2 826296

with the prisoner until she was returned to her tier. During that time frame, the correctional officers who performed that task were unavailable to assist in the search of the division.

34.    Whenever our correctional officers in Divisions III or IV became aware of a prisoner who threatened self-injurious behavior or who actually injured herself during a weekend lockdown, they were instructed and trained to have that prisoner removed from her cell and taken off her tier for a psychiatric screening. Our correctional officers were instructed and trained to make a psychiatric referral whenever they learned that a prisoner appeared depressed, overly anxious, stared into space, did not know who she was, where she was at or what she was doing, appeared confused or was unable to concentrate, was suicidal, suspicious or was experiencing auditory or visual hallucinations. In the event the prisoner inflicted some form of injury upon herself during a weekend lockdown, medical care would first be provided to any physical injury and then the prisoner would be sent for a psychiatric evaluation.

35.    Mental health personnel employed by or under contract with Cermak Health Services who made the psychiatric evaluation of such a prisoner and would determine if and when that prisoner could return to her cell or if the prisoner should be moved to a different cell, a different division or to Cermak's stand-alone facility for further care or evaluation. Prisoners from Divisions III and IV were removed from their cells and taken for psychiatric evaluations whenever it became necessary during the course of the weekend lockdowns when they were held in those divisions.

36.    A correctional officer from the division would accompany a prisoner to and from a psychiatric screening and would remain nearby while the screening occurred. Those screenings occurred in the basement beneath Division V and when a prisoner from either Division III or IV was taken for such a screening, the prisoner was not only taken off of her tier, but into a different division of the jail. While a correctional officer performed that assignment,

-13-

that officer was unable to assist in the search of the division while it was on weekend lockdown status.

37.     In order to safely search a prisoner's cell during a weekend lockdown, all prisoners assigned to that cell had to first be removed from the cell. While the prisoners' cells on a given tier in Division III or IV were being searched during a weekend lockdown, all prisoners on that tier were removed from their cells.

38.     In Division IV, female prisoners were temporarily moved from their cells into the tier's dayroom. In Division III, female prisoners were removed from their cells and were temporarily moved through the tier interlock door into a recreation room on the first floor. Only prisoners from one tier of Division III would be moved into a recreation room at any one time. Correctional officers from those respective divisions monitored and supervised the prisoners while they were being moved and once they were located in the dayrooms or recreation room. Immediately after the completion of the cell searches for a specific tier, the prisoners would then be returned to their cells and the dayroom or recreation room would again be searched. Thus, no prisoner in Divisions III or IV was ever locked in her cell for the entire weekend lockdown.

39.     One of the essential services provided during the weekend lockdowns in Divisions III and IV was the delivery of food to the prisoners in their cells. Additionally, during weekend lockdowns, garbage and refuse would be collected and the common areas of the tiers and common areas of the division would were cleaned. During the weekend lockdowns, those services were provided through the use of prisoners who were permitted to be out of their cells in order to work during the lockdown. While those workers were outside of their cells during a weekend lockdown, they were supervised by correctional officers from their division.

40.     There were two types of prisoner workers at the jail, living unit workers and building workers. As the name suggests, during a weekend lockdown, living unit workers

worked the specific tier on which they were housed. Building workers on the other hand, worked in different tiers and moved between various tiers and areas of their division during the weekend lockdowns.

41.     A living unit worker under the supervision of a correctional officer or depending upon the operational practice followed by a correctional officer, the correctional officer delivered food to the prisoners in their cells on her tier from a food cart that was delivered to the tier by a building worker. Lunch is typically delivered to prisoners in bags. Dinners would typically be delivered on a food tray. During weekend lockdowns, prisoners are fed on their regular meal schedule and the delivery of food to prisoners in their cells presented another opportunity when our correctional staff would check on a prisoner's status in her cell. A living unit worker collected food bags or food trays from prisoners in their cells on her tier when that meal was finished. Because the cell doors in Divisions III and IV had a rectangular opening through which a food tray could not fit, a correctional officer who did not deliver food to the prisoners on his or her tier would accompany the living unit worker in order to open the cell doors when she delivered and collected the food trays and/or food bags. The living unit workers would collect garbage from the cells when the food bags or trays were collected. Garbage collected from the cells and the other common areas of the tier was bagged by the living unit worker and left near the tier interlock door for the building workers to collect. The living unit workers also mopped and cleaned the common areas of the tier, including the hallways outside the cells and the shower room and dayroom for their tier.

42.     Building workers provided a variety of services during the weekend lockdowns in Divisions III and IV. One group of building workers would go the basement of the division and deliver food carts from the basement to each tier of their division. They also collected the food carts and delivered them back to the basement area. The building workers entered the various

-15-

tiers through the tier interlock doors to deliver and collect the food carts under the direction and supervision of a correctional officer. They also would pick up the garbage from that tier which the living unit worker collected and bagged up. The Building Unit worker then took that garbage to the basement of the division and then to the main dumpster outside of Division V. To accomplish this, the building workers moved outside their division of the jail. Building workers mopped and cleaned all common areas of the division outside the interlock areas including the hallways, the gymnasium and any other rooms that required cleaning. Another group of building workers during the weekend lockdowns in Divisions III and IV worked in the clothing and storage rooms of their respective divisions under the supervision of correctional officers from their division.

43.     There were a large number of female prisoners who worked either as living unit or building workers because they worked in shifts. Building workers who delivered the breakfast carts to the various tiers in their division would be awoken at 3:00 a.m. to begin their work. During a typical weekend lockdown in Divisions III and IV, there were up to 44 building workers for Division IV and up to another 40 in Division III. During each shift, there were an additional 2 to 4 living unit workers on each tier in those divisions who were permitted to work outside of their cells on their respective tiers during the course of a weekend lockdown. The correctional officers who supervised the activities of the prison workers during weekend lockdowns were not available to search the division while performing that assignment.

44.     The criteria used to select living unit and building workers were that they had been charged with a non-violent offense, had no history of violence in their background, had a low bond and had displayed the ability to comply with the jail's regulations. The living unit and building workers were out of their cells for an extended period of time during the course of a weekend lockdown while performing their assignments. Based upon my training, education and

-16-

my 20 years of experience at the jail, in my opinion it would be wrong from both a correctional and security perspective to assume that simply because the living unit and building workers had a minimum security classification, that they would not willingly participate or be forced to participate in the trafficking or movement of weapons, drugs or contraband at the jail. Such an assumption would lessen the security and heighten the danger to other prisoners and correctional staff at the jail. In fact, we have discovered prison workers with a minimum security classification in possession of contraband in the jail. At one time, employees of a food service vendor at the jail was a source of contraband for prison workers.

45.     Prisoners were removed from their cells and taken off their tiers during a weekend lockdown whenever their bond was paid, whenever their sentence expired or whenever they were placed on a furlough program. Each division of the jail has its own separate clothing room and storage rooms where jail uniforms, pillows, sheets, blankets and mattresses were stored. The clothing room and storage rooms had to be posted with correctional officers from that division during the course of a weekend lockdown so that a discharged prisoner could obtain her clothing and return her jail uniform, and any pillow, sheet, mattress and blanket from her bunk to the division's storage room. Additionally, those rooms had to be staffed so that when new prisoners arrived during a weekend lockdown, their clothing and personal belongings could be secured in the clothing room and they could obtain a jail uniform, a mattress, pillow, sheet and blanket before they were escorted to their cell by a correctional officer.

46.     Every time a prisoner was allowed to move outside of her cell during a weekend lockdown for any of the reasons noted above, our policy required a correctional officer to "pat down" the prisoner and then have the prisoner either accompanied by a correctional officer or kept under the observation of a correctional officer. That security practice limited the number of correctional officers available to search during the course of a weekend lockdown. Any time a

5902478v2 826296

prisoner moved off of her tier for any of the reasons described above during a weekend lockdown, the interlock door for that tier had to be opened. Additionally, the tier interlock door was opened whenever a building worker entered the tier or whenever a nurse or medical personnel arrived or whenever a correctional officer made a 30 minute security check or a head count of the prisoners on that tier.

47.     During the weekend lockdowns in Divisions III and IV, all essential posts in those divisions had to be staffed. Mandatory security posts that had to be staffed at all times included the division's security office, the front lobby, the main interlock into the division and the tunnel area through which access into the division can be gained as well as the tier monitoring stations. Additionally, the division's clothing and storage rooms, and visitation area had to be staffed.

48.     A collective bargaining agreement had been entered into between the County of Cook, the Sheriff of Cook County and the Metropolitan Alliance of Police, Cook County Corrections Officers Chapter No. 222 (MAP). It is attached to my Declaration as Exhibit 2. Under section 3.2(c) of that collective bargaining agreement, our correctional staff was (and currently remains) entitled to a one-hour lunch break during the course of their shift. One-third of our correctional staff in each division of the jail was allowed to go to lunch at the same time during their shift. Thus, the lunch breaks permitted under the collective bargaining agreement essentially ran over three hours, with one-third of our correctional staff taking their hour lunch break during one hour of that three-hour time frame. During their lunch break, correctional staff would not be available to perform their routine, normal duties. Therefore, during the weekend lockdowns, there was a three-hour window of time when one-third of our correctional staff was at lunch during each shift. Thus, during each shift of a weekend lockdown, there was a three-hour period of time when searches could not be performed because one-third of our correctional staff was at lunch. All essential posts in a division had to remain staffed at all times during the

-18-

day and evening hours of a weekend lockdown, including all entrances, exits and tier monitoring

stations. Additionally, we would not search a tier during the time when the prisoners on that tier

were eating a meal.

49.     During the weekend lockdowns in Divisions III and IV, correctional officers who

were posted at the tier monitoring stations would check the status of the prisoners in their cells

on those tiers every half hour as required under the Illinois County Jail Standards. The American

Correctional Association's standards also require that prisoners be checked every 30 minutes.

The correctional officers would make their 30 minute status checks of the prisoners on their tiers

by walking the hallway outside each cell and by verbally or visually checking on the status of the

prisoners in their cells. Those half hour checks are documented on logbooks entitled "Officer's

Living Unit Logs." Attached to my Declaration as Group Exhibit 3 are representative examples

of several living unit logs for Divisions III and IV when weekend lockdowns occurred which

reflect that 30 minute checks were made of those prisoners on those respective tiers.

Additionally, correctional officers are required to make a "head count" of prisoners three times a

day and head counts were made during the weekend lockdowns which are the subject of

plaintiffs' lawsuit. These head counts were also accomplished by correctional officers visually

checking on the prisoners in their cells and counting the number of prisoners on their respective

tiers. These operational practices provided multiple opportunities during the course of each shift

while a lockdown was in effect for our correctional officers to check on the prisoners' status and

multiple opportunities for prisoners to speak with a correctional officer and to bring any issues or

problems to the officer's attention. Furthermore, the cell doors in Divisions III and IV can be

electronically opened from the tier monitoring station, they cannot be electronically locked.

Those cells have to be manually locked by a correctional officer inserting a key in the cell's

locking mechanism. During the weekend lockdowns that occurred in Divisions III and IV,

-19-

whenever a prisoner who had been permitted out of her cell for any of the reasons discussed in the preceding paragraphs returned to her cell, the correctional officer located at the tier monitoring station had to manually lock that prisoner's cell door. This operational requirement provided that correctional officer with an opportunity to check on the status of any other prisoners in that cell. It also provided prisoners in any cell located between the tier monitoring station and the cell being locked to speak directly to a correctional officer as the officer walked to or from the cell which the officer was locking up.

50.     The entries appearing on the living unit logs attached to my Declaration as Group Exhibit 3 were made by correctional officers at or near the time of the events described in those logs. The living unit logs attached as Group Exhibit 3 were made and kept in the regular course of our activities at the jail and it was the regular practice of the jail to maintain living unit logs to record and document events and activities on the various tiers of the jail.

51.     I formerly worked as a correctional officer in Division IV when it housed male prisoners and in Division V. One of my assignments in those divisions was to work at a tier monitoring station. I have worked at a tier monitoring station in Divisions IV and V while those divisions were on lockdown and depending upon the ambient noise level that was present and how loudly a prisoner was, I could hear prisoners while they were locked in their cells from that monitoring station. Additionally, there are a number of ways a prisoner can get, and has gotten the attention of a correctional officer stationed at the tier monitoring post while locked in her cell. Prisoners frequently kick the bottom of their cell door which makes a loud booming noise that can readily be heard at a tier monitoring station. Prisoners flick the light in their cells on or off and have placed their arms outside the opening of the cell door and either waived their arm, a towel or some other similar object to gain the attention of the correctional officer. A correctional

5902478v2 826296

officer sitting at a tier monitoring station in either Division III or IV could see or hear that activity and was trained and instructed to respond upon seeing that type of signal from a prisoner.

52.     I have also been asked to clarify that for many (but not all) of the weekends when lockdowns were held in Division III, those lockdowns began on Saturday morning, not Friday afternoon.  All of the lockdowns held in 2001 and five (5) in 2002 for Division III began on Saturdays.  This was due to the fact that commissary was frequently (but not always) delivered in Division III on Friday afternoons.  During the weekend lockdowns in Divisions III and IV, prisoners had access to the various commissary items they had previously ordered.  Once the search of the entire division was completed, the weekend lockdowns was lifted, even if the search was completed during the course of a shift change.  We did not keep a division on weekend lockdown status any longer than necessary to search the division.  There was no set time on a Sunday when the weekend lockdown was lifted.

53.     During a weekend lockdown in Divisions III and IV, all areas of a division on lockdown were searched.  This included all hallways, common areas, shower rooms, clothing rooms, recreation rooms, dayrooms, libraries, the chapel, storage rooms, classrooms (we have eight (8) classrooms in Divisions III and IV), gymnasiums, the beauty shop as well as any other areas in the division where a weapon or item of contraband could be hidden.  Some of the common areas would be searched at night while the prisoners were asleep.  All objects or items in area that was searched, in which or under which a weapon or an item of contraband could be stored or hidden, such as desks, desk drawers, tables, chairs, books, clothing bags and board games to name but a few was searched.  There are large numbers of books in our classrooms and libraries that can be a hiding place for drugs, a weapon or contraband.  Our weekend lockdown searches were more comprehensive and more intense than other searches of a cell or a tier that occurred at the jail.  During the search of a cell during those lockdowns, our policy was for

correctional officers to check the integrity of the outside walls of the cells, to check for extra bedding or clothing, to check a cell's electrical fixture, to search around, under, inside of or behind any mirror or objects on the cell walls, including any vents or ducts or grates, the toilet and sink areas, the mattresses, pillows and bed frames and to inspect, open and search any personal property kept by the prisoners in their cell.

54.    The time it would take to search an area such as a beauty shop, a dayroom, a clothing room or the cells on a tier would depend upon the number of correctional staff involved, the thoroughness of an individual staff member's search, the number of objects or items that have to be opened, looked under or examined and the nature of anything seized during the search.  Discovery of a weapon or drugs in a prisoner's cell which could lead to a criminal prosecution lengthens the time it takes to complete the search because staff had to properly inventory the item recovered and investigate which prisoner was responsible for possession of the object which can be especially time consuming because more than one prisoner was typically assigned to a cell in Divisions III and IV.

55.    It has been our experience at the jail that the longer a prisoner remains in our custody, the greater the number of objects or items that are accumulated in the prisoner's cell and the longer it would take to search that cell as a result.  All objects in which a weapon or an item of contraband could be hidden had to be examined, opened and searched. Some of the types of items that could typically be found in a prisoner's cell are reflected of the commissary list attached hereto as Exhibit No.4.

56.    It has also been our experience at the jail that we have a higher number of correctional staff who call in sick or take allotted "comp time" on the weekends than on weekdays.  This impacted the total number of correctional staff available for a division during a

5902478v2 826296

weekend lockdown and as a result, the number of correctional officers available to participate in a search of the division.

57.   I have been asked to explain to the Court why an entire division of the jail remained on lockdown and why a tier was not taken off of lockdown after a search of the tier was completed.  There were several reasons for that practice.  First, as explained above, not all prisoner movement was eliminated during weekend lockdowns.  At various times during a weekend lockdown, prisoners were permitted out of their cells, off of their tiers and moved between various areas of the division for attorney visits or visits with family and friends; to work; to visit the medical dispensary or a hospital; for a psychiatric screening; when discharged or released from the jail for any reason or when they were moved to a different cell or division following a psychiatric screening or a disturbance with another prisoner.

58.   While our policy was to pat down a prisoner whenever she was removed from her cell during the course of the weekend lockdown, administrators and staff at the jail recognized that this did not eliminate the possibility that a small weapon or item of contraband could be missed or that another prisoner could pass an object to that prisoner after she had been patted down when a correctional officer was not looking.  I am aware (because correctional staff have either caught a prisoner in the act or in some instances a prisoner has admitted to us) that female prisoners have secreted items in the soles of their shoes, in the braids in their hair, in their bras, in their vaginal area and in their panties.  Such a prisoner could then potentially move or secrete the object elsewhere in the division.

59.   Permitting prisoners to have unsupervised access to the dayroom area after a tier has been searched would permit such a prisoner to transport a weapon or item of contraband into the dayroom where not just one or two other prisoners from that prisoner's cell were located, but where an entire tier of prisoners could mingle and interact.  If such an operational practice were

-23-

permitted, such a prisoner could transfer possession of a weapon or item of contraband to any other prisoner on the tier if she was so inclined, to use a weapon against another prisoner in the dayroom or to hide the weapon or contraband in the dayroom after it was searched. In our opinion, we believed such an operational practice should not be permitted because among other reasons, our typical weekend staffing pattern at the jail was not followed during the weekend lockdowns because a number of correctional officers were pulled from their normal posts and assigned to a team that searched other areas of the division.

60.    Contraband or weapons can also be secreted in food trays or garbage bags collected and moved by the living unit and building workers or in their mops or cleaning buckets. Because building workers move between different tiers of their division and in some instances outside their division, they could willingly or be threatened or forced to unwillingly move a weapon or an item of contraband to a different location in the division after it had been searched.

61.    Additionally, exit through the tier interlock doors is not the only means by which a prisoner can leave the tier. There is more than one exit for the tiers in Divisions III and IV for fire safety reasons. Each tier in Divisions III and IV has a fire safety door that opens onto a common stairwell for the division. That stairwell is used for routine prisoner movement. Prisoners who leave a tier in Divisions III and IV through the interlock door, travel up or down that common stairwell to get to another floor of the division. Those fire doors which open onto the common stairwells in Divisions III and IV are normally kept locked. In the event of a fire, a correctional officer can electronically open the fire door to allow prisoners to leave the tier through that fire door. We have had numerous instances where prisoners have slid items of contraband under the fire door of their tier into the common stairwell so that the contraband could be picked up by another prisoner walking up or down that stairwell. If prisoners had been

-24-

Case 1:03-cv-01768   Document 172-2   Filed 03/18/08   Page 26 of 51

allowed access to the dayroom during the weekend lockdowns in Divisions III and IV after a search of their tier was completed, items of contraband could be slid under the door into or out of their tier. Those common stairwells that the fire doors open onto were used to move prisoners in Divisions III and IV during weekend lockdowns when prisoners were allowed to move off of their tier for any of the reasons explained above. If a correctional officer did not keep every prisoner who moved through those stairwells under constant observation, contraband could be readily transferred during a weekend lockdown by sliding under a fire door. By keeping prisoners in their cells during the weekend lockdowns after their tier had been searched, we attempted to eliminate that means of moving contraband off of or onto a tier during the weekend lockdown.

62.     It has also been our experience, that prisoners have passed items of contraband into and through vents or ducts which are located in their jail cells and in various common areas of their division of the jail. Those vents or ducts lead directly into air ventilation shafts which run between various floors of the division. We have discovered this when correctional officers have searched the openings of those vents or ducts and found items of contraband with lengths of string attached. This means that prisoners have attempted to pass weapons or items of contraband to other prisoners on the tier above (by the prisoner above lowering the string to an inmate below who ties an object to the string so that the prisoner above can then pull the object up to him or her), or below them without having left their tier. We even have had prisoners attempt to pass small weapons or items of contraband wrapped in cellophane through the plumbing pipes of the jail. During the weekend lockdowns, when a tier of a division was being searched, it was not uncommon for inmates to tap on pipes or other objects in an attempt to notify prisoners on nearby tiers that a particular area was being searched. Weapons or

5902478v2 826296

contraband can be secreted on the underside of surfaces through the use of gum, toothpaste or other substances both inside a cell and in other areas of the jail by a prisoner.

63.     Because we attempted to make the search for weapons and contraband as effective as possible, in view of: (a) the prisoner movement off of their tiers that occurred during those weekend lockdowns, and, (b) the ability to pass items through vents or shafts or under fire doors, we felt it was imperative to keep the division on lockdown, not release prisoners from their cells into the dayrooms until the entire search of the division was completed.

64.     Additionally, staffing that would typically occur in a division during a weekday is less on the weekend, because the transport of a large number of prisoners to courtrooms or the IDOC was not required.  Because the number of correctional officers assigned to a division was less on a weekend than a weekday, and because correctional officers were pulled from their usual assignments to participate in the searches that occurred during a weekend lockdown, it was our opinion that allowing a group of potentially violent prisoners to mingle in dayrooms or other similar areas for an extended period of time during a weekend lockdown could be more dangerous for staff and the prisoners should a disturbance occur in the dayroom and that the prisoners would be safer if they remained in their cells.  There were only two or in some instances three prisoners assigned to a cell who would have to be controlled in the event of a disturbance in the cell.  Thirty to fifty prisoners would potentially have to be controlled if they were allowed to remain in a dayroom or recreation room for an extended period of time and a disturbance happened to occur.  This was especially true on those tiers where large numbers of gang members or prisoners with a maximum security classification were housed together.

65.     Normally, during each day at the jail, prisoners are locked in their cells at night from approximately 9:00 p.m. to 7:00 a.m. except for approximately 30 minutes when they receive their breakfast.  Normally, the prisoners are also locked in their cells at other times.  For

5902478v2 826296

example, prisoners are locked in their cells for approximately another two hours prior to, and then shortly after the course of a shift change for the 3:00 p.m. to 11:00 p.m. shift in order for staff to obtain a head count and to allow a shift change to safely occur. Thus, prisoners at the jail are locked in their cells for at least half of their day under normal circumstances. While the prisoner remained in her cell, the door to the cell would be locked. While locked in their cells, prisoners in Divisions III and IV can read their mail, paper back books, magazines or religious reading materials which we allow prisoners to have in their cells. If they are in school at the jail, they can read any school books or work on school projects in their cells. They can write letters, draw, do crossword puzzles or play cards which are available through our commissary. If they happen to have a chess or checkers set in their cell from the dayroom, they can play those board games as well. There are sinks in each cell and prisoners can wash themselves and their hair in the sink. Attached to my Declaration as Exhibit 4 is a list of commissary items which prisoners were allowed to purchase and have in their cells during the weekend lockdowns.

66.     The risks which a prisoner faced and the conditions of a prisoner's confinement while locked in her cell during the course of a weekend lockdown were no different than the risks faced and conditions a prisoner would experience during the other times when that prisoner was locked in her cell at the jail. The risk of prisoner on prisoner violence exists at all times at any correctional facility where large numbers of violent persons are held against their will.

67.     Attached to my Declaration as Group Exhibits 5 through 47 respectively are the following Visitation Logs for Divisions III and IV for various weekends when weekend lockdowns occurred in those divisions:

> (a)     Defendant's Group Exhibit 5 – Visitation Log for Division III for March 18, 2001 (Div. 3 02893-02903).
>
> (b)     Defendant's Group Exhibit 6 – Visitation Log for Division III for May 27, 2001 (Div. 3 02904-02910).

-27-

(c)     Defendant's Group Exhibit 7 – Visitation Log for Division III for June 24, 2001 (Div. 3 02911-2919).

(d)     Defendant's Group Exhibit 8 – Visitation Log for Division III for July 29, 2001 (Div. 3 02920-02926).

(e)     Defendant's Group Exhibit 9 – Visitation Log for Division III for August 18th and August 19, 2001 (Div. 3 02927-02933).

(f)     Defendant's Group Exhibit 10 – Visitation Log for Division III for September 9, 2001 (Div. 3 02934-02941).

(g)     Defendant's Group Exhibit 11 – Visitation Log for Division III for October 14, 2001 (Div. 3 02942-02949).

(h)     Defendant's Group Exhibit 12 – Visitation Log for Division III for November 18, 2001 (Div. 3 02950-02957).

(i)     Defendant's Group Exhibit 13 – Visitation Log for Division III for December 16, 2001 (Div. 3 02958-02961).

(j)     Defendant's Group Exhibit 14 – Visitation Log for Division III for January 27, 2002 (Div. 3 02962-02968).

(k)     Defendant's Group Exhibit 15 – Visitation Log for Division III for February 10, 2002 (Div. 3 02969-02976).

(l)     Defendant's Group Exhibit 16 -- Visitation Log for Division III for March 17, 2002 (Div. 3 02977-02982).

(m)     Defendant's Group Exhibit 17 – Visitation Log for Division III for April 28, 2002 (Div. 3 02983-02990).

(n)     Defendant's Group Exhibit 18 – Visitation Log for Division III for May 12, 2002 (Div. 3 02991-02998).

(o)     Defendant's Group Exhibit 19 – Visitation Log for Division III for June 16, 2002 (Div. 3 02999-03004).

(p)     Defendant's Group Exhibit 20 – Visitation Log for Division III for July 14, 2002 (Div. 3 03005-03011).

(q)     Defendant's Group Exhibit 21 – Visitation Log for Division III for August 4, 2002 (Div. 3 03012-03019).

(r)     Defendant's Group Exhibit 22 -- Visitation Log for Division III for September 28, 2002 (Div. 3 03020-03027).

(s)     Defendant's Group Exhibit 23 – Visitation Log for Division III for October 6, 2002 (Div. 3 03028-03035).

5902478v2 826296

(t)   Defendant's Group Exhibit 24 – Visitation Log for Division III for November 24, 2002 (Div. 3 03036-03042).

(u)   Defendant's Group Exhibit 25 – Visitation Log for Division III for December 22, 2002 (Div. 3 03043-03048.).

(v)   Defendant's Group Exhibit 26 – Visitation Log for Division III for January 19, 2003 (Div. 3 03049-03053).

(w)   Defendant's Group Exhibit 27 – Visitation Log for Division III for March 2, 2003 (Div. 3 03054-03060).

(x)   Defendant's Group Exhibit 28 – Visitation Log for Division IV for March 30-31, 2001 (Div 4 05415-05432).

(y)   Defendant's Group Exhibit 29 – Visitation Log for Division IV for April 27-28, 2001 (Div. 4 05433-05446).

(z)   Defendant's Group Exhibit 30 – Visitation Log for Division IV for May 18-19, 2001 (Div. 4 05447-05461).

(aa)  Defendant's Group Exhibit 31 – Visitation Log for Division IV for June 15-16, 2001 (Div. 4 05462-05477).

(bb)  Defendant's Group Exhibit 32 – Visitation Log for Division IV for July 28, 2001 (Div. 4 05478-05486).

(cc)  Defendant's Group Exhibit 33 – Visitation Log for Division IV for August 30, 2001 and September 1-2, 2001 (Div. 4 05487-05500).

(dd)  Defendant's Group Exhibit 34 – Visitation Log for Division IV for October 27, 28, 2001 (Div. 4 05501-05516).

(ee)  Defendant's Group Exhibit 35 – Visitation Log for Division IV for December 1-2, 2001 (Div. 4 05517-05530).

(ff)  Defendant's Group Exhibit 36 – Visitation Log for Division IV for January 11-13, 2002) (Div. 4 05531-05547).

(gg)  Defendant's Group Exhibit 37 – Visitation Log for Division IV for February 2-3, 2002 (Div. 4 05548-05560).

(hh)  Defendant's Group Exhibit 38 – Visitation Log for Division IV for March 2-3, 2002 (Div. 4 05561-05567).

(ii)  Defendant's Group Exhibit 39 – Visitation Log for Division IV for April 19-21, 2002 (Div. 4 05568-05585).

(jj)  Defendant's Group Exhibit 40 – Visitation Log for Division IV for May 24-26, 2002 (Div. 4 05586-05600).

(kk)   Defendant's Group Exhibit 41 – Inmate Visitation Log for Division IV for June 22-23, 2002 (Div. 4 05601-05612).

(ll)   Defendant's Group Exhibit 42 – Visitation Log for Division IV for July 6-7, 2002 (Div. 4 05613-05627).

(mm)  Defendant's Group Exhibit 43 – Visitation Log for Division IV for August 23-25, 2002 (Div. 4 05628-05640).

(nn)   Defendant's Group Exhibit 44 – Visitation Log for Division IV for October 26-27, 2002 (Div. 4 05641-05655).

(oo)   Defendant's Group Exhibit 45 – Visitation Log for Division IV for November 8-10, 2002 (Div. 4 05656-05673).

(pp)   Defendant's Group Exhibit 46 – Visitation Log for Division IV for December 20-22, 2002 (Div. 4 05674-05689).

(qq)   Defendant's Group Exhibit 47 – Visitation Log for Division IV for January 18-19, 2003 (Div. 4 05690-05707).

68.   The entries appearing in the Visitation Logs which are attached as Group Exhibits 5 through 47 were made by members of our correctional staff at the time those visits occurred. The visitation logs attached as Group Exhibits 5 through 47 were made and kept in the regular course of our activities at the jail and it was the regular practice of the jail to maintain visitation logs of this type in order to record the identity of visitors, prisoners who received visitors and when those visits occurred.

69.   The Visitation Logs which are attached as Group Exhibits 5 through 47 document that during the course of the weekend lockdowns for Divisions III and IV, prisoners were permitted to have visits by family, friends and/or attorneys and that those prisoners who received visits were not kept in their cells during the entire time the division was on lockdown and were permitted to communicate with their lawyers, family and friends. Those Visitation Logs indicate that on January 18, 2003, Caprice Morales was allowed to visit with her daughter for 30 minutes (see Group Exhibit 47, Bates No. Div. 4 05694). Additionally, Genise Hart had a 15 minute visit during a February, 2002 lockdown of Division IV (See Group Ex. 37, Bates No. Div. 4 05555).

-30-

While the prisoners' name in the log was entered as Denise Hart rather than Genise Hart, I have checked the detainee I.D. number appearing on the log, 02-04951, against our computer records and have verified that was the identification number assigned to Genise Hart at the time of her admission to the jail on January 18, 2002. In addition, while the date of visit was written down as "2/3" a series of entries before and after Ms. Hart's entry reflect visits shortly before and after the time of Ms. Hart's visit reflect that those visitations occurred on "2/2." That leads me to conclude that Ms. Hart's visit occurred on February 2, 2002 while the lockdown was in effect.

70.     Attached to my Declaration as Group Exhibits 48 through 86 respectively are the following Movement Logs for Divisions III and IV when weekend lockdowns occurred in those divisions:

(a)     Defendant's Group Exhibit 48 – Movement Log for Division III for March 17-18, 2001 (Div. 3 03061-03063).

(b)     Defendant's Group Exhibit 49 – Movement Log for Division III for May 26-27, 2001 (Div. 3 03064-03066).

(c)     Defendant's Group Exhibit 50 – Movement Log for Division III for June 23-24 2001 (Div. 3 03067-03069).

(d)     Defendant's Group Exhibit 51 – Movement Log for Division III for July 27-29, 2001 (Div. 3 03070-03075).

(e)     Defendant's Group Exhibit 52 – Movement Log for Division III for August 17-19, 2001 (Div. 3 03076-03080).

(f)     Defendant's Group Exhibit 53– Movement Log for Division III for September 7-9, 2001 (Div. 3 03081-03085).

(g)     Defendant's Group Exhibit 54 – Movement Log for Division III for October 12-14 2001 (Div. 3 03086-03091).

(h)     Defendant's Group Exhibit 55 – Movement Log for Division III for December 14-16, 2001 (Div. 3 03092-03096).

(i)     Defendant's Group Exhibit 56 – Movement Log for Division III for January 25-27, 2002 (Div. 3 03097-03102).

(j)     Defendant's Group Exhibit 57 – Movement Log for Division III for February 8-10, 2002 (Div. 3 03103-03106).

-31-

(k)     Defendant's Group Exhibit 58 – Movement Log for Division III for March 16, 2002 (Div. 3 03107-03109).

(l)     Defendant's Group Exhibit 59 – Movement Log for Division III for April 27-28, 2002 (Div. 3 03110-03112).

(m)    Defendant's Group Exhibit 60 – Movement Log for Division III for May 10-12, 2002 (Div. 3 03113-03116).

(n)     Defendant's Group Exhibit 61 – Movement Log for Division III for June 14-16, 2002 (Div. 3 03117-03120).

(o)     Defendant's Group Exhibit 62 – Movement Log for Division III for August 2-4 2002 (Div. 3 03121-03125).

(p)     Defendant's Group Exhibit 63 – Movement Log for Division III for October 4-6, 2002 (Div. 3 03126-03128).

(q)     Defendant's Group Exhibit 64 – Movement Log for Division III for November 22-24 2002 (Div. 3 03129-03133).

(r)     Defendant's Group Exhibit 65 – Movement Log for Division III for December 20-22, 2002 (Div. 3 03134-03137).

(s)     Defendant's Group Exhibit 66 – Movement Log for Division III for March 1-3 2003 (Div. 3 03138-03139).

(t)     Defendant's Group Exhibit 67 – Movement Log for Division IV for March 30 –April 1, 2001 (Div. 4 05707A-05718).

(u)     Defendant's Group Exhibit 68 – Movement Log for Division IV for April 27-29, 2001 (Div. 4 05719-05727).

(v)     Defendant's Group Exhibit 69 – Movement Log for Division IV for May 18-20, 2001 (Div. 4 05741-05752).

(w)    Defendant's Group Exhibit 70– Movement Log for Division IV for June 15-17, 2001 (Div 4 05728-05740).

(x)     Defendant's Group Exhibit 71 – Movement Log for Division IV for July 27-29, 2001 (Div. 4 05753-05761).

(y)     Defendant's Group Exhibit 72 – Movement Log for Division IV for August 31 –September 2, 2001 (Div. 4 05762-05771).

(z)     Defendant's Group Exhibit 73 – Movement Log for Division IV for October 26-28, 2001 (Div. 4 05772-05783).

(aa)    Defendant's Group Exhibit 74 – Movement Log for Division IV for November 30, – December 2, 2001 (Div. 4 05784-05796).

5902478v2 826296

(bb)   Defendant's Group Exhibit 75 – Movement Log for Division IV for January 11-13 2001 (Div. 4 05797-05806).

(cc)   Defendant's Group Exhibit 76 – Movement Log for Division IV for February 1-3 2002 (Div. 4 05807-05817).

(dd)   Defendant's Group Exhibit 77 – Movement Log for Division IV for March1-3 2002 (Div. 4 05818-05828).

(ee)   Defendant's Group Exhibit 78 – Movement Log for Division IV for April 19-21, 2002 (Div. 4 05829-05843).

(ff)   Defendant's Group Exhibit 79 – Movement Log for Division IV for May 24-26, 2002 (Div. 4 05844-05855).

(gg)   Defendant's Group Exhibit 80 – Movement Log for Division IV for June 21-22, 2002 (Div. 4 05856-05868).

(hh)   Defendant's Group Exhibit 81 – Movement Log for Division IV for July 5-7, 2002 (Div. 4 05869-05878).

(ii)   Defendant's Group Exhibit 82 – Movement Log for Division IV for August 23-25, 2002 (Div. 4 05879-05882).

(jj)   Defendant's Group Exhibit 83 – Movement Log for Division IV for October 25-27, 2002 (Div. 4 05883-05892).

(kk)   Defendant's Group Exhibit 84 – Movement Log for Division IV for November 8-10, 2002 (Div. 4 05893-05904).

(ll)   Defendant's Group Exhibit 85 – Movement Log for Division IV for December 20-22, 2002 (Div. 4 05905-05916).

(mm)   Defendant's Group Exhibit 86 – Movement Log for Division IV for January 17-19, 2003 (Div. 4 05917-05930).

71.   The entries appearing in the Movement Logs which are attached as Group Exhibits 48 through 86 were made by members of our correctional staff at or near the time a prisoner was moved from her cell to another location in the jail. The Movement Logs attached as Group Exhibits 48 through 86 were made and kept in the regular course of our activities at the jail and it was the regular practice of the jail to maintain movement logs to document the movement of the prisoners in the jail.

-33-

72.   The Movement Logs which are attached to my Declaration as Group Exhibits 48 through 86 document that during the course of the weekend lockdowns that were held in Divisions III and IV, prisoners were removed from their cells for the following reasons:

- taken to Cermak Hospital for the administration of methadone;

- taken to Cermak Hospital's emergency room for medical care;

- taken to the pharmacy at Cermak Hospital;

- taken to Cermak Hospital for medical testing;

- taken to Cermak Hospital's tuberculosis clinic;

- taken to Cermak Hospital's ENT clinic;

- taken to Cermak Hospital for surgery;

- taken for psychiatric evaluations elsewhere in the jail;

- to be released from the jail because of a sentence expiring;

- to be released from the jail by virtue of the receipt of administrative mandatory furlough or an "I" bond;

- to be released from the jail on a 10% cash bond or "D" bond;

- to be released from the jail after placement into the Sheriff's Electronic Monitoring (EM) program;

- to attend a wake or funeral service for a family member under the supervision of a correctional officer;

- for transfer to the Gateway Program in Division III;

- to permit them to work as inmate workers during the course of a lockdown;

- to receive insulin shots or nebulizer treatments and at a division's medical dispensary.

73.   During weekend lockdowns, our correctional officers were trained and instructed to respond to any disturbances involving one or more prisoners if and when a disturbance occurred, to separate the prisoners involved, to determine if one or more of the prisoners involved needed to be moved to a different cell, required medical attention or a psychiatric evaluation.  If in the opinion of correctional staff, one or more of the prisoners required to be

-34-

moved to a different cell or tier, the prisoner(s) was/were moved. If correctional staff determined that one or more of the prisoner(s) required medical attention, nurses from the division's medical dispensary were called and that if one or more of the prisoners required a psychiatric evaluation or screening, the prisoner(s) was/were taken for such an evaluation. They are also trained to treat prisoners at the jail in a respectful manner.

74.     Before a correctional officer can begin working at the jail, the officer must complete a training program at the Sheriff's Training Academy and pass a state certification test. The Sheriff's Training Academy was recently certified by Illinois' Law Enforcement Training and Standard's Bureau.

75.     The State of Illinois only requires 200 hours of training for jail correctional officers. The Sheriff's Training Academy provides 476 hours of training on topics including Firearms, Sexual Harassment, Domestic Violence, Detainee Rights and Privileges, Illinois Jail Standards, Human Behavior, Criminal Offenses, Detention Area Safety and Security, Stress Management, Head Counts, Detainee Transport, Report Writing, Protecting a Crime Scene, Searches and contraband, CIMIS, Child Safety/Protection, Threat Assessment-Decision Making, Crisis Intervention, First Aid, Technical Emergency Response, Medical Services, Physical Identification, Correctional Theory, Defensive Tactics, CPR, Radio Codes, Gender Responsiveness, Cultural Diversity, Ethics, Hostage Behavior, Mass Movement, Riot Control, and the General Orders for the jail. The Sheriff's Training Academy provides not only classroom training, but also field training on many of these topics. Graduates also receive 12 hours of college credit through the Sheriff's Training program.

76.     Once a prospective correctional officer completes that course of training and passes the State required exam, he or she achieves probational status for 1 year. During this time, the probational correctional officer will be assigned to a Field Training Officer (FTO) for

-35-

an initial two-week period and then periodically during the remainder of the year. The probational correctional officer will work under the supervision of an FTO and will require training and evaluation in the field by his or her FTO and other correctional staff. On a yearly basis, our correctional officers from the jail also receive 40 hours of in-service training on various topics which include the use of force, defensive tactics, crisis intervention, emergency procedures, firearms usage, sexual harassment, CPR and report writing.

77.    During the time the weekend lockdowns in Divisions III and IV were being held, the Executive Director of the jail was Ernesto Velasco and when Mr. Velasco retired, John Maul became the Acting Executive Director of the jail. Both Mr. Velasco and Mr. Maul had over two decades of experience in the correctional field and had worked at the jail for most of their adult work life. Both Mr. Velasco and Mr. Maul began their careers as correctional officers at the jail and both were promoted to the rank of sergeant, lieutenant, captain and had experience as a division superintendent before appointment to the Executive Director position at the jail. Callie Baird was not the Director of the jail during the time when weekend lockdowns in Divisions III and IV now at issue were being held. Mr Velasco and Mr. Maul were responsible for the day to day operation of the jail during the time when the weekend lockdowns now at issue were being held at the jail.

78.    I have also been asked to explain why we did not call in correctional officers from other divisions of the jail to perform these weekend lockdown searches. There was several reasons. First, calling in correctional officers from other divisions which are not on lockdown would create potential security risks in those divisions because officers would be taken from their assigned posts or duties. We do not have extra correctional officers working on the weekends. Our correctional officers are also subject to the provisions of a collective bargaining agreement which allows them to bid for specific shifts in specific divisions of the jail and

-36-

79.     The Sheriff can recommend, but has no direct control over his annual budget for the jail which by statute is set by the Cook County Board of Commissioners.  The maximum number of correctional officers that can work at the jail, the grade and the amounts paid to those officers is capped on a yearly basis by that annual budget.  In 1995, there was 2496 correctional officers at the jail.  From 1996 through 1998, the number was 2446.  From 1998 through 2004 the number of correctional officers at the jail was set at 2426.

80.     During the weekend lockdowns that occurred in Divisions III and IV, our correctional officers were required to make all necessary headcounts at the beginning and periodically during the course of their shift and to complete all necessary paperwork incidental to carrying out their assigned tasks and functions during the lockdown.

81.     Based upon a check I made using their names, jail identification and IR numbers, none of the named plaintiffs, Genise Hart, Carmen Feliciano, Anne Francis Gelco, Helen Koss, Michelle Gandy, or Caprice Morales are currently detained at the Cook County Jail.

I verify under penalty of perjury that the foregoing information is true and correct.

Executed on March ___, 2008.

_____
Scott Kurtovich

5902478v2 826296

# GROUP EXHIBIT 1















