## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| Genise Hart, Carmen Feliciano, | ) | |
| Ann Francis Gelco, Helen Koss | ) | |
| Caprice Morales  and | ) | |
| Michelle Gandy, individually and | ) | |
| and on behalf of a class, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. 03 C 1768 |
| | ) | |
| vs. | ) | JUDGE: James Zagel |
| | ) | MAGISTRATE: Ashman |
| THOMAS DART, | ) | |
| SHERIFF OF COOK COUNTY, | ) | |
| in his official capacity, and | ) | |
| Cook County | ) | |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF
### MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(b)(3)(A)

Now comes the Plaintiffs, by and through their attorneys, Thomas G. Morrissey, Ltd., and

Robert H. Farley, Jr., Ltd., and pursuant to Local Rule 56.1(b)(3)(A), responds to Defendants'

Statement of Material Facts ("SMF"), as follows:

**Plaintiffs have filed separately a "Statement Of Additional Facts" pursuant to**

**Local Rule 56.1(b)(3)(B).**

## I.     PARTIES, VENUE AND JURISDICTION

1.  Venue is proper in the Northern District of Illinois because the events referred to in plaintiffs' complaint allegedly occurred at the Cook County Department of Corrections ("Cook County Jail" or jail) which is located in the Northern District of Illinois (Ex. A, par. 8).

**Response:**     Admitted.

1

2. This Court has jurisdiction over plaintiffs' claims because they are being brought pursuant to 42 U.S.C. Sec. 1983 (Ex. A, par. 7).

**Response:**     Admitted.

3. Michael Sheahan is the elected Sheriff of Cook County (Ex. A, par 16).

**Response:**     Denied.  Thomas Dart is now the elected Sheriff of Cook County.

4. Genise Hart is a resident of the State of Illinois.  At the time plaintiffs filed their original complaint in this matter, Ms. Hart was a former detainee who had been housed in Division IV of the jail (Ex. A, par. 1, 10).

**Response:**     Admitted.

5. Caprice Morales is a resident of the State of Illinois.  At the time plaintiffs filed their original complaint in this matter, Ms. Morales was a former detainee who had house in Divisions III and IV of the jail (Ex. A, par. 1, 11).

**Response:**     Admitted.

6. Ann Francis Gelco is a resident of the State of Illinois.  At the time plaintiffs filed their original complaint in this matter, Ms. Gelco was a former detainee who had been house in Divisions III and IV of the jail (Ex. A., par. 1, 12).

**Response:**     Admitted.

7. Helen Koss is a resident of the State of Illinois.  She was a pretrial detainee in Division IV of the jail at the time plaintiffs filed their original lawsuit (Ex. A, par. 1, 13).

**Response:**     Admitted.

8. Michelle Gandy is a resident of the State of Illinois.  At the time plaintiffs filed their original complaint in this matter, Ms. Gandy was a former detainee who had been held in Division IV of the jail (Ex. A, par. 1, 14, 50)

**Response:**     Admitted.

9. As of February, 2008, none of the plaintiffs (Ms. Hart, Ms. Morales, Ms. Gelco, Ms Koss or Ms. Gandy) were incarcerated or detained at the Cook County Jail (Ex. B, par. 81)

**Response:**     Admitted.

2

10.  Some of the female prisoners held in custody at the Cook County Jail during the time when weekend lockdowns in Divisions III and IV were held were servicing sentences following a conviction on a misdemeanor charge; others had been convicted of a misdemeanor or felony charge and were awaiting sentencing, other female prisoners were housed there after having been brought back to the jail from the Illinois Department of Corrections and others were in custody for a probation or parole violation (Ex. B, par. 6).

**Response:**      Admitted.

11.  Not all of the female prisoners at the Cook County Jail during the time when the weekend lockdowns were being held in Divisions III and IV were "pretrial detainees" (Ex. B, par. 6).

**Response:**      Admitted.

## II.      THE COOK COUNTY JAIL - BACKGROUND INFORMATION.

12.  The Cook County Department of Corrections (hereinafter "The Cook County Jail" or "jail") is the largest single-site jail in the United States (Ex. B, par 4).

**Response:**      Admitted.

13.  The Cook County Jail is located in an approximate ten (10) square block area covering approximately 96 acres near the Cook County criminal court building at 2600 S. California Ave. In Chicago, Illinois (Ex. B, par. 4).

**Response:**      Admitted.

14.  The Cook County Jail currently houses between 10,000 and 10,500 male and female prisoners (Ex. B, par. 4).

**Response:**      Admitted.

15.  Currently, there are slightly more than 1,000 female prisoners at the jail (Ex. B, par. 4).

**Response:**      Admitted.

16.  The exact number of prisoners held at the jail varies from day to day depending on the number of prisoners admitted to, discharged or transferred from the jail on a daily basis (Ex. B, par. 4).

**Response:**      Admitted.

3

17. The total number of male and female prisoners held at the jail was slightly higher in 2001 and 2002 when the weekend lockdowns in Division III and IV were being held than the current number of male and female prisoners housed at the jail (Ex. B, par. 4).

**Response:**   Admitted.

18. Approximately 100,000 prisoners are admitted to the Cook County Jail on an annual basis (Ex. B, par. 4)

**Response:**   Admitted.

19. The Cook County Jail is comprised of 10 divisions. Each division has its own separate building on the grounds of the jail and operates semi-autonomously under the administrative direction of its own superintendent and supervisory staff with the exception of Division III (for women) and Division VIII (for men) which share the same superintendent and supervisory staff (Ex. B, par. 5)

**Response:**   Admitted.

20. Each division of the jail has its own visiting area, medical dispensary, law library, chapel or multi-purpose room, Correctional Rehabilitation Worker (CRW) office, beauty or barber shop, classrooms as well as clothing and storage rooms (Ex. B, par. 5).

**Response:**   Admitted.

21. Located on the jail's grounds is a stand-alone health facility (Cermak), which employs approximately 600 full and part-time employees (Ex. B, par. 5).

**Response:**   Admitted.

22. There are two third-party educational departments (Chicago Board of Educationand Chicago City Colleges) as well as a privatized food services and commissary agency serving prisoners at the jail which are also located on the jail's grounds (Ex. B, par. 5).

**Response:**   Admitted.

23. Female prisoners are held in two separate divisions of the jail, Divisions III and IV (Ex. B, par. 6)

**Response:**   Admitted.

24. There are sixteen (16) tiers with 352 cells or living units in Division IV (Ex. B, par.

6; Ex. C, p. 13)

**Response:**     Admitted.

25. There are six (6) tiers with 180 cells or living units in Division III (Ex. B, par. 6; Ex. C, p. 135).

**Response:**     Admitted.

26. The tiers in Division III and IV have a dayroom with a television mounted on the wall (Ex. C, pp. 23, 137).

**Response:**     Admitted.

27. Normally, during each day at the jail, prisoners are locked in their cells at approximately 1:30 p.m. each day for several hours to obtain a "head count" of the number of prisoners and to permit a shift change of correctional officers to safely occur (Ex. B, par. 65; Ex. C, pp. 194, 213-14).

**Response:**     Admitted.

28. Normally, prisoners are locked in their cells at night from approximately 9:00 p.m. until approximately 7:00 a.m. except for approximately 30 minutes in the morning when they receive their breakfast (Ex. B, par. 65; Ex. C, p. 194).

**Response:**     Deny . Plaintiff Gelso stated that normally you are out of your cell between 3:00 a.m. to 4:00 a.m. for breakfast and again between 6:00a.m. and 1:00 p.m. (Tab "6" - Gelso Dep. pp. 67-68)

29. Normally, during each day at the jail, prisoners are locked in their cells for at least half of each day (Ex. B, par. 65)

**Response:**     Deny . Plaintiff Gelso stated that normally you are out of your cell between 3:00 a.m. to 4:00 a.m. for breakfast ; between 6:00a.m. and 1:00 p.m and then again between 4:30 p.m. to 9:30 p.m. (Tab "6" - Gelso Dep. pp. 67-68)

30. While in their cells, prisoners can ready their mail or write letters, they can read paperback books, magazines or religious reading materials which prisoners are allowed to have in their cells. If they are in school at the jail, they can ready any school books or work on school projects in their cell. They can do crossword puzzles or play cards which are available through the jail's commissary. There are sinks in each cell and prisoners can wash themselves and their hair in the sink while they remain in their cells (Ex. B, par. 65).

**Response:**
> Deny.  Plaintiff Gelso described the cells as being dark because most of the time the lights don't work (Tab "6" - Gelso Dep. p. 105)

31.  Division III and IV has its own nursing station which includes a medical dispensary stocked with various medications as well as various items of medical equipment used to evaluate a prisoner's condition and to provide medical care to prisoners (Ex. B, par. 29).

**Response:**     Admitted.

32.  Cermak Health Services has a stand-alone health care facility on the jail's grounds where medical and/or mental health services are available and were provided to our prisoners during the weekend lockdowns that occurred in Divisions III and IV (Ex. B, par. 31).

**Response:**     Deny.  Plaintiff Gelso testified that during weekend lockdowns oftentimes she did not get her medication. (Plts. Facts 79-81) (note: Plts. Facts refer to Plts. Additional Facts)

33.  The American Correctional Association (ACA) is an international corrections association formed in 1870, located in Lanham, Maryland.  The ACA's purpose is to improve correctional practices in jails and prisons (Ex. B, par. 3).

**Response:**     Admitted.

34.  The ACA promulates standards applicable to the operations of jails and prisons and the training of correctional staff (Ex. B, par. 3).

**Response:**     Admitted.

35.  The ACA inspects and audits correctional facilities for compliance with its standards, and will accredit a facility that is in compliance with its standards (Ex. B, par. 3).

**Response:**     Admitted.

36.  The Cook County Jail is currently accredited by the ACA and was accredited by the ACA during the time when weekend lockdowns in Divisions III and IV were being held (Ex. B, par. 3).

**Response:**     Admitted.

37.  The Cook County Jail is the largest jail in the United States to receive accreditation by the ACA (Ex. B, par. 3).

6

**Response:**     Admitted.

## III.     INTAKE SCREENINGS AND EVALUATIONS OF PRISONERS.

38.  Each time a new prisoner is admitted to the jail, his or her level of security risk is evaluated by jail staff (Ex. B, par. 7).

**Response:**     Admitted.

39.  Each new prisoner at the jail is classified as either a minimum, medium or maximum security risk (Ex. B, par. 7).

**Response:**     Admitted.

40.  The security risk evaluation for each new prisoner is accomplished through a point system which, among other things, consider's a prisoner's offense history, any history of alcohol or drug abuse, any prior convictions, the nature of those convictions, the nature of the pending criminal charge(s), the prisoner's age, any known gang affiliation, the stability of the prisoner's prior living arrangements, whether the prisoner was involved in any prior institutional escapes, any prior disciplinary problems and whether the prisoner is a suspected drug trafficker (Ex. B, par. 7).

**Response:**     Admitted.

41.  Currently, approximately 34% of all prisoners at the Cook County Jail are classified are maximum security (Ex. B, par. 7).

**Response:**     Admitted.

42.  Currently, approximately 18% of the female prisoners at the Cook County Jail have a maximum security classification (Ex. B, par. 7).

**Response:**     Admitted.

43.  The same approximate percentage of male and female prisoners at the jail were classified as "maximum security" in 2001 and 2002 when the weekend lockdowns in Division III and IV were being held (Ex. B, par. 7).

**Response:**     Admitted.

44.  Each time a new prisoner is admitted into the jail, as part of the intake process, the prisoner is medically and psychologically evaluated and screened by an independent team of trained medical and mental health personnel who are either employed by or under contract with

7

Cermak Health Services (hereinafter Cermak personnel) (Ex. B, par. 8).

**Response:**     Admitted.

45. Female prisoners with special medical needs such as substance abuse or who are pregnant, depending upon the state of the pregnancy, are housed in Division III of the jail (Ex. B, par. 8)

**Response:**     Admitted.

46. Prisoners in Division III are grouped together on tiers based on the nature of the medical need. For example, the jail attempts to house all prisoners receiving methadone on the same tier in Division III. (Ex. B, par. 10).

**Response:**     Admitted.

47. The Cermak medical and mental health personnel performing the medical and psychological evaluations and screenings of new prisoners at the jail determine if a female prisoner should be assigned to Division III, Division IV or should be sent to Cermak's stand-alone health facility located on the jail's grounds (Ex. B, par. 8, 31).

**Response:**     Admitted.

48. At the time of intake into the jail, the Cermak medical and mental health personnel will assess whether a new prisoner suffers from any physical or mental condition which requires the administration of medication (Ex. B, par. 9).

**Response:**     Admitted.

49. If Cermak personnel determine that a prisoner will require medication while in custody at the jail, the type of medication as well as its dosage and frequency of administration will be noted in the prisoner's medical chart which will be sent to the medical dispensary for the division to which that particular prisoner is assigned (Ex. B, par. 9).

**Response:**     Object.  Defendants fail to support this statement with non-hearsay testimony . Director Kurtovich lacks personal knowledge in regards to procedures and practices followed by medical personnel at Cermak.

50. In Division IV, female prisoners with a maximum security classification are generally segregated by tier from medium and minimum security prisoners (Ex. B, par. 10).

**Response:**     Admitted.

51. The Sheriff has historically offered various programs to the female prisoners at the jail. Division IV also has several "program tiers" on which prisoners are not segregated by their security classification but rather are grouped together by virtue of their enrollment in a specific program at the jail such as the "school program," the "dare to be different program" which focuses on drug violence, respect for life, self dignity and religious beliefs or the "Gateway" program which focuses on drug rehabilitation (Ex. B, par. 10).

**Response:**     Admitted.

52. To gain entry into such a program tier on Division IV, prisoners must request admission and be accepted into the program (Ex. B, par. 10).

**Response:**     Admitted.

## IV.    CONTRABAND AT THE JAIL.

53. Contraband is any object or thing that a prisoner is not permitted to have in the jail; any object or item that is used in a fashion other than for its intended purpose or anything found in a location of the jail where it is not permitted (Ex. B, par. 19; Ex. D-1, bates stamped SUM 000279-SUM 000293 and SUM 000332 6 0 SUM 000340).

**Response:**     Admitted.

54. Common objects that prisoners are allowed to have in their cells such as toothbrushes or pens have been converted into crude weapons by sharpening down their edges or be inserting a pin, paperclip or sharp object into one of its ends (Ex. B, par. 19, Ex. D).

**Response:**     Admitted.

55. Weapons and contraband can be fashioned out of virtually anything found in a prison or jail (Ex. B, par. 19; Ex. D-1; bates stamped SUM 000282-000-283, 000286, 000290 - 000292, 000326, 000330, 000332 - 000334, 000337 - 000340).

**Response:**     Objection, the term "virtually anything" is overbroad.

56. Cardboard toilet papers have been converted into a crude pipe for smoking drugs by carving or cutting out a portion of the cardboard and then inserting tinfoil into the opening. Toilet paper will then be wrapped around it in an attempt to prevent its discovery (Ex. B, par. 19; Ex. D-1, bates stamped SUM 000289 and SUM 000334).

**Response:**     Admitted.

57. Extra bedding sheets can be torn into strips to form a rope (Ex. B, par. 19; Ex. D-1,

9

bates stamped SUM 000280, 000284, 000290 - 000291).

**Response:**      Admitted.

58. Small thin metal objects can be used to pick locks (Ex. B, par. 19; Ex. D).

**Response:**      Admitted.

59. Prisoners at the Cook County Jail have broken off pieces of metal from vent plates or grates or even from the sides of risers in the jail's gymnasiums. They will then sharpen or bend the piece of metal so that it has a point and thereby fashion a home-made weapon referred to as a shank (Ex. B, par. 21; Ex. D).

**Response:**      Admitted.

60. Examples of shanks made in the Cook County Jail by prisoners at the jail are depicted in photographs marked Group Ex. No. 1 attached to Scott Kurtovich's Declaration (Ex. B, par. 21; Ex. D).

**Response:**      Admitted.

## V.      PURPOSE OF WEEKEND LOCKDOWNS.

61. Lockdowns of an entire division of the jail were formerly held at the jail over a portion of a weekend ("weekend lockdowns") to make a thorough search of all areas of the division for weapons, drugs or contraband (Ex. B, par. 13).

**Response:**      Deny. Plaintiffs don't know why weekend lockdowns were conducted. (Tab "6" - Gelso Dep. at p.62) An inmate being subjected to disciplinary action, would spend 23 hours in a cell and be let out of her cell for 1 hour per day. (Tab "2" - Glinsey Dep. at p. 33, 34; Tab "3" -Harrison Dep. at p. 37)  During weekend lockdowns, the women in Division IV were locked down in their cells for over 24 hours. (Tab "3" -Harrison Dep. at p. 37)  In Division IV, the weekend lockdowns would start on Friday afternoon and the women would start to be locked down at 2:00 p.m. and the weekend lockdown would last for three days and the earliest time that the women would be released from a lockdown on a weekend on Sunday would be 11:00 a.m. (Tab "3" - Harrison Dep. at p. 10, 12-14)  In Division III, during 2002 weekend lockdowns would start on Friday afternoon and at times would extend through Sunday. (Tab "1"- Allen Dep. at p. 43)

62. The purpose of those weekend lockdowns searches was not to punish a particular detainee or group of prisoners at the jail (Ex. B, par 13).

**Response:**     Denied. An inmate being subjected to disciplinary action, would spend 23 hours in a cell and be let out of her cell for 1 hour per day. (Tab "2" - Glinsey Dep. at p. 33, 34; Tab "3" -Harrison Dep. at p. 37)   During weekend lockdowns, the women in Division IV were locked down in their cells for over 24 hours. (Tab "3" - Harrison Dep. at p. 37)   In Division IV, the weekend lockdowns would start on Friday afternoon and the women would start to be locked down at 2:00 p.m. and the weekend lockdown would last for three days and the earliest time that the women would be released from a lockdown on a weekend on Sunday would be 11:00 a.m. (Tab "3" -Harrison Dep. at p. 10, 12-14)   In Division III, during 2002 weekend lockdowns would start on Friday afternoon and at times would extend through Sunday. (Tab "1" -Allen Dep. at p. 43)

63. The purpose of those weekend lockdowns was to search, find and confiscate, drugs, weapons or other items of contraband inside the jail before a violent outbreak or incident occurred (Ex. B, par. 13)

**Response:**     Denied. Supt. Harrison stated that she does not know the reason behind the policy of keeping detainees lockdown in their cells after their tiers were searched. (Tab "3" - Harrison Dep. at p. 69-70)

64. The only way contraband in a facility the size and complexity of the Cook County Jail can be controlled is to be constantly on the alert and to be thorough and systematic when searching an area of the jail (Ex. B, par 13).

**Response:**     Admitted.

65. The discovery and confiscation of weapons, drugs or items of contraband makes the jail a safer and more secure facility for the correctional staff, and for the prisoners housed at the jail (Ex. B, par. 14; Ex. C, p. 183).

**Response:**     Admitted.

66. Weapons, drugs and contraband were found during various division-wide searches that occurred during the weekend lockdowns that were formerly held at the jail (Ex. B, par. 20, 21)

**Response:**     Denied. The Defendants statement of fact is not supported by the record. The Defendants rely upon the Declaration of Supt. Kurtovich and his claim of knowledge of contraband being found during weekend lockdowns is not based on his personal knowledge but based on hearsay. Kurtovich testified during his deposition testimony that he did not have personal knowledge of contraband being discovered during weekend lockdowns. (Tab "24" - Dep. of Kurtovich at pages 37-39)   Moreover, the Defendant has prepared summary of contraband incident reports from Division 3 and Division 4 between 2001 and 2003 (D-1 Sum 000279-000293; Sum 000326-000340) and has failed to identify that any contraband was

11

discovered during the weekend lockdowns.

67.  Photographs which truly and accurately depict home-made weapons recovered in various divisions searches of the jail are attached as Group Ex. No. 1 to Scott Kurtovich's Declaration (Ex. B, par. 20).

**Response:**     Admitted.

68.  Weapons or items of contraband similar to those depicted in Group. Ex. No. 1 have been discovered in the jail during weekend lockdown searches (Ex. B, par. 20).

**Response:**     Denied.  See Response to paragraph 66 above.

69.  Emergency lockdowns of an entire division have also been held at the jail following a violent outbreak or disturbances, but plaintiffs are not contesting the need to conduct emergency lockdowns of the jail (Ex. A, par. 23; Ex. B, par. 15).

**Response:**     Admitted.

## VI.     MOVEMENT OF CONTRABAND AT THE JAIL.

70.  Anytime a prisoner moves from one location to another within the jail or even within a division of the jail - including during the weekend lockdowns - the potential exists that a weapon, drugs or an item of contraband could be moved to a different location, transferred to another prisoner or secreted in a hiding place in the jail (Ex. B, par. 23; Ex. G, p.79, Ex. D-1 bates stamped SUM 000280-000283, 000287 - 000289, 000292, 000326 - 000333, 000337 0 000340).

**Response:**     Admitted.

71.  Every time a prisoner in either Division III or IV was allowed to move outside of her cell and off her tier for any reason during the weekend lockdowns that were formerly held in those divisions of the jail, the jail's policy was that the prisoner should undergo a "pat-down" search (Ex. B, par. 46; Ex. C, p. 180).

**Response:**     Admitted.

72.  While the jail's policy was to "pat-down" a female prisoner in Division III and IV whenever a prisoner was allowed to move out of her cell during a weekend lockdown, the jail's administrators recognized that this did not eliminate the possibility that a small weapon or an item of contraband could be missed or that another prisoner could pass an object to that prisoner after she had been patted down when a correctional officer was not looking (Ex. B, par. 58).

12

**Response:**     Denied. Director Kurtovich's declaration does not state that he has personal knowledge of pat down searches conduct during lockdown weekends in Division Three and Four.

73.  Because of the potential that a prisoner could transport a weapon, drugs or an item of contraband and not be detected, the jail attempted to restrict prisoner movement during the weekend lockdowns while still providing essential services to the prisoners during the time a lockdown was in effect (Ex. B, par. 22-23, Ex. H, pp. 56-58).

**Response:**     Denied. Plaintiffs have testified that the guards were absent during for extended periods during lockdowns , and at times the plaintiffs were not provided with prescription medication. (Tab "7" -Dep. of Koss, p. 92; Tab "6" -Gelso Dep at pp. 74, 105,  109-110,  113-115 )

74.  Female prisoners have secreted small weapons or contraband items in the soles of their shoes, in the braids of their hair, in their bras, in their panties and in their vaginal area (Ex. B, par. 58, Ex. D-1, bates stamped SUM 000280 - 000283, 000287 -000289, 000292, 000326 - 000333, 000337 - 000340).

**Response:**     Admitted.

75.  Contraband or weapons can also be secreted in food trays or garbage bags or in mops or cleaning buckets used and moved by prison workers between various areas of the jail during weekend lockdowns (Ex. B, par. 41, 42, 60, Ex. D-1, bates stamped SUM 000280 - 000283, 000287 - 000289, 000292, 999326 - 000333, 000337 - 000340).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact  during lockdown weekends in Division Three and Four. (Tab "24" - Kurtovich Dep. pp. 37-40)

76.  For fire safety reasons, the tier interlock door is not the only means by which a prisoner can exit or leave a tier in Division III and IV in the event of an emergency.  Each tier has also a fire door (which is normally kept locked) in Division III and IV which open onto a common stairwell (Ex. B, par. 61)

**Response:**     Admitted.

77.  The common stairwells in Division III and IV which the fire door open onto are used to move of prisoners between floors of those divisions (Ex. B, par. 61).

**Response:**     Objection. Director Kurtovich Director Kurtovich's declaration does not state that he has  personal knowledge for this fact  during lockdown weekends in Division

13

Three and Four. (Tab "24" - Kurtovich Dep. pp. 37-40)

78. The jail has had instances where prisoners have slid items of contraband under a fire door into the common stairwell which would allow the contraband to be picked up by another prisoner walking up or down the stairwell (Ex. B, par. 61).

**Response:**     Objection. The declaration submitted by Director Kurtovich does not reflect that he has personal knowledge for this statement. (Tab "24" -Kurtovich Dep. pp. 37-40)

79. Prisoners have also passed items into and through vents or ducts located in jail cells and in various common areas which lead directly to our ventilation shafts running between various floors of a division of the jail (Ex. B, par. 62, Ex. H, pp. 77-79).

**Response:**     Admitted.

80. Various items of contraband have been discovered by correctional officers when searching the openings of those vents and ducts (Ex. B, par. 62, Ex. H, pp. 77-79).

**Response:**     Admitted.

81. Prisoners have attempted to pass weapons or items of contraband to other prisoners on the tiers above or below them by using string by lowering contraband tied to that string down to a prisoner below or by lowering the string having a prisoner below tie the object to the string and then pulling it up through those vents or ducts (Ex. B, par. 62, Ex. H, pp. 77-79).

**Response:**     Admitted.

82. The jail has also discovered that prisoners have attempted to pass small weapons or items of contraband wrapped in cellophane through the plumping pipes of the jail (Ex. B, par. 62, Ex. H, pp. 77-79).

**Response:**     Admitted.

83. Weapons or items of contraband can be secreted on the underside of surfaces in the jail through the use of gum, toothpaste or other substances both inside of the cell and in other areas of the jail that prisoners have access to (Ex. B, par. 62).

**Response:**     Admitted.

14

## VII.  REASON THOSE LOCKDOWNS WERE HELD ON WEEKENDS.

84.  The division-wide lockdowns occurred on weekends because during weekdays, the Sheriff transports over 1,000 prisoners per day to and from various courthouses throughout Cook County (Ex. B, par. 16)

**Response:**    Admitted.

85.  Additionally, from Monday through Thursday of each week, between 50 and 350 male and/or female prisoners are transported by the Sheriff to the Illinois Department of Corrections (Ex. B, par. 16).

**Response:**    Admitted.

86.  The only courts that are typically in session during a weekend are bond courts.  On weekends, correctional staff at the jail did not have to transport prisoners to court as a result (Ex. B, par. 17).

**Response:**    Admitted.

87.  Because there was no movement of prisoners from the jail to court facilities, or to IDOC, the division-wide lockdowns were held on the weekends (Ex. B, par. 16).

**Response:**    Admitted.

88.  Correctional officers at the jail processed new prisoners into the jail who failed to make bond.  On weekends, new prisoners were admitted to Divisions III and IV at various times during the day and evening hours while a lockdown was in effect.  The time a newly admitted prisoner remained in her cell during a weekend lockdown depended upon, among other things, when her processing into the jail was completed and when the lockdown ended (Ex. B, par. 17).

**Response:**    Admitted.

## VIII.  MANNER IN WHICH WEEKEND LOCKDOWNS WERE FORMERLY HELD.

89.  Female prisoners in Divisions III and IV were not kept locked in their cells during the entire course of a weekend lockdown of those divisions (Ex. B, par. 22, 37, 38).

**Response:**    Admitted.  During weekend lockdowns, the women in Division IV were locked down in the cells for over 24 hours.  (Tab "3" - Harrison Dep. at p. 37).  During weekend lockdowns, the women would be temporarily removed from their cells while their tier was being inspected and after the tier inspection, they would be returned and lockdown in their cells.  (Def. Exh. B, par. 38)

15

90. Not all prisoner movement was eliminated in Division III and IV when those divisions were placed on weekend lockdown status (Ex. B, par. 22)

**Response:**   Admitted.

91. Essential services were provided to prisoners during the course of the weekend lockdowns in Divisions III and IV (Ex. B, 22).

**Response:**   Denied. During lockdown weekends the guards often were not present in the tiers for extended periods of time and detainees detainees often did not receive their medication. (Plts. Fact 15-17, 27-29; 77-81)

92. Some controlled movement of prisoners in Division III and IV occurred while those divisions were on weekend lockdown status because of the services that were provided to prisoners while the lockdown was in effect (Ex. B, par. 22, 23)

**Response:**   Admitted.

93. The weekend lockdown searches of Division III and IV were manually completed. The jail did not have any portable magnetometers, fluoroscopes or other electronic equipment available to use during those searches (Ex. B, par. 18).

**Response:**   Admitted.

94. Administrators at the jail attempted to vary the intervals between the weekend lockdowns of a specific division of the jail so that the lockdown searches did not occur under any recognizable pattern so that the prisoners housed in a particular division could not predict when a weekend lockdown was likely to occur (Ex. B, par. 18).

**Response:**   Admitted.

95. The jail varied the time intervals between the weekend lockdowns in an attempt to increase the effectiveness of the searches that were made during those weekend lockdowns (Ex. B, par. 18).

**Response:**   Admitted.

96. Many of the weekend lockdowns that occurred in Division III began on Saturday morning, not Friday afternoon (Ex. B, par. 52).

**Response:**   Denied. Weekend lockdowns during 2002 would start on Friday afternoon and at times extend through Sunday. (Tab "1" - Allen Dep. at p. 43)

16

97.  Weekend lockdowns in Division III frequently began on Saturday because commissary typically (but not always), was delivered in Division III on Friday afternoons (Ex. B, par. 52).

**Response:**     Denied.  Weekend lockdowns during 2002 would start on Friday afternoon and at times extend through Sunday.  (Tab "1" - Allen Dep. at p. 43)

98.  All of the lockdowns held in Division III in 2001 and five (5) of the lockdowns held in 2002 began on Saturday mornings (Ex. B, par. 52).

**Response:**     Denied.  Weekend lockdowns during 2002 would start on Friday afternoon and at times extend through Sunday.  (Tab "1" - Allen Dep. at p. 43)

99.  During the weekend lockdowns in Division III and IV, prisoners had access to various commissary items they had previously ordered (Ex. B, par. 52).

**Response:**     Admitted.

100.  A list of commissary items which prisoners had access to while in their jail cells when the weekend lockdowns in Divisions III and IV were being held is attached as Exhibit No. 4 to Scott Kurtovich's Declaration (Ex. B, par. 55).

**Response:**     Admitted.

101.  During the weekend lockdowns that were held in Division III and IV, nurses employed by or under contract with Cermak Health Serivces (Cermak Nurses) were stationed at the medical dispensaries in those divisions "24 x 7" and were available to assess a prisoner's condition and to provide medication, medical care and treatment around the clock in those divisions (Ex. B, par. 27, 29-32).

**Response:**     Denied.   Detainees often did not receive medical treatment or  their medication for extended periods during lockdown weekends. (Plts. Facts, 77-81)

102.  During weekend lockdowns in Divisions III and IV, the Cermak nurses visited the tiers in those divisions to deliver medication.  They also evaluated a prisoner's condition and provided medical care to prisoners when requested to prisoners at their cells during those lockdowns (Ex. B, par. 29, 32; Ex. C., pp. 195-97).

**Response:**     Denied.     Detainees often did not receive medical treatment or  their medication for extended periods during lockdown weekends. (Plts. Facts, 77-81)

17

103. During weekend lockdowns in Divisions III and IV, the Cermak nurses responded to calls from correctional staff when medical assistance on a tier was request (Ex. B, par. 30)

**Response:** Denied.     Detainees often did not receive medical treatment or their medication for extended periods during lockdown weekends. (Plts. Facts, 77-81)

104. Certain types of medications and certain medical care could not be administered at a prisoner's cell on the tiers in Divisions III and IV.  When that situation arose during the weekend lockdowns in Divisions III and IV, prisoners receiving that type of medication or needing that type of care were escorted off their tier to the division's medical dispensary or when the Cermak nursing staff deemed it necessary, prisoners were transported to Cermak's health care facility on the jail's grounds or to some other hospital (Ex. B. par. 27-31; Ex. C, pp. 196-98)

**Response:**     Denied.     Detainees often did not receive medical treatment or their medication for extended periods during lockdown weekends. (Plts. Facts, 77-81)

105. During the weekend lockdowns in Divisions III or IV, all areas of the division on lockdown were searched (Ex. B, par. 53).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

106. Weekend lockdown searches of a division were different than other searches of a cel or a tier that occur at the jail.  Weekend lockdown searches were more intense and more comprehensive than those other searches (Ex. B, par. 53; Ex. C, p. 105).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

107. During the weekend lockdowns in Divisions III and IV, the jail's policy was for correctional officers to check the integrity of the outside walls of the cell, to search for extra bedding or clothing in the cell, to check the cell's electrical fixtures. In addition, the areas around, under, inside of or behind any mirror or objects on the wall, including any vents, ducts or grates in the wall was to be searched as well as the toilet and sink areas and any mattresses, pillows or bed frames in the cells (Ex. B, par. 53).

**Response:**     Admitted.

108. The search of a division during a weekend lockdown included all hallways, common areas, shower rooms, clothing rooms, recreation rooms, dayrooms, libraries, chapels, visitation rooms, storage rooms, classrooms, gymnasiums, lobbies, beauty shops as well as any other areas in the division where a weapon or item of contraband could be hidden (Ex. B, par. 53; Ex. C, pp. 138, 191-92, 202-04).

**Response:**     Admitted.

109.  All objects in any area searched in which or under which a weapon or an item of contraband could be hidden had to be examined, opened and searched (Ex. B, par. 53, 55).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

110.  During the weekend lockdowns in Divisions III and IV, desk drawers, tables, chairs, books, clothing bags, jars, shower and toilet stands, or board games had to be searched (Ex. B., par. 53; Ex. C, p. 191).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

111.  There were a large number of books in classrooms and libraries that can be a hiding place for drugs, a weapon or contraband which were searched during the weekend lockdowns in Divisions III and IV (Ex. B, par. 53).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

112.  There are eight (8) classrooms in Divisions III and IV (Ex. B, par. 53).

**Response:**     Admitted.

113.  Some of the common areas of the division would be searched at night while the prisoners were asleep (Ex. B, par. 53).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

114.  During a weekend lockdown, everything in a cell was searched including any and all items of personal property.  The tops of containers were removed and correctional officers were to look inside of everything in which a weapon or item of contraband could be hidden (Ex. B, par. 53, 55; Ex. C, par. 126)

**Response:**     Admitted.

115.  The longer a prisoner remains in custody at the jail, the greater number of objects or items the prisoner accumulates in her cell and the longer it would take to search the cell as a result during a weekend lockdown (Ex. B, par. 55; Ex. C, p. 215).

19

**Response:**     Admitted.

116. Examples of the type of items that could be found in a prisoner's cell that had to be opened and searched during the course of a weekend lockdown are reflected on the commissary list which is attached to Ex. B as Exhibit No. 4 (Ex. B, par. 55).

**Response:**     Admitted.

117. The time it would take to search an area such as a beauty shop, a dayroom, a clothing room or the cells on a tier would depend upon the number of correctional officers involved, the thoroughness of an individual officer's search, the number of objects or items that had to be opened, looked under or examined and the nature of anything seized during the search (Ex. B, par. 54; Ex. C, pp. 187-88)

**Response:**     Admitted.

118. The discovery of a weapon or drugs in a prisoner's cell which could lead to a criminal prosecution would lengthen the time it took to complete the search of a tier because correctional staff had to properly inventory the item recovered and investigate which prisoner is responsible for possession of the contraband which can be time consuming because more than one prisoner was typically assigned to a cell in Divisions III and IV (Ex. B, par. 154).

**Response:**     Admitted.

119. There is no set or specific number of correctional officers assigned to search the living units or common areas during a weekend lockdown. The number of officers vary depending upon the number of officers that are then available (Ex. C, p. 163).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

120. During the weekend lockdowns, in Divisions III and IV, correctional officers who were assigned to search the division were pulled off the search assignment to perform other tasks such as transporting prisoners to Cermak or to the division's medical dispensary for treatment which impacts the time to complete the search (Ex. B, par. 36, 33, 46; Ex. C, pp. 188-89).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

121. During the weekend lockdowns in Divisions III and IV, correctional staff at the jail would not search a prisoner's cell or a tier during the time when prisoners on that tier were eating a meal (Ex. B, par. 48).

20

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

122.   During each shift when the weekend lockdowns in Division III and IV occurred, there was a three-hour timeframe when one-third (1/3) of the correctional staff in a division was at lunch and during that time, searches could not be performed (Ex. B, par. 48).

**Response:**     Admitted.

123.   There was no set time when the weekend lockdowns ended on a Sunday.  In Division IV, the doors to the cells would be opened anywhere between 7:00 a.m. to 10:30 a.m. on a Sunday (Ex. B, par. 52; Ex. C, p. 172).

**Response:**     Admit there was no set time when the weekend lockdowns ended on a Sunday. Deny the lockdowns would end in Division IV on a Sunday by 10:30 a.m. as Supt. Harrison stated that the earliest time that the women would be released from a lockdown in Division IV on a Sunday would be 11:00 a.m.  (Tab "3" - Harrison Dep. at p. 13-14)

124.   Once the search of the entire division was completed, the lockdown was lifted (Ex. B, par. 52, Ex. C, p. 172).

**Response:**     Admitted.

125.   Because the purpose of the weekend lockdowns in Division III and IV was to search for weapons, drugs and contraband, the jail attempted to limit prisoner movement while the division was on lockdown (Ex. B, par. 22).

**Response:**     Admitted.

126.   During the weekend lockdowns in Divisions III and IV, services provided to the prisoners included feeding them in their cells on their regular meal schedule; permitting visits by family, friends and attorneys; and the provision of medication, medical and mental health care. Additionally, psychiatric evaluations of prisoners were made, the jail was cleaned, prisoners were released or discharged from jail, new prisoners were processed into the jail, and if a disturbance occurred in the cell, the prisoners would be separated and, when necessary, transferred to a different tier or division (Ex. B, par. 24-25, 27-28, 31-32, 34-36, 39-43, 45-46, 66-67).

**Response:**     Denied.  During lockdown weekends the guards often were not present in the tiers for extended periods of time and detainees often did not receive medical care and their medication. (Plts. Fact 15-17, 27-29; 77-81)

127.   Because these essential services were provided to prisoners during the weekend lockdowns in Divisions III and IV, it was impossible to eliminate prisoner movement outside

their cells and off their tier during those weekend lockdowns (Ex. B, par. 22).

**Response:**  Denied.  During lockdown weekends the guards often were not present in the tiers for extended periods of time and detainees often did not receive medical care and their medication. (Plts. Fact 15-17, 27-29; 77-81)

128.  During the weekend lockdowns that occurred in Divisions III and IV, every prisoner was removed from their cell while the cells on a tier were being searched (Ex. B, par. 37)

**Response:**      Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

.      129.  During the weekend lockdowns that were formerly held in Division III and IV, no prisoner was kept locked in her cell curing the entire course of the lockdown (Ex. B, par 37).

**Response:**      Admit that during weekend lockdowns, the women would be temporarily removed from their cells while their tier was being inspected and after the tier inspection, they would be returned and lockdown in their cells. (Def. Exh. B, par. 38)  During weekend   . lockdowns, the women in Division IV were locked down in the cells for over 24 hours.  (Tab "3" -Harrison Dep. at p. 37).

130.  The risks which a prisoner faced and the conditions of a prisoner's confinement during the course of a weekend lockdown were no different than during the other times when the prisoner was locked in her cell (Ex. B, par. 66).

**Response:**      Denied:  During lockdown weekends the guards often were not present in the tiers for extended periods of time and detainees often did not receive medical care and their medication. (Plts. Fact 15-17, 27-29; 77-81)   Due to the shortage of correctional officers in 2001 through 2003, the Sheriff would engage in "crosswatching" which involved one officer being assigned to more than one tier or housing unit.[1]  Crosswatching occurred during weekend lockdowns. (Tab "3" -Harrison Dep. at p. 23)  Superintendent Harrison of Division IV, one of the women's divisions, stated that if an officer was crosswatching certain tiers that it would be physically impossible to see into the cells of the other tiers and that an officer would not be able to hear whether an inmate was screaming out for help if attacked by someone or screaming for medical attention.  (Tab "3" -Harrison Dep. at p. 23-24, 35-36).

There was a shortage of correctional staff on weekends.  (Def. Exh. B, par. 56) The jail had a higher number of staff who called in sick or took allotted "comp time on the weekends.  (Id) The jail would not call in staff from other divisions during weekend lockdowns.

---

[1]  The annual budget for the years 2001 through 2003 provided for 2,426 correctional officers to be assigned to the Cook County Jail. (Kurtovich Dep. at p. 10)  For 2007, there were 3,062 positions for correctional officers under the Cook County Budget. (- - cite - - )

22

(Def. Exh. B, par. 78) The jail did not have extra correctional officers working on the weekends. (Id.)

131. The risk of prisoner on prisoner violence exists at all times at any correctional facility where large number of violent persons are held against their will (Ex. B, par. 66).

**Response:**     Admitted

132. During the weekend lockdowns in Divisions III and IV, correctional officers were required to make all necessary head counts at the beginning and then periodically during the course of their shift and to complete all necessary paperwork incidental to carrying out their assigned tasks and functions during the lockdown (Ex. B, par. 80).

**Response:**     Admit that correctional officer conducted counts during lockdown weekend but deny that correctional officers carried out their assigned tasks and functions during lockdown weekends. During lockdown weekends the guards often were not present in the tiers for extended periods of time and detainees  often did not receive medical care and their medication. (Plts. Fact 15-17, 27-29; 77-81)

## IX.     MOVEMENT OF PRISONERS OUT OF THEIR CELLS AND/OR OFF OF THEIR TIER DURING WEEKEND LOCKDOWNS.

### A.     VISITS WITH FAMILY, FRIENDS OR ATTORNEYS

133. Because either the wholesale cancellation of weekend visits for prisoners in a division or the wholesale denial of visits for prisoners in a division on a particular weekend would alert the prisoners in that division that a weekend lockdown was likely to occur which would provide them with an opportunity to move or secrete contraband elsewhere within the division or the jail, the jail permitted prisoner visits to occur during those weekend lockdown (Ex. B, par. 24, Ex. H, p. 58)

**Reponse:**     Admitted.

134. During the weekend lockdowns, prisoners were permitted to leave their cells, move off tier and visit with family or friends for thirty (30) minutes if such a visit had been previously scheduled in accordance with the jail's rules and regulations (Ex. B, par. 24; Ex. C, pp. 173-74, Ex. E, p. 23, Ex. F, p.37).

**Response:**     Admitted.

135. The jail also permitted unscheduled prisoner visits to occur during a weekend lockdown if the visitor had traveled over 150 miles to make the visit (Ex. B, par. 24; Ex. C, p. 195).

23

**Response:**     Admitted.

136.  If a prisoner had more than one visit scheduled and the visitors arrived at different times, the prisoner would be removed from her cell on multiple occasions for visitation purposes (Ex. B, par. 24).

**Response:**     Admitted.

137.  Prisoners were also removed from their cells, moved off their tiers and were allowed to meet for an unlimited period of time with the attorney during a weekend lockdown whenever the attorney appeared at the jail and requested such a meeting or had such a meeting prearranged with his or her client (Ex. B, par. 25; Ex. C, p. 195).

**Response:**     Admitted.

138.  Each division of the jail has its own visiting room or visiting area (Ex. B, par. 26).

**Response:**     Admitted.

139.  Whenever prisoner visits were allowed to occur during a weekend lockdown, a correctional officer from the prisoner's division would either accompany the prisoner from her tier to the division's waiting room and back again or depending on staffing issues, correctional officers would keep a prisoner under observation as she moved from location to location or from security post to security post in the division (Ex. B, par. 26).

**Response:**     Admitted.

140.  Another correctional officer from that division was stationed in the visiting area while those visits occurred (Ex. B, par. 26).

**Response:**     Admitted.

141.  Correctional officers who either accompanied or observed the prisoners and those who were posted in the visiting areas were not available to search various areas of the division while performing those task (Ex. B, par. 26).

**Response:**     Admitted.

142.  Visitation Logs for Divisions III and IV for various weekends when weekend lockdowns occurred in those divisions are attached to the Declaration of Scott Kurtovich as Group Exhibit Nos. 5 through 47 (Ex. B, par. 67).

**Response:**     Admitted.

24

143. The entries appearing in the Visitation Logs which are attached to Ex. B as Groups Exhibit Nos. 5 through 47 were made by correctional staff at the time those visits occurred and those logs were made and kept in the regular course of activities at the jail and it was the regular practice of the jail to maintain visitation logs of this type in order to record the identity of visitors, prisoners who received visitors and when those vists occurred (Ex. B, par. 68).

**Response:**    Admitted.

144. The Visitation Logs which are attached to Ex. B as Group Exhibit Nos. 5 through 47 document that during the weekend lockdowns in Divisions III and IV, prisoners were permitted to have visits by family, friends and/or attorneys (Ex. B, 69).

**Response:**    Admitted.

145. The Visitation Logs which are attached to Ex. B as Group Exhibit Nos. 5 through 47 document that those prisoners who received visits were not kept in their cells during the entire time that their division was on lockdown and were permitted to communicate with their lawyers, family and friends (Ex. B, par. 69).

**Response:**    Admitted.

146. One Visitation Log indicates that Caprice Morales was allowed to visit with her daughter for 30 minutes on January 18, 2004 during the course of a weekend lockdown (Ex. B, Group Exhibit 47, Bates No. Div. 4 05694.

**Response:**    Admitted.

147. One Visitation Log indicates that a "Denise Hart" having a detainee I.D. No. 02-04951 received a 15 minute visit during a February, 2002 weekend lockdown of Division IV (Ex. B, par. 69; Group Ex. 37 Bates No. Div. 4 05555).

**Response:**    Admitted.

148. The Denise Hart which received a visitor during the February, 2002 weekend lockdown is Genise Har, one of the named plaintiffs (Ex. B, par. 69).

**Response:**    Admitted

### B. MEDICAL CARE.

149. During the weekend lockdowns in Divisions III and IV, prisoners who experienced medical problems which could not be treated at their cells, or claimed they were sick, were removed from their cells, moved off of their tier, and were provided medical care or treatment

25

either at the division's medical dispensary by Cermak nursing staff or were transported to Cermak or to some other hospital facility whenever the Cermak nursing staff believed that a prisoner's condition warranted such care (Ex. B, par. 27, 31; Ex. C, pp. 174-75, 190, 210, Ex I, p. 45; Ex. N. p. 24)

**Response:**   Denied.  Detainees  often did not receive medical care and their medication. (Plts. Fact ; 77-81)

150.  During the weekend lockdowns in Divisions III and IV, diabetic inmates were taken to the medical dispensary where the Cermak nurses would provide them with their insulin shots (Ex. B, par. 28, Ex. H, pp. 57-58).

**Response:**   Admitted.

151.  During the weekend lockdowns in Divisions III and IV, prisoners who were asthmatic and required a breathing treatment would be brought to the division's medical dispensary for nebulizer treatement (Ex. B, par. 28; Ex. C, p. 210).

**Response:**   Denied. Plaintiff Gandy had an asthma attack and didn't receive treatment during a lockdown weekend. (Plt. Fact 33)

152.  During the weekend lockdowns in Division III, inmates who were on methadone were taken to the Cermak health care facility on the jail's grounds to receive that medication (Ex. B, par. 28; Ex. C, pp. 197-98).

**Response:**   Admitted.

153.  Whenever a prisoner from either Division III or IV was taken to the division's medical dispensary or transported to Cermak or to some other hospital during a weekend lockdown, a correctional officer from that division accompanied the prisoner and would remain with the prisoner until she returned to her tier (Ex. B, par. 33; Ex. C, pp. 195, 198)

**Response:**   Admitted.

154.  While a correctional officer remained with a prisoner who was receiving care at the division's dispensary at Cermak or some other hospital, that officer was unavailable to assist in the search of the division (Ex. B, par. 33; Ex. C, pp. 195, 198)

**Response:**   Admitted.

155.  In her answers to interrogatories, Michele Gandy acknowledged that during a weekend lockdown, she was released from her cell and received treatment at the nurse's station on the first floor of her division from shortness of breath allegedly due to asthma (Ex. J, par. 5, 6.

Ex. K, p. 29; Ex. AA, par. 22-23)

**Response:**   Denied. Plaintiff Gandy had an asthma attack and didn't receive treatment during lockdown weekend. (Plt. Fact 33)

156.  In her answers to interrogatories, Helen Kos admitted that for pre-labor pains she allegedly experienced during a weekend lockdown, she saw the nurse, was given Tylenol and told to lay down (Ex. L, par. 6; Ex. M, pp. 21-22, 27-28; Ex. AA, par. 10-11).

**Response:**   Admit in part, but stated in her answers to interrogatories that the correctional officer would not take her to Cermak with her pre-labor pains.  In addition, Plaintiff Kos stated in her deposition that she was pounding on the door of her cell for about five hours prior to receiving medical attention.  (Def. Ex. L, par. 6; Plts. Fact 32.)

157.  In her answers to interrogatories, Ms. Kos indicates that while in the County Jail, she was referred to Cermak Hospital because she became depressed, felt suicidal, was unable to sleep and felt anxious allegedly as a result of the lockdowns and was placed on medication and received counseling twice a week for a number of months. Plaintiff Koss would not always receive her medication during weekend lockdowns (Ex. L, par. 7; Ex. M, p. 28).

**Response:**  Admitted in part,  Plaintiff Koss would not always receive her medication during weekend lockdowns . (Plt. Fact 80).

## C. PSYCHIATRIC EVALUATIONS.

158.  During the course of the weekend lockdowns in Divisions III and IV, prisoners were removed from their cells, taking off of their tiers and were escorted for psychiatric evaluations whenever it became necessary during the course of any lockdown that occurred in those divisions (Ex. B, par. 34-36, Ex. N, p. 24; Ex. D-2, bates stamped SUM 000324-000325, 000369, 000371-000374, 0003890000381, 000393).

**Response:**   Denied. Plaintiff Gelso was injured when she attempted to prevent a cell mate from committing suicide and no guard was present to intercede. (Plt. Fact 51)

159.  Prisoners were referred for psychiatric evaluations whenever they threatened to commit or committed self-injurious behavior (Ex. B, par. 34; Ex. H, p. 59, Ex. D-2, bates stamped SUM 000324-000325, 000369, 000371-000374, 000380-00381, 000393).

**Response:**   Denied.  See Answer to 158 above.

27

160. In the event that a prisoner inflicted some form of injury upon himself during a weekend lockdown, medical care would first be provided to any physical injury and the prisoner would be sent for a psychiatric evaluation (Ex. B, par. 34; Ex. H, p. 59, Ex. D-2, bates stamped SUM 000324-000325, 000369, 000371-000374, 000380-00381, 000393).

**Response:**     Denied. Medical care not provided promptly. See Answer to 158 above.

161. Correctional officers were instructed and trained to make a psychiatric referral whenever a prisoner appeared depressed, overly anxious, did not know who she was, where she was at or what she was doing, appeared confused or unable to concentrate, was suicidal or experiencing visual or auditor hallucinations (Ex. B, par. 34).

**Response:**     Denied, See answer to 158 above.

162. Independent mental-health care personnel employed by or under contract with Cermak Health Services (Cermak mental health personnel) made the psychiatric evaluations of prisoners during the course of the weekend lockdowns in Divisions III and IV (Ex. B, par. 35).

**Response:**     Admitted, but see response to par. 158 above.

163. The Cermak mental-health personnel who made the psychiatric evaluations of prisoners during the weekend lockdowns in Division III and IV would determine if the prisoner could be returned to her cell, if the prisoner had to be moved to a different cell, to a different division or sent to Cermak for further evaluation (Ex. B, par. 35, Ex. G, p. 78).

**Response:**     Admitted, but see response to par. 158 above.

164. Whenever a psychiatric evaluation of a prisoner in either Division III or IV occurred during a weekend lockdown in those divisions, a correctional officer from the division would accompany a prisoner to and from the psychiatric screening and would remain nearby the prisoner whenever the evaluation occurred (Ex. B, par. 36)

**Response:**     Admitted.

165. The psychiatric screenings or evaluations of prisoners that occurred during the weekend lockdowns in Divisions III and IV occurred in the basement area of Division V, which was a different division of the jail (Ex. B, par. 36).

**Response:**     Admitted.

166. During the weekend lockdowns in Divisions III and IV, whenever a correctional officer accompanied a prisoner to a psychiatric evaluation, that correctional officer was unable to assist in the search of the division while performing the assignment (Ex. B, par. 36)

**Response:**     Admitted..

## D. CELL SEARCHES

167.  In order to safely search a prisoner's cell during a weekend lockdown in Divisions III and IV, prisoners assigned to the cell had to first be removed from it (Ex. B, par. 37; Ex. C, p. 110).

**Response:**     Admitted.

168.  While the cells on a given tier in Divisions III or IV were being searched during a weekend lockdown, all prisoners on that tier were removed from their cells (Ex. B, par. 37).

**Response:**     Objection. Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

169.  During the weekend lockdowns that occurred in Division IV, female prisoners were temporarily moved from their cells and placed into the tier's dayroom (Ex. B, par. 38; Ex. C, p. 189).

**Response:**     Admitted.

170.  During the weekend lockdowns that occurred in Division III, female prisoners were temporarily moved from their cells and temporarily moved through the tier interlock door into a recreation room on the first floor of Diviison III. (Ex. B, par. 38).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact  during lockdown weekends in Division Three and Four .

171.  Correctional officers from those respective divisions monitored the movement of prisoners out of their cells and into the dayroom areas (in Division IV) and the first floor recreation room (in Division III) and then back again during the weekend lockdowns of those divisions (Ex. B, par. 38).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact  during lockdown weekends in Division Three and Four .

172.  Correctional officers from Division III monitored and supervised the prisoners while they remained in the recreation room while their cells were being searched during the course of the weekend lockdowns in that division (Ex. B, par. 38).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal

knowledge for this fact during lockdown weekends in Division Three and Four .

173. Correctional officers from Division IV monitored and supervised the prisoners while they remained in the dayrooms while their cells were being searched during the course of the weekend lockdowns in that division (Ex. B, par. 38)

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

174. Immediately after the completion of the cell searches for a specific tier, the prisoners would then be returned to their cells and the dayroom or recreation room would again be searched (Ex. B, par. 38).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

175. Because prisoners were removed from their cells during the weekend lockdowns that occurred in Divisions III and IV while their cells were being searched, no prisoner in those divisions was ever locked in her cell for the entirety of the weekend lockdown (Ex. B, par. 38).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

## E. PRISON WORKERS - MEAL DELIVERY, CLEANING COMMON AREAS AND WORK IN THE DIVISION'S CLOTHING AND STORAGE ROOM.

176. During the weekend lockdowns of Divisions III and IV, certain prisoners were allowed out of their cells for an extended period of time in order to deliver food, collect garbage, mop the floors and clean common areas of their tiers and others were permitted to leave their tiers in order to perform similar work in various common areas of their division outside of their tier (Ex. B, par. 39, 40, 42, 44).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

177. Those prisoners who worked on the tier in which they were housed are called living unit workers. Those prisoners who were allowed to move off of their tier and who worked in common areas of the division and moved between tiers are referred to as building workers (Ex. B, par. 40, 42).

**Response:**     Admitted.

178. During weekend lockdowns in Divisions III and IV, among other things, the

building workers delivered food carts to various tiers of their division from the basement of their division and returned those carts when the mean was completed (Ex. B, par. 42).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four .

179.  During the weekend lockdowns in Divisions III and IV, building workers also collected garbage from various tiers and transported that garbage to the basement of the division and then placed it in the main dumpster outside of Division V (Ex. B, par. 42).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four .

180.  During the weekend lockdowns in Divisions III and IV, other building workers worked in the clothing and storage room of their respective divisions under the supervision of correctional officers from that division (Ex. B, par. 42)

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four .

.    181.  During the weekend lockdowns in Divisions III and IV, building workers also mopped and cleaned all common areas of the division outside of the tier interlock areas such as the hallways and lobby (Ex. B, par. 42)

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four .

182.  Building workers worked on tiers different from the one on which they were housed and moved between various tiers in areas of the division of the jail during the weekend lockdowns in Divisions III and IV (Ex. B, par. 40).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four .

183.  During a typical weekend lockdown in Division III and IV, there were up to forty-four (44) building workers for Division IV and up to another (40) in Division III (Ex. B, par. 43).

**Response:**      Admitted.

184.  To move off of their tier, those building workers had to travel through the interlock door for their tier to perform their assignments during the course of the weekend lockdown (Ex. B, par. 46).

**Response:**     Admitted.

.

185.  During the weekend lockdowns in Divisions III and IV, for each shift, there was an additional two to four living unit workers on each tier (a daily total of 6 to 12 on each tier in each division) that were allowed out of their cells to work during a weekend lockdown (Ex. B, par. 43).

**Response:**     Admitted.

186.  Because Division III had six (6) tiers, there were between 36 and 72 living unit workers (2 to 4 workers per tier x 3 shifts x 6 tiers) who were permitted out of their cells each day while a weekend lockdown was in effect in the division (Ex. B, par. 43).

**Response:**     Admitted.

187.  Because Division IV had 16 tiers, there were between 96 and 192 living unit workers (16 tiers x 2 to 4 workers x 3 shifts) that were permitted to be out of their cells each day while the weekend lockdown was in effect (Ex. B, par. 43).

**Response:**     Admitted.

188.  While prison workers were out of their cells during the weekend lockdowns in Divisions III and IV, they were supervised by correctional officers from their division (Ex. B, par. 39).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal
              knowledge for this fact  during lockdown weekends in Division Three and Four .

.

189.  During the weekend lockdowns in Divisions III and IV, the correctional officers who supervised the activities of prison workers while they were outside of their cells were unable to participate in the search of the division during the lockdown (Ex. B, par. 43).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal
              knowledge for this fact  during lockdown weekends in Division Three and Four .

.

190.  The criteria used to select living unit and building workers were that they had been charged with a non-violent offense, had no history of violence in their background, had a low bond and had displayed the ability to comply with the jail's regulations (Ex. B, par. 44).

**Response:**     Admitted.

191.  It would be wrong from both a correctional and security perspective to assume that

simply because living unit and building workers had a minimum security classification that they would not either willingly participate or that they could not be forced to participate in the trafficking or movement of weapons, drugs or contraband at the jail (Ex. B, par. 44).

**Response:**     Admitted.

192.  Building workers with a minimum security classification have been found in possession of contraband at the jail (Ex. B, par. 43).

**Response:**     Admitted.

### F.  DISCHARGE FROM THE JAIL/TRANSFER FROM THE DIVISION

193.  Prisoners were removed from their cells and taken off of their tiers during a weekend lockdown in Divisions III and IV whenever their bond was paid, whenever their sentence expired, whenever they were placed on a furlough program (Ex. B, par. 45; Ex. C, pp. 175, 195).

**Response:**     Admitted.

194.  If a disturbance in a cell occurred during a weekend lockdown in Divisions III and IV, one or both of the prisoners involved would be removed from their cells and either transferred to another tier or to a different division if a disturbance in a cell occurs, if in the opinion of correctional staff, such a move was required.  (Ex. B, par. 73; Ex. C, pp. 205-208).

**Response:**     Denied. During lockdown weekends the guards often were not present in the tiers for extended periods of time. (Plts. Fact 15-17, 27-29; 51)

### G.  MOVEMENT LOGS

195.  Attached to the Declaration of Scott Kurtovich (Ex. B) as Groups Exhibit Nos. 48 through 86, respectively are Movement Logs for Divisions III and IV when weekend lockdowns in those divisions occurred (Ex. B, par. 70)

**Response:**     Admitted.

196.  The entries appearing in the Movement Logs attached as Group Exhibit Nos. 48 through 86 to Ex. B were made by correctional staff at the Cook County Jail at or near the time a prisoner moved from her cell to another location in the jail (Ex. B, par. 71).

**Response:**     Admitted.

197. The Movement Logs attached as Group Exhibit Nos. 48 through 86 of Ex. B were made and kept in the regular course of activities at the jail and it was the regular practice of the jail to maintain Movement Logs to document the movement of prisoners in the jail (Ex. B, par. 71).

**Response:**   Admitted.

198. The Movement Logs which are attached to Ex. B as Group Exhibit Nos. 48 through 86 document that during the course of the weekend lockdowns that were held in Divisions III and IV, prisoners were removed from their cells, taken off of their tier and transported to Cermak for the administration of methadone, to Cermak's emergency room, to Cermak's pharmacy, to Cermak for medical testing, to Cermak's tuberculosis clinic, to Cermak's ENT clinic, to Cermak for surgery (Ex. B, par. 72).

**Response:**   Admitted.

199. The Movement Logs which are attached to Ex. B as Group Exhibits Nos. 48 through 86 document that during the course of the weekend lockdowns that were held in Divisions III and IV, prisoners were removed from their cells and taken off of their tier for psychiatric evaluations, to permit prisoners to serve as building workers, to receive insulin shots or nebulizer treatments at the division's medical dispensary, were released from the jail because of a sentence expiring, were released from the jail because of an administrative mandatory furlough - an I-bond, were released from the jail on a 10% cash bond or "D" bond, were released from the jail after placement into the Sheriff's Electronic Monitoring Program, were permitted to attend a wake or funeral service for a family member under the supervision of a correctional officers, for transfer to the Gateway Program in Division III, (Ex. B, par. 72).

**Response:**   Admitted.

200. During the weekend lockdowns in Divisions III and IV, whenever a prisoner was allowed to be out of her cell and was permitted to move off of her tier for any reason, the tier interlock door for the division had to be opened (Ex. B, par. 46).

**Response:**   Admitted.

201. During the weekend lockdowns in Divisions III and IV, the tier interlock door was opened whenever a building worker entered the tier or whenever a nurse or medical personnel arrived or whenever a correctional officers made a thirty (30) minute security check or a head count of prisoners on that tier (Ex. B, par. 46).

**Response:**   Admitted.

34

XI.   **PRISONERS WERE NEVER OUT OF THE SIGHT Or HEARING OF GUARDS FOR AN EXTENDED PERIOD DURING WEEKEND LOCKDOWNS.**

   **A. CHECKS ON PRISONERS IN THEIR CELLS OCCURRED EVERY 30 MINUTES.**

202.   During the weekend lockdowns in Divisions III and IV, correctional officers who were posted at the tier monitoring stations in those divisions would check the status of the prisoners in their cells on those tiers every half hour (Ex. B, par. 49).

**Response:**   Denied.  During lockdown weekends the guards often were not present in the tiers for extended periods of time and did not conduct 30 minute security checks. (Plts. Fact 15-17, 27-29, 51, 65-76)

203.   The thirty (30) minute safety checks on prisoners in their cells are required by the Illinois County Jail Standards as well as standards promulgated by the American Correctional Association (Ex. B, par. 49).

**Response:**   Admitted.

204.   Correctional officers would make their thirty (30) minute status checks of prisoners on their tiers during the weekend lockdowns by walking the hallway outside each cell and by verbally or visually checking on the status of prisoners in their cells to make sure everything is "ok" (Ex. B, par. 49; Ex. C, pp. 75-76).

**Response:**   Denied.  During lockdown weekends the guards often were not present in the tiers for extended periods of time and did not conduct 30 minute security checks. (Plts. Fact 15-17, 27-29, 51, 65-76)

205.   The half-hour checks on prisoners are documented in logbooks entitled "Officer's Living Unit Logs" (Ex. B, par. 49).

**Response:**   Denied.  The "Officer's Living Unit Logs" provides for documentation of half-hour checks on inmates.  However, correctional officers often do not provide half hour checks. (Plts. Fact 15-17, 27-29, 51, 65-76)

206.   Copies of Officer's Living Unit Logs are attached to the Declaration of Scott Kurtovicy (Ex. B) as Group Exhibit No. 3 (Ex. B, par. 49).

**Response:**   Admitted.

207.   The Officer's Living Unit Logs which are attached as Group Exhibit No. 3 to Ex. B, are representative examples of several living unit logs for Divisions III and IV when weekend

35

lockdowns occurred and document that thirty (30) minute checks were made of those prisoners on those respective tiers (Ex. B, par. 49).

**Response:**   Denied. The living unit logs are not representative examples of living unit logs during weekend lockdowns which document that 30 minutes checks were made of the inmates as there are numerous living unit logs which document that 30 minute checks were not performed by tier officers.(Plts. Fact 15-17, 27-29, 51, 65-76)

208.   The entries appearing in the Living Unit Logs attached as Group Exhibit No. 3 to Ex. B were made by correctional officers at or near the time of the events described in those logs; were made and kept in the regular course of activities at the jail and it was the regular practice of the Jail to maintain Living Unit Logs to record and document events and activities on various tiers of the jail (Ex. C, par. 50).

**Response:**   Admitted.

### B.  ADDITIONAL HEAD COUNTS

209.   Correctional officers at the jail are required to make a "head count" of prisoners three (3) times a day and head counts were made during the time when weekend lockdowns occurred (Ex. B, par. 49).

**Response:**   Admitted.

210.   Correctional officers accomplished these had counts by visually checking on the prisoners in their cells and counting the number of prisoners on their respective tiers (Ex. B, par. 49).

**Response:**   Admitted.

211.   The operational practice of making 30-minute checks and "head counts" on prisoners three times a day provided multiple opportunities during the course of each shift while a lockdown was in effect for correctional officers to check on the prisoners' status and multiple opportunities for prisoners to speak with a correctional officer and to bring any issues or problems to an officer's attention (Ex. B, par. 49).

**Response:**   Denied. During lockdown weekends the guards often were not present in the tiers for extended periods of time and did not conduct 30 minute security checks. (Plts. Fact 15-17, 27-29, 51, 65-76)

## C. MEAL DELIVERY TO CELLS

212. Meals were delivered to prisoners in their cells while a weekend lockdown was in effect on the regular meal schedule (Ex. B, par. 41; Ex. N, p. 24).

**Response:**     Admitted.

213. Meals were either delivered by a correctional officer or by a living unit worker under the supervision of the correctional officer (Ex. B, par. 41)

**Response:**     Admitted.

214. The delivery of meals to prisoners in their cells provided another opportunity when correctional staff would check on a prisoner's status in her cell during the weekend lockdowns that occurred in Divisions III and IV (Ex. B, par. 41)

**Response:**     Denied.  During lockdown weekends the guards often were not present in the tiers for extended periods of time. (Plts. Fact 15-17, 27-29, 51, 65-76)

## D. MANUAL LOCKING OF CELL DOORS WHENEVER A PRISONER RETURNED TO HER CELL.

215. While the cell doors in Divisions III and IV can be electronically opened from the tier monitoring station, they cannot be electronically locked (Ex. B, par. 51).

**Response:**     Admitted.

216. The cell doors in Division III and IV have to be manually locked by a correctional officer who inserts a key into the door's locking mechanism (Ex. B, par. 51).

**Response:**     Admitted.

217. During the weekend lockdowns that occurred in Divisions III and IV, whenever a prisoner returned to her cell after having been permitted to leave for any reason, a correctional officer on the tier would have to manually lock that prisioner's cell door (Ex. B, par. 51).

**Response:**     Admitted.

218. Whenever a correctional officer locked a prisoner's cell door upon the return of a prisoner to her cell during a weekend lockdown in Divisions III and IV, that correctional officer had the opportunity to check on the status of the prisoners in that cell and on prisoners in cells located between the tier monitoring station and the cell being locked up, and prisoners had the opportunity to speak directly to a correctional officer as the officer walked to or from the cell

being locked (Ex. B, par. 151).

**Response:**      Objection. Director Kurtovich's declaration does not state that he  has  personal
                  knowledge for this fact  during lockdown weekends in Division Three and Four .

.

## E.  OTHER ADDITIONAL WAYS CORRECTIONAL OFFICERS WERE ABLE TO MONITOR PRISONERS IN THEIR CELLS DURING LOCKDOWNS.

219.  Depending on the ambient noise level present and how loud a prisoner yelled, a correctional officer sitting at a tier monitoring station can hear a prisoner while locked in a cell from that monitoring station (Ex. B, par. 51; Ex. C, p. 51; Ex. O, p.13).

**Response:**      Denied.  Director Fasano testified that it would be difficult for a guard to hear a
                  detainee locked in her cell from the guard booth. (Plt. Fact. 13-37).

220.  A prisoner can also get the attention of a correctional officer stationed a tier monitoring station while locked in her cell by kicking the bottom of the cell door which makes a loud booming noise (Ex. B, p. 51).

**Response:**   Objection. Director Kurtovich's declaration does not state that he  has  personal
knowledge for this fact  during lockdown weekends in Division Three and Four .
Without waiving this objection, plaintiffs' deny the statement.  (See Plts. Facts 13-37)

221.  Prisoners locked in their cells can, and have obtained the attention of a correctional officer stationed at a tier monitoring post by flicking the light in their cells on and off (Ex. B, par. 51).

**Response:**   Objection. Director Kurtovich's declaration does not state that he  has  personal
knowledge for this fact  during lockdown weekends in Division Three and Four .
Without waiving this objection, plaintiffs' deny the statement.  (See Plts. Facts 13-37)

222.  Prisoners locked in their cells can, and have obtained the attention of a correctional officer located at a tier monitoring station by waiving their arm, a towel or some other similar object out the opening of their cell door (Ex. B, par. 51).

**Response:**      Objection. Director Kurtovich's declaration does not state that he  personal
knowledge for this fact  during lockdown weekends in Division Three and Four. Without
waiving this objection, plaintiffs' deny the statement.  (See Plts. Facts 13-37)

223.  A correctional officer positioned at a tier monitoring station in either Divisions III or IV can see or hear the activity noted above (kicking the cell door or flickering a light on and off, waiving an arm, towel or object out of the cell) and has been trained and instructed to respond to such a signal from a prisoner (Ex. B, par. 51).

**Response:**    Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four. Without waiving this objection, plaintiffs' deny the statement. (See Plts. Facts 13-37)

## XI.    MEDICAL CARE PROVIDED AND AVAILABLE DURING WEEKEND LOCKDOWNS.

224. Divisions III and IV each have their own medical dispensary or medical aid station (Ex. B, par. 29).

**Response:**    Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four .

225. Cermak Nurses were stationed around the clock in the medical dispensaries for both Divisions III and IV during the weekend lockdowns that occurred in those divisions (Ex. B, par. 29).

**Response:**    Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four . Without waiving this objection, plaintiffs admit that at times nursing staff were present but deny that the nursing staff was present within the tiers consistently during lockdown weekends. (See Pltfs. Facts 77-81).

226. During the weekend lockdowns of Divisions III and IV, nursing staff from the division's medical dispensary would visit the tiers to deliver and administer medication to prisoners at their cells (Ex. B, par. 32).

**Response:**    Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four . Without waiving this objection, plaintiffs admit that at time nursing staff were present but deny that the nursing staff was present within the tiers consistently during lockdown weekends. (See Pltfs. Facts 77-81).

227. During the weekend lockdowns in Divisions III and IV, the Cermak nursing staff were available at all times to evaluate, triage, treat and provide medical care to prisoners in those divisions during those weekend lockdowns (Ex. B, par. 29).

**Response:**    Objection. Director Kurtovich's declaration does not state that he has personal knowledge for this fact during lockdown weekends in Division Three and Four . Without waiving this objection, plaintiffs admit that at times nursing staff were present but deny that the nursing staff was present within the tiers consistently during lockdown weekends. (See Pltfs. Facts 77-81).

228. During the weekend lockdowns in Divisions III and IV, Cermak nursing staff responded from the division's medical dispensary to calls from correctional officers when medical assistance was requested (Ex. B, par. 30)

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four . Without waiving this objection, plaintiffs admit that at times nursing staff were present  but deny that the nursing staff was present within the tiers  consistently during lockdown weekends. (See Pltfs. Facts 77-81).

229. Visits by nurses to the various tiers in either Divisions III and/or IV while they were on lockdowns to provide medication or medical care were documented in Officers Living Logs (Ex. B, Group Exhibit No. 3)

**Response:**     Admitted.

230. There were certain medications and certain medical care that could not be delivered or administered to prisoners in their cells.  When that situation arose during the weekend lockdowns in Divisions III and IV, those prisoners were escorted to their division's medical dispensary, to Cermak or some other hospital facility (Ex. B, par. 32)

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four .

231. During the weekend lockdowns in Divisions III and IV, prisoners with certain medical problems were taken to the division's medical dispensary for treatment.  For example, diabetic inmates were taken to the division's medical dispensary where nursing staff would provide them their insulin shots.  Prisoners who required a breathing treatment were brought to the medical dispensary for nebulizer treatments (Ex. B, par. 28).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four .

232. Cermak Health Services also has a stand-alone facility on site at the jail where additional medical and/or mental health services were available and were provided to prisoners during the course of weekend lockdowns (Ex. B, par. 31).

**Response:**     Admitted.

233. During the weekend lockdowns in Division III and IV, prisoners were taken to Cermak for, among other things, x-rays, testing, emergency care when nursing staff felt such care was required (Ex. B, par. 31).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal
knowledge for this fact during lockdown weekends in Division Three and Four .

234. Additionally, during weekend lockdowns in Divisions III and IV, prisoners in those
divisions have been transferred to Provident Hospital, Stroger (County) Hospital and other
various specialty facilities or hospitals when a prisoner's medical condition warranted such care
(Ex. B, par. 31).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal
knowledge for this fact during lockdown weekends in Division Three and Four .

235. Cermak mental-health personnel made the psychiatric evaluations of such prisoners
during the weekend lockdowns that occurred in Divisions III and IV (Ex. B, par. 35).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal
knowledge for this fact during lockdown weekends in Division Three and Four .

236. Prisoners in Divisions III and IV were removed from their cells and taken for a
psychiatric evaluation or screening whenever a correctional officer learned that a prisoner
appeared depressed, overly anxious, stared into space, appeared confused or was unable to
concentrate, was suspicious, suicidal or was experiencing auditory or visual hallucinations (Ex.
B, par. 34).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal
knowledge for this fact during lockdown weekends in Division Three and Four .

237. Cermak mental-health personnel who made the psychiatric evaluations during the
weekend lockdowns in Divisions III and IV would determine if and when a prisoner could return
to her cell or if the prisoner should be moved to a different cell, to a different division or to
Cermak for further evaluation and care (Ex. B, par. 35).

**Response:**     Objection. Director Kurtovich's declaration does not state that he has personal
knowledge for this fact during lockdown weekends in Division Three and Four .

## XII.   STAFFING ISSUES DURING WEEKEND LOCKDOWNS.

238. During weekend lockdowns that occurred in Divisions III and IV, all essential posts
in a division on lockdown had to be staffed by correctional officers at all times when the
lockdowns remained in effect (Ex. B, par. 47)

**Response:**     Admit that all essential posts were required to be staffed but deny that during the
weekend lockdown all essential posts were staffed at the Jail because many times the tiers were

41

not staffed by guards and the Jail engaged in cross-watching of tiers which means that an essential post - monitoring the tier - was not staffed.  (See Plts. Facts. 13-50 & 82-95)

239.  Security posts which had to be staffed at all times during the weekend lockdowns included all entrances and exits to the division, the division's security office, the front lobby, the main interlock into the division, the tunnel area through which access into the division can be gained and the various tier monitoring stations (Ex. B, par. 47, 148).

**Response:**       Admit that all essential posts were required to be staffed but deny  that during the weekend lockdown all essential posts were staffed at the Jail because many times the tiers were not staffed by guards and the Jail engaged in cross-watching of tiers which means that an essential post - monitoring the tier - was not staffed. (See Plts. Facts. 13-50 & 82-95)

240.  Each division of the jail has its own separate clothing room and storage rooms where the prisoner's personal belongings as well as jail uniforms, pillows, sheets, blankets and mattresses are stored.  Those rooms had to remain open during weekend lockdowns so that discharged prisoners could return their jail uniforms, pillows, mattresses, blankets from her cell and obtain her personal clothing and belongings and so that new prisoners could obtain jail uniforms, mattresses, pillows, sheets and blankets before being escorted to their cells by a correctional officer (Ex. B, par. 45).

**Response:**     Admitted.

241.  A division's clothing and storage rooms and the visiting area also had to be staffed during the weekend lockdowns (Ex. B, par. 47).

**Response:**     Admitted.

242.  The Office of the Sheriff of Cook County and the Metropolitan Alliance of Police, Cook County Corrections Officers Chapter No. 222 (MAP) entered into a Collection Bargaining Agreement (CBA) which is attached to the Declaration of Scott Kurtovich as Exhibit No. 2 (Ex. B, par. 48)

**Response:**     Admitted.

243.  Under section 3.2(c) of the CBA entered into with MAP, all correctional staff at the jail are entitled to a one-hour lunch break during the course of their shift (Ex. B, par. 48).

**Response:**     Admitted.

244.  One-third of correctional staff in each division of the jail went to lunch at the same time during their shift (Ex. B, par. 48)

**Response:**     Admitted.

245.  The lunch breaks permitted under the CBA with MAP for correctional staff at the jail ran over a three (3) hour period for each shift, with one-third of a division's correctional staff taking their hour lunch break during a one-hour period of that three-hour timeframe (Ex. B, par. 48).

**Response:**     Admitted.

246.  During their lunch break, correctional staff would not be available to perform their routine normal duties and therefore, there was a three-hour window of time one-third of correctional staff was at lunch during each shift during the course of the weekend lockdowns (Ex. B, par. 48).

**Response:**     Admitted.

247.  During each shift of the weekend lockdown, there was a three-hour period of time when searches could not be performed because one-third of the correctional staff was at lunch (Ex. B, par. 48).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four .

248.  The number of correctional officers working in a division at the jail during a weekend is less than during a weekday because prisoners are not required to be transported to county courtrooms or to the IDOC on the weekends (Ex. B, par. 64).

**Response:**     Admitted.

249.  There were less correctional officers working on the weekends than during the weekdays under normal conditions at the jail (Ex. B, par. 64).

**Response:**     Admitted.

250.  A higher number of correctional staff call in sick or take allotted "comp time" on the weekends than on the weekdays.  This also impacted the total number of correctional officers *available for a division during a weekend lockdown and the number of officers available to* search during a weekend lockdown of the division (Ex. B, par. 64).

**Response:**     Admitted.

251.  Weekend staffing patterns that were typically followed in Divisions III and IV were not followed on lockdown weekends because officers were pulled from their normal assignments

43

to search areas of the divisions (Ex. B, par. 59).

**Response:**    Admitted.

252.  Cross-watching two (2) tiers is permitted in certain housing divisions at the jail. (Ex. R, pp. 2-3, Ex. H, pp. 53-55).  Cross-watching could occur, for example, when officers were pulled from normal assignments to search areas of the division, or an officer on one tier is providing lunch relief for an officer on an adjacent tier. (Ex. B, p. 59; Ex. O, pp. 11-13).

**Response:**    Admit that cross-watching is permitted in certain limited situations, but deny that cross-watching is permitted in the manner in which the Jail performs cross-watching as noted by the - - - Report previously produced by the Defendants.

253.  On a date subsequent to March 2003, MAP prepared double assignment memos in an attempt to obtain more money for cross-watching. (Ex. P, pp. 28-30). The union has not been able to point to any specific incidents where someone has been injured during a cross-watching situation. (Ex. P, pp. 30-31). When a correctional officer is assigned to cross-watch, it requires more work, but it is something that can be done, because it is done. (Ex. P, p. 31; Ex. H, p. 55; Ex. F, pp. 26-27; Ex. N, pp. 22-24; Ex. Q, pp. 23-25, Ex. AA, pp. 55-60)

**Response:**    Admit the first and second sentence.  Admit that when a correctional officer is assigned to cross-watch, it requires more work, but denies that cross-watching can be done in a manner without subjecting the inmates to a risk of serious harm by an unreasonably protracted detention of them out of sight and out of hearing of the guards. (See Plts. Facts 38-50 & 82-88)

254.  Female inmates would not be subject to a greater risk of harm during weekend lockdowns as opposed to not being on a lockdown, because during a lockdown, the prisoners were locked in their cells, and, for the most part, there would only be two prisoners in a cell as opposed to when they are not locked down and are all out at one time.  With sixty females out of their cells at one time on a tier, it is more of a risk.  (Ex. N, pp. 21-24)

**Response:**    Denied. During weekend lockdowns, there were extended periods when the tier officers were not present on the tiers. Due to the shortage of correctional officers in 2001 through 2003, the Sheriff would engage in "crosswatching" which involved one officer being assigned to more than one tier or housing unit.[2]  Crosswatching occurred during weekend lockdowns. (Tab "3" - Harrison Dep. at p. 23)  Superintendent Harrison of Division IV, one of the women's divisions, stated that if an officer was crosswatching certain tiers  that it would be physically impossible to see into the cells of the other tiers and that an officer would not be able to hear

---

[2]  The annual budget for the years 2001 through 2003 provided for 2,426 correctional officers to be assigned to the Cook County Jail.  (Tab "24" - Kurtovich Dep. at p. 10)  For 2007, there were 3,062 positions for correctional officers under the Cook County Budget.  (Plts. Fact 108)

whether an inmate was screaming out for help if attacked by someone or screaming for medical attention. (Tab "3" Harrison Dep. at p. 23-24, 35-36).   Additionally, There was a shortage of correctional staff on weekends. (Def. Exh. B, par. 56) The jail had a higher number of staff who called in sick or took allotted "comp time on the weekends. (Id) The jail would not call in staff from other divisions during weekend lockdowns. (Def. Exh. B, par. 78) The jail did not have extra correctional officers working on the weekends. (Id.) (See Plts.Facts 13-50 & 82-95)

## XIII.   REASONS WHY TIERS WERE NOT TAKEN OFF OF LOCKDOWNS AFTER SEARCH OF THE TIER WAS COMPLETED.

255.   During the weekend lockdowns that occurred in Division III and IV of the jail, one reason a tier was not taken off of lockdowns after a search of the tier was complete was due to the fact that not all prisoner movement off of the tiers was eliminated (Ex. B, par. 57).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four . Without waiving this objection, plaintiffs deny the statement.   Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched. (Plts. Facts 10-11)

256.   At various times during a weekend lockdown, prisoners were permitted out of their cells, off of their tiers and moved between various areas of a division for visits with attorneys, with family members and friends; to serve as building workers; for visits to the division's medical dispensary; for visits to Cermak or an outlying hospital; for psychiatric screenings; when discharged or released from the jail for any reason or when moved to a different cell or division following a psychiatric screening or a disturbance with another prisoner (Ex. B, par. 57).

**Response:**     Admit

257.   While it was the jail's policy to pat-down a prisoner whenever she was removed form her cell during a weekend lockdown in Divisions III or IV, jail administrators recognized that this did not eliminate the possibility that a small weapon or item of contraband could be missed or that another prisoner could pass an object to that prisoner after she had been patted-down when a correctional officer was not looking (Ex. B, par. 59)

**Response:**     Admit the paragraph above but Deny that said paragraph is a valid reason why tiers were not taken off of lockdowns after search of the tier was completed.   Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched.  (Plts. Facts 10)

258.   Female prisoners have secreted items in the soles of their shoes, in the braids of their hair, in their bras, in their vaginal areas and in their panties. Such a prisoner could then

45

potentially move or secrete an object elsewhere in the division if a pat-down search did not discover the weapon or item of contraband that was so secreted (Ex. B, par. 58).

**Response:**   Admit the paragraph above but Deny that said paragraph is a valid reason why tiers were not taken off of lockdowns after search of the tier was completed.  Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched.(Plt. Facts 10)

259.  Contraband or weapons can also be secreted in food trays or garbage bags that were collected and moved by the living unit and building workers or in the mops and cleaning buckets used by those workers (Ex. B, par. 60).

**Response:**   Admit the paragraph above but Deny that said paragraph is a valid reason why tiers were not taken off of lockdowns after search of the tier was completed.  Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched.(Plt. Facts 10)

260.  Building workers who move between different tiers of the divisions and in some instances outside of their division, either could willingly or be threatened or forced to unwillingly move a weapon or item of contraband to a different location in the division after it had been searched during a weekend lockdown (Ex. B, par. 60).

**Response:**   Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four . Without waiving this objection, plaintiffs deny the statement.   Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched. (Plts. Facts 10-11)

261.  There are fire doors for each tier in Divisions III and IV which open up into a common stairwell that is used for prisoner movement (Ex. B, par. 61).

**Response:**   Admit the paragraph above but Deny that said paragraph is a valid reason why tiers were not taken off of lockdowns after search of the tier was completed.  Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched. (Plts. Facts 10-11)

262.  Correctional staff at the jail have found items of contraband which apparently has been slid under the fire door into that stairwell so that it could be picked up by another prisoner who was walking up or down that common stairwell (Ex. B, par. 61).

**Response:**   Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact during lockdown weekends in Division Three and Four. Kurtovich testified that he has never observed an inmate sliding contraband under the fire door. (Tab "24" -

Dep. of Kurtovich at p. 39)  Without waiving this objection, plaintiffs admit that it while it may be feasible to slid contraband under a fire door,  Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched and therefore deny this paragraph . (Plts. Facts 10)

263.  The common stairwells which are immediately adjacent to the fire doors off of the tiers in Divisions III and IV were used for movement of prisoners during the weekend lockdowns that occurred in those divisions (Ex. B, par. 61).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four. Without waiving this objection, plaintiffs are without knowledge whether this occurs during weekend lockdowns and based upon the testimony of  Superintendent Harrison from Division Four  that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched ,deny this paragraph . (Plts. Facts 10)

264.  Another reason why prisoners were not released from their cells after a search of their tier was completed during the weekend lockdowns that occurred in Divisions III and IV was that if allowed out of their cells, prisoners could slide contraband under the fire door which could then be retrieved by another prisoner who was walking up or down the stairs of that common stairwell (Ex. B, par. 61).

**Response:**          Objection. Director Kurtovich's declaration does not state that he  has personal knowledge for this fact  during lockdown weekends in Division Three and Four. Kurtovich testified that he has never observed an inmate sliding contraband under the fire door. (Tab "24" - Dep. of Kurtovich at p. 39)  Without waiving this objection, plaintiffs are without knowledge whether this occurs during weekend lockdowns and based upon the testimony of Superintendent Harrison from Division Four  that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched ,deny this paragraph . (Plts. Facts 10)

265.  If a correctional officer did not keep a prisoner under constant observation while the prisoner walked through the common stairwell during the course of a weekend lockdown, that prisoner could retrieve an item of contraband slid under a fire door by a prisoner who was let out of her cell during the course of a weekend lockdown (Ex. B, par. 61).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four.  Kurtovich testified that he has never observed an inmate sliding contraband under the fire door.  (Tab "24" - Dep. of Kurtovich at p. 39)  Without waiving this objection, the plaintiffs admit the paragraph above but Deny that said paragraph is a valid reason why tiers were not taken off of lockdowns after search of the tier was completed.  Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells

47

after their tiers were searched.  (Plts. Facts 10)

266.  By keeping prisoners in their cells during the weekend lockdowns after their tier had been searched, correctional staff attempted to eliminate that means of moving contraband off or or onto a tier during a weekend lockdown (Ex. B, par. 61; Ex. H. pp. 55-57 and 77-79).

**Response:**     Denied.  See Defendant Fact # 19 where the defendants represent that each division "operates semi-autonomously under the administrative direction of its own superintendent and supervisory staff." Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched.  Furthermore, Director Fasano testified that this practice was contrary to legitimate correctional standards.  (Plts. Facts 8, `10)

267.  Prisoners have also attempted to pass items into and through the vents or ducts located in the jail cells and various common areas of the jail through the use of string.  This means that prisoners have attempted to pass weapons or items of contraband to other prisoners on the tier above or below them without having left their tier  (Ex. B, par. 62; Ex. H, pp. 77-79).

**Response:**     Admit the paragraph above but Deny that said paragraph is a valid reason why tiers were not taken off of lockdowns after search of the tier was completed.  Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched. Furthermore, Director Fasano testified that this practice was contrary to legitimate correctional standards. (Plts. Facts 8, `10)

268.  Because correctional staff at the jail wanted to make the search for weapons and contraband as effective as possible in view of the prisoner movement off of tiers that occurred during those weekend lockdowns and the ability to pass items through vents or shafts or under fire doors, correctional staff felt it was imperative to keep the division on lockdown and not release prisoners from their cells into the dayroom until the entire search of the division was completed. (Ex. B, par. 63)

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has personal knowledge for this fact  during lockdown weekends in Division Three and Four. See defendant Fact # 19 where the defendants represent that each division "operates semi-autonomously under the administrative direction of its own superintendent and supervisory staff." Without waiving this objection, plaintiffs deny the statement.  Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched. Furthermore, Director Fasano testified that this practice was contrary to legitimate correctional standards (Plts. Facts 8, 10)

269.  Permitting prisoners to have unsupervised access to the dayroom area after a tier has been searched would permit such a prisoner to potentially transport a weapon or item of

contraband into the dayroom where not just one or two other prisoners from that prisoner's cell were located, but where an entire tier of prisoners could mingle and interact. If such an operational practice were permitted, such a prisoner could transfer possession of a weapon or item of contraband to any other prisoner on the tier if she was so inclined, to use a weapon against another prisoner in the dayroom or to hide the weapon or contraband in the dayroom after it was searched (Ex. B, par. 59).

**Response:**     Denied.   See Defendant Fact # 19 where the defendants represent that each division "operates semi-autonomously under the administrative direction of its own superintendent and supervisory staff." Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched. Furthermore, Director Fasano testified that this practice was contrary to legitimate correctional standards. (Plts. Facts 8, 10)

270.  It was the opinion of the jail's administration that such an operational practice of permitting prisoners to be out of their cells after the search of the tier was completed should not be permitted because among other reasons, the typical weekend staffing patterns in a division could not be followed during the weekend lockdowns because a number of correctional officers were pulled from their normal posts and assigned to a team that searched other areas of the division (Ex. B, par. 59)

**Response:**     Objection. Director Kurtovich's declaration does not state that he has  personal knowledge for this fact  during lockdown weekends in Division Three and Four. See Defendant Fact # 19 where the defendants represent that each division "operates semi-autonomously under the administrative direction of its own superintendent and supervisory staff." Without waiving this objection, plaintiffs deny the statement.  Superintendent Harrison from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched. (Plts. Facts 10)

271.  Because the number of correctional officers assigned to a division was less on a weekend than on a weekday, and because correctional officers were pulled from their usual assignments to participate in searches that occurred during a weekend lockdown, it was the opinion of administrators at the jail that allowing a group of potentially violent prisoners to mingle in dayrooms or other similar areas for an extended period of time during a weekend lockdown could be more dangerous to staff and prisoners should a disturbance occur in the dayroom and that prisoners would be safer if they remained in their cells during the weekend lockdowns (Ex. B, par. 59, 64)

**Response:**       Objection. Director Kurtovich's declaration does not state that he  has personal knowledge for this fact  during lockdown weekends in Division Three and Four. See *Defendant Fact # 19 where the defendants represent that each division "operates semi- autonomously under the administrative direction of its own superintendent and supervisory staff."* Without waiving this objection, plaintiff deny this statement. Superintendent Harrison

49

from Division Four testified that she does not know the reason behind this policy of keeping detainees lockdown in their cells after their tiers were searched. (Plts. Facts 10)

272.  During the weekend lockdowns that occurred in Divisions III and IV, there would only be two or in some instances, three prisoners assigned to a cell who would have to be controlled in the event of a disturbance between the prisoners (Ex. B, par. 64).

**Response:**     Objection. Director Kurtovich's declaration does not state that he  has  personal knowledge for this fact  during lockdown weekends in Division Three and Four Without waiving this objection, plaintiffs admit this statement but deny that this practice and policy justifies leaving prisoners unattended for extended periods of time out of sight and hearing of guards. (Plts. Facts 13-37)

273.  During the weekend lockdowns that occurred in Divisions III and IV, thirty (30) to fifty (50) prisoners would potentially have to be controlled if they were allowed to remain the dayroom or recreation room for an extended period of time and a disturbance happened to occur (Ex. B, par. 64; Ex. N, pp. 23-24).

**Response:**     Plaintiffs admit that this occurs whenever prisoners are allowed in the dayroom during a lockdown weekend or at any other time,  but deny that this practice and policy justifies leaving prisoners unattended for extended periods of time out of sight and hearing of guards. (Plts. Facts 13-37)

274.  This concern was especially heightened for those tiers where large numbers of gang members or prisoners with a maximum security classification were housed together (Ex. B, par. 64)

**Response:**     Plaintiffs admit that this occurs whenever prisoners are allowed in the dayroom during a lockdown weekend or at any other time,  but deny that this practice and policy justifies leaving prisoners unattended for extended periods of time out of sight and hearing of guards. (Plts. Facts 13-37)

## XIV.   THE COUNTY JAIL IS NO LONGER HOLDING WEEKEND LOCKDOWNS.

275.  Weekend lockdowns which are the subject of plaintiffs' lawsuit, are no longer being conducted in either the men's or women's divisions of the jail (Ex. B, par. 2).

**Response:**     Admitted.

276.  The former Executive Director of the jail, Callie Baird, stopped the practice of holding periodic weekend lockdowns in the men's divisions of the jail well over one year ago (Ex. B, par. 2)

50

**Response:**     Admitted.

277.  The jail stopped holding weekend lockdowns of the women's divisions of the jail before the lockdowns of the men's divisions were stopped (Ex. B, par. 2).

**Response:**     Admitted.

278.  The jail has no current intention of reinstituting weekend lockdowns at the jail (Ex. B, par. 2).

**Response:**     Admitted.

## XV.   PROGRAMS OFFERED TO FEMALE PRISONERS AT THE JAIL.

279.  Various programs and services are currently, and were offered to prisoners at the jail during the time when weekend lockdowns of Divisions III and IV had been held (Ex. B, par. 11).

**Response:**     Admitted.

280.  Any prisoner under the age of twenty-one (21) who does not have a high school diploma is eligible to participate in the York Alternative School which offers a high school education program sponsored by the Chicago Board of Education (CBE) (Ex. B, par. 10, 11).

**Response:**     Admitted.

281.  The CBE makes available seventy-five (75) teaches and ten (10) support personnel including social workers, speech pathologists, psychologists, and a principal for the jail's school who develop an educational curriculum specific to the needs of a detainee (Ex. B, par. 10, 11).

**Response:**     Admitted.

282.  Special Education is also offered to prisoners up through the age of twenty-two (22) through an inclusion model at the jail (Ex. B, par. 11).

**Response:**     Admitted.

283.  The jail also makes college-level courses available through the Chicago City Colleges (Ex. B, par. 11).

**Response:**     Admitted.

284.  The jail has contracted with Gateway to provide substance abuse treatment in its various divisions including Divisions III and IV (Ex. B, par. 12).

**Response:**    Admitted.

285.  The services of Alcoholics Anonymous and Narcotics Anonymous are also made available in each division of the jail (Ex. B, par. 12).

**Response:**    Admitted.

286.  The Human Resources Development Institute Impact (HRDI) program was and is available to prisoners designated by correctional staff or mandated by a circuit court judge and provides a therapeutic community medical treatment service model for drug and alcohol addicted prisoners (Ex. B, par. 12).

**Response:**    Admitted.

287.  The HRDI program was evaluated by the Egan Urban Center of DePaul University several years ago and concluded that prisoners participating in that program were learning to feel good about themselves without the need for drugs or alcohol and had expressed confidence that they could remain drug and alcohol free upon their release (Ex. B, par. 12).

**Response:**    Admitted.

288.  The Sheriff further offers the services of Genesis House to female prisoners which provides hospitality and information to women who are involved in prostitution to assist them in making a free choice about their lifestyle and provide appropriate support and services to prisoners who choose to leave that illegal line of work (Ex. B, par. 12).

**Response:**    Admitted.

289.  Companions is a program offered in conjunction with Aunt Mary's Storybook Project which allows female prisoners to create an audio cassette tape of children's stories for their children (Ex. B, par. 12).

**Response:**    Admitted.

290.  The Chicago Legal Advocacy for Incarcerated Mothers (C.L.A.I.M.S.) provides legal services and education at the jail to help families of female prisoners remain intact (Ex. B, par. 12).

**Response:**    Admitted.

291.  The jail also has historically provided prenatal classes and classes on problem pregnancies to female prisoners.  Those classes provide information on nutrition, safe sex, parenting skills, exercise and personal hygiene for detainees (Ex. B, par. 12)

**Response:**     Admitted.

292.  The DOULA project was then and is available to female prisoners in Division III and is designed to assist them with their birth experience and postpartum maternal infant interaction while in the jail (Ex. B, par. 12).

**Response:**     Admitted.

293.  An art therapy program has also been available to those prisoners who are mentally challenged in order to find new ways to achieve individual self-esteem (Ex. B, par. 12).

**Response:**     Admitted.

294.  The ACA in its last certification of the Cook County Jail commended the jail on the number and variety of programs which are offered to the prisoners (Ex. B, par. 12)

**Response:**     Admitted.

## XVI.   REASONS CORRECTIONAL OFFICERS COULD NOT BE UNILATERALLY TRANSFERRED DURING WEEKEND LOCKDOWNS.

295.  The CBA entered into between the Sheriff and MAP provides for a yearly bidding procedure for correctional officers working at the jail whereby those officers bid for specific open positions at the jail based upon their seniority.  Under this yearly bidding procedure, correctional officers can bid on the division in which they want to work, the shift they want to work and what days they want to have off in that bidding process (Ex. B, par. 78; Ex. C, p. 12).

**Response:**     Admitted.

296.  The terms of that CBA would be violated if the executive director were to assign correctional officers who are normally assigned to Division IV to Division III even for a two-day period, in the absence of an emergency (Ex. B, par. 78; Ex. C, pp. 154-155).

**Response:**     Denied.  If there was a staff shortage in one division, requests would be made to the other divisions for officer(s) to work the staff shortage.   (Tab "13" - Thomas Dep. at p. 12-13)

297.  A routine temporary reassignment during weekend lockdowns is something about which the correctional officers would complain to their union about and they would challenge any attempt to temporarily reassign correctional officers to another division of the jail (Ex. C, p. 157).

**Response:**     Denied.  If there was a staff shortage in one division, requests would be made to

the other divisions for officer(s) to work the staff shortage.   (Tab "13" -Thomas Dep. at p. 12-13)

298.  Correctional officers were not pulled from other divisions of the jail that were not on lockdown to perform the weekend lockdowns searches that formerly occurred in Divisions III and IV because the jail did not have extra correctional officers working on the weekends and that type of temporary reassignment would create staffing issues in those divisions and possible operational risks in those divisions because officers would have to be pulled from their assigned posts or duties (Ex. 78).

**Response:**     Admitted.

## XVII. THE SHERIFF HAS NO DIRECT CONTROL OVER NUMBER OF CORRECTIONAL OFFICERS WHO CAN WORK AT THE JAIL.

299.  In 1995, there was 2,496 correctional officers at the jail (Ex. B, par. 79).

**Response:**     Admitted.

300.  From 1996 through 1998, there were 2,446 correctional officers at the jail (Ex. B, par. 79).

**Response:**     Admitted.

301.  From 1998 through 2001, the number of correctional officers at the jail was 2,426 (Ex. B, par. 79).

**Response:**     Admitted.

302.  The Sheriff can recommend, but has no direct control over his annual budget at the jail which by statue is set by the Cook County Board of Commissioners.

**Response:**     Admitted.

303.  The maximum number of correctional officers that can work at the jail, their grad and pay is capped on a yearly basis by the County's annual budget.

**Response:**     Admitted.

## XVIII. PLAINTIFF'S INTERROGATORY ADMISSIONS.

304.  Neither Caprice Morales nor Genise Hart claims to have experienced any type of physical injury or physical trauma during any weekend lockdown (Ex. S, par. 5-6; Ex. T, par. 5-

6).

**Response:**     Admitted.

305.  Both Caprice Morales and Genise Hart claim that they allegedly became depressed as a result of a weekend lockdown (Ex. T, par. 7)

**Response:**     Admitted.

306.  Neither Caprice Morales nor Genise Hart required or obtained any type of care counseling or treatment for that emotional or psychological condition at any time since their lockdown(s) (Ex. T, par. 8).

**Response:**     Admitted.

307.  Michele Gandy did not experience any type of physical trauma or physical injury (other than shortness of breath allegedly due to asthma for which she received treatment) during the course of any weekend lockdown (Ex. J, par. 5-6).

**Response:**     Deny.  Plaintiff had an asthma attack and when she called for assistance the guard was not there.  (Plt. Fact 33)

308.  The only type of psychological, mental or emotional trauma Michelle Gandy allegedly sustained as a result of a weekend lockdown was being unable to sleep, becoming anxious and feeling a loss of self worth (Ex. J, par. 7).

**Response:**     Denied.   The psychological, mental or emotional trauma Michelle Gandy sustained included that the "Plaintiff felt claustrophobic" and in addition, the Plaintiff was unable to sleep during the lockdowns, became anxious, and a feeling of loss of self worth.  (Def. Ex. J., par. 7)

309.  Michele Gandy did not require nor has she obtained any type of care, counseling or treatment for the psychological, mental and/or emotional condition she allegedly sustained (Ex. J, par 8).

**Response:**     Admitted.

310.  Ann Francis Gelco claims she was struck by her cellmate and received an unspecified injury to her jaw during a May 24, 2002 lockdown at the jail (Ex. U., par 5).

**Response:**     Admit that plaintiff Gelso jaw was injured during a lockdown weekend. Deny that it was unspecified . (Plt. Facts 52)

55

311. Ann Francis Gelso does not claim that she ever sought or obtained medical care or treatment for the unspecified injury to her jaw upon her release from the jail on or about June 5, 2002 (Ex. U, par. 2, 6).

**Response:**   Admitted.


## XIX.   PLAINTIFFS FAILURE TO PRODUCE ANY DOCUMENTS TO SUPPORT THEIR CLAIMS FOR MENTAL OR PHYSICAL INJURY SUFFERED AS A RESULT OF THE CONDUCT OF WEEKEND LOCKDOWNS AT JAIL

312.   Each of the Plaintiffs was served with a notice of deposition that included a RIDER seeking the production of documents including, among other things, any and all medical records regarding the medical treatment and/or psychiatric treatment of the plaintiff for injuries claimed to have been sustained as a result of the events alleged in the Plaintiffs' Fifth Amended Complaint (Ex. V; Ex. W; Ex. X; Ex. Y; and Ex. Z; Ex. AA, par. 1, 13, 19, and 25).

**Response:**   Admitted.

313. At no time during litigation in the instant lawsuit have any of the Plaintiffs produced any documents to support their claims for any type of mental or physical injury suffered as a result of the conduct of weekend lockdowns at the Cook County Jail.  (Ex. AA, par. 2, 14, 20, 26, and Ex. BB, p. 8)

**Response:**   Denied.  Plaintiffs have tendered sworn answers (documents) to the Defendants' Interrogatories stating that they have a claim for mental and/or physical injuries suffered as a result of the conduct of the weekend lockdowns at the Cook County Jail.  (Def. Ex. J, par. 6-7; Def. Ex. L, par. 6-7; Def. Ex. S, par. 6-7; Def. Ex. T, par. 6-7; Def. Ex. U, par. 6-7)


Respectfully submitted,

/s/ *Thomas G. Morrissey*
One of the Attorneys for Plaintiffs


Thomas G. Morrissey
Thomas G. Morrissey, Ltd.
10249 S. Western Avenue
Chicago, IL 60652
Phone: 773-233-7900
Fax:    773-239-0387

## CERTIFICATE OF SERVICE

     I, Robert H. Farley, Jr.,  Attorney for the Plaintiffs, deposes and states that he caused the foregoing Plaintiffs' Responses To Defendnats' Statement of Undisputed Facts and Statement of Additiotional Material Facts, by electronically filing said document with the Clerk of the Court using the CM/ECF system, this 14th day of April, 2008.

                                           */s/ Robert H. Farley, Jr.*

Attorneys for the Defendant

Mr. Bernard E. Jude Quinn
Mr. Frank J. Marsico
Hinshaw & Culbertson
222 N. LaSalle, Street, Suite 300
Chicago, IL 60601-1081

Mr. Patrick Smith
Mr. Patrick T. Driscoll, Jr.
Office of the State's Attorneys
500 Richard J. Daley Center
Chicago, IL 60602