IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Genise Hart, Carmen Feliciano, | ) | |
| Ann Francis Gelco, Helen Koss | ) | |
| Caprice Morales  and | ) | |
| Michelle Gandy, individually and | ) | |
| and on behalf of a class, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. 03 C 1768 |
| | ) | |
| vs. | ) | JUDGE: James Zagel |
| | ) | MAGISTRATE: Ashman |
| THOMAS DART, | ) | |
| SHERIFF OF COOK COUNTY, | ) | |
| in his official capacity, and | ) | |
| Cook County | ) | |

**PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS
PURSUANT TO LOCAL RULE 56.1(b)(3)(B)**

Now comes the Plaintiffs, by and through their attorneys, Thomas G. Morrissey, Ltd., and

Robert H. Farley, Jr., Ltd.,  and pursuant to Local Rule 56.1(b)(3)(B), submits a Statement of

Additional Facts that require denial of Defendants Motion for Summary Judgment:

**I. Detention Is Unreasonably Protracted.**

1. In Division III, weekend lockdowns during 2002 would start on Friday afternoon and

at times extend through Sunday.  (Tab "1" - Deposition of Allen at page 43)

2. In Division III, weekend lockdowns would end on Sundays around 2:45 to 3:15 p.m.

(Tab "2" - Dep. of Glinsey at pages 6 - 7)

3. In Division IV, weekend lockdowns would start on Friday afternoon and the women

1

would start to be locked down at 2:00 p.m.  The weekend lockdown would last for three days and the earliest time that the women would be released from a lockdown on a weekend on Sunday would be 11:00 a.m.  (Tab "3" - Dep. of Harrison at pages 10, 12-14)

4.  In Division III, it may be possible to conduct a search of the tiers on the first, second and third floors within an eight hour shift.  (Tab "1" - Dep. of Allen at pages 68-69)

5.  In Division III, it would be possible in a period of approximately 3 to 4 hours to conduct a routine shakedown effectively of the six units (tiers).  (Tab "4" - Dep. of Fasano at page 71)

6.  In Division IV, a search of a living unit (tier) under normal circumstances is usually accomplished within a half hour period of time.  (Tab "4" - Dep. of Fasano at pages 54-55)

7.  In Division III, a 48 hour weekend lockdown is unreasonable and unnecessary.  (Tab "4" - Dep. of Fasano  at page 69)

8.  Once a search has been completed on a single living unit (tier), there is no legitimate correctional objective by keeping that unit on lockdown for the duration of the shakedown of the entire building.  It would only be necessary to keep them on lockdown until such time as a shakedown of an immediately adjacent unit such as one above or below it would be completed, and at that point, there is no legitimate correctional objective of continuing the lockdown of those units that have been checked or searched.  (Tab "4" - Dep. of Fasano at pages 57-58, 172)

9.  During a lockdown weekend before a single tier has been searched, there is no legitimate penological objective not to release a certain number of inmates from their cell and keep the other inmates in the tier locked up to take showers and to use the phone while they are being viewed by the correctional staff.  (Tab "4" - Dep. of Fasano at page 61)

2

10.  Superintendent Harrison from Division IV she does not know the reason behind the policy of keeping detainees lockdown in their cells after their tiers were searched.  (Tab "3" - Dep. of Harrison at pages 69-70)

11.  Officer Guzman does not know the reason why it is necessary to continue the lockdown until Sunday for those inmates who have had their tier searched on a Friday.  (Tab "5" - Dep. of Guzman at pages 128-129)

12.  The Jail no longer conducts weekend lockdowns, but "[t]he same areas are being searched with a difference of specific area opposed to a whole building from top to bottom, right to left.  There are cluster searches going on throughout the entire compound."  (Tab "24" - Dep. of Kurtovich  at page 41)


**II.  Out Of Sight & Hearing Of Guards.**

13.  In Division IV, there are four interior tiers on each of the two floors (K-1 and L-1; M-1 and N-1; K-2 and L-2; M-2 and N-2) and the tiers are opposite each other separated by a hallway.  (Tab "3" - Dep. of Harrison at pages 14-15)

14.  Each tier in Division IV has two levels, an upper and lower level.  A detainee held in the upper level cell could see whether or not the correctional officer (tier officer) was present in the guard booth.   (Tab "3" - Dep. of Harrison at pages 26-27)

15.  In Division IV during weekend lockdowns, the Plaintiff Gelso could look out her cell hole and see that correctional officers were not present in the officer's station for that tier a lot of times.  (Tab "6" - Dep. of Gelso at pages 107-109)

16  When Plaintiff Koss was housed in Division IV during weekend lockdowns, she

3

could observe from her cell whether the correctional officer was present in the officer station. (Tab "7" - Dep. of Koss at page 91)

17. When Plaintiff Koss was housed in Division IV during weekend lockdowns, the correctional officer was absent almost all the time. (Tab "7" - Dep. of Koss at page 92)

18. Inmates assigned to Division III can not observe from their cell whether the correctional officer is present in the officer's station within the tier because this office is not located within the cell block. (Tab "6" - Dep. of Gelso at page 112)

19. When correctional officers enter and leave the tier in Division lll, a popping noise occurs when the exterior doors is open and the inmates can determine when a correctional officer is present on the tier. (Tab "6" - Dep. of Gelso at pages 112-113; Tab "7" - Dep. of Koss at pages 74, 76, 80-81)

20. During one weekend lockdown in Division lll, Plaintiff Koss rigged her cell door not to lock and snuck into the dayroom for about 2 hours. From the dayroom, Koss was able to observe that the correctional officer was not present in the guard's booth. (Tab "7" - Dep. of Koss page 86)

21. In Division III, the correctional officer was present only when count was taken during a shift change and afterwards the correctional officer would leave the tier. (Tab "6" - Dep. of Gelso at pages 113-115)

22. At times a correctional officer would inform the inmates in a tier that he/she had been assigned to cross watch another tier and then Plaintiff Gelso would not see the correctional officer again for hours. (Tab "6" - Dep. of Gelso at pages 74, 109-110)

23. If a correctional officer was assigned to cross watch another tier, Plaintiff Gelso

4

would be unable to contact the correctional officer because the correctional officer would be unable to hear her. (Tab "6" - Dep. of Gelso at pages 109-110)

24. During weekend lockdowns, hours would go by before Plaintiff Gelso saw a correctional officer. (Tab "6" - Dep. of Gelso at page 74)

25. During lockdown weekends, correctional officers were not present to protect inmates from harm caused by other inmates, and oftentimes the correctional staff was only present during when the count was taken. (Tab "6" - Dep. of Gelso at pages 106-107)

26. Female detainees are housed in Division III and IV. Division IV is separated into sixteen tiers. Each tier is a self contained unit, and the only way to enter or leave the tier is through the interlock area or a fire door. (Tab "8" - Def. Answer to Fifth Amended Complaint at par. 17, pages 10-11)

27. Plaintiff Gandy testified that from her cell in Division IV, she noticed most of the time the correctional officer was not present in the guard booth. (Tab "9" - Dep. of Gandy at pages 79-80)

28. Plaintiff Morales testified that from her cell in Division Four, she noticed most of the time the correctional officer was not present in the guard booth. (Tab "10" - Dep. of Morales at page 62)

29. In Division IV during a weekend lockdown, the Plaintiff Hart could look out her cell hole and see that correctional officers were not present in the officer's station for hours and not present in the booth for most of the day. (Tab "11" - Dep. of Hart at pages 45-46)

30. The Plaintiff Gelso was out of sight and hearing of guards during a weekend lockdown. During a weekend lockdown, a cellmate of Gelso attempted suicide and Gelso and

5

her other cellmate and other inmates on her tier were screaming for help and no guard answered

the calls for assistance and a guard showed up almost an hour later. (Tab "6" - Dep. of Gelso at

pages 79-81, 110-111)

31.  The Plaintiff Koss was out of sight and hearing of guards during a weekend

lockdown.  During a weekend lockdown, Koss was attacked by her cellmate and the Plaintiff

screamed for help and other inmates screamed and banged on the doors trying to get the attention

of a guard and no guard came into the tier until about 3 to 4 hours later. (Tab "7" - Dep. of Koss

at pages 43, 46-48, 76-77, 81-82)

32.  During a weekend lockdown, the Plaintiff Koss experienced prelabor pains and

inmates on the tier were yelling and banging on the doors for the guard and no guard came to

assist her and she received medical attention about five hours later.  (Tab "7" - Dep. of Koss at

pages 84-85)

33.  The Plaintiff Gandy had an asthma attack during a weekend lockdown, she couldn't

breath and the asthma pump that she had was not working and she called out for the guard and

the guard was not present.  (Tab "9" - Dep. of Gandy at pages 78-80)

34.  During the weekend lockdown, there were occasions when inmates requested

correctional officers and the officers would not respond. (Tab "10" - Dep. of Morales  at page

62)

35.  Charles Fasano, the Director of Prisons and Jails for the John Howard Association,

stated that it would be difficult for a correctional officer in Division IV to hear an inmate calling

for assistance when the cell doors are locked and the division is on lockdown. (Tab "4" - Dep. of

Fasano at pages 5, 33)

6

36. A correctional officer cannot see and hear what is going on in the other tier during cross watching. (Tab "12" - Dep. of Perkins at page 22)

37. From the correctional officer's booth in the tier, the officer from his office could not visually see into the individual cells. (Tab "3" - Dep. of Harrison at page 27); (Tab "4" - Dep. of Fasano at page 31)

38. A correctional officer cannot hear what is going on in the other tier during cross watching. (Tab "13" - Dep. of Thomas at pages 10-11); (Tab "6" - Dep. of Gelso at page 110)

39. An inmate on a tier in Division IV would not be able to contact the correctional officer if he or she was crosswatching another tier. (Tab "6" - Dep. of Gelso at pages 109-110)

40. In Division IV, from the officer's station in each tier, the officer could not physically see most of the cells. (Tab "1" - Dep. of Allen at pages 56-57)

41. In Division IV, if an officer was in the officer's station in M, that officer could not physically see into the cell area in tier N, across from the hall. If an officer was in the officer's station in K, that officer could not physically see into the cells in tier L from the officer's station in K. (Tab "1" - Dep. of Allen at pages 57-58)

42. In Division IV, if any officer was in the officer's station in K, that officer could not hear a detainee who was housed in a cell in L if she cried out for help. (Tab "1" - Dep. of Allen at pages 57-58)

43. It is physically impossible for a tier officer from the officer's station in K-1 to see into the cells of the detainees housed in L-1. And the same would be true if an officer was in L and was crosswatching K on either floor. And the same would be true if an officer was in M and was crosswatching N. (Tab "3" - Dep. of Harrison at pages 23-24)

7

44.  It would be very difficult for an officer in K-1 to hear a detainee that was lockdown in a cell in L-1.  And that would be true of the other tiers, K-2 and L-2; and M-2 and N-2.  (Tab "3" - Dep. of Harrison at pages 24-25)

45.  An officer assigned to K-1 would neither be able to see nor hear a detainee that was locked down in L-1.  (Tab "3" - Dep. of Harrison  at page 25)   An officer in K-1 would not be able to hear whether an inmate in L-1 was screaming out for help if attacked by someone.  (Tab "3" - Dep. of Harrison at page 36)  An officer in K-1 would not be able to hear whether an inmate in L-1 was screaming out for medical attention.  (Tab "3" - Dep. of Harrision at page 36)

46.  An officer assigned to K-1 and also assigned to crosswatch L-1, except for the brief period of time that he or she did a 30-minute inspection in L-1, would not be able to have a visual contact with the detainees in L-1.  (Tab "3" - Dep. of Harrison at page 35)  Except for the brief period of time that the officer assigned to K-1 was in L-1, that officer would be unable to monitor whether an inmate lockdowned was attacked by another inmate.  (Tab "3" - Dep. of Harrision at page 35)

47.  If Officer Marshall was sitting in the interlock area of K-1 and was cross watching L-1, she could not hear an inmate calling out in L-1 while she was sitting in the interlock in K-1.  (Tab "14" - Dep. of Marshall at pages 33-34)

48.  If Officer Bester was assigned to two separate tiers, it is impossible for her to hear what is going on another tier if she is assigned to another tier.  (Tab "15" - Dep. of Bester at page 14)  If tier K-2 is on the opposite side of the hallway from L-2, then it would be impossible for her if she was in K-2 to hear what was going on in L-2.  (Tab "15" - Dep. of Bester at page 15)

49.  When cross watching it is hard to see what's going on the other tier.  (Tab "16" -

8

Dep. of Addison at page 23)

50.   In Division IV during a weekend lockdown, the Plaintiff Hart could look out her cell hole and see that correctional officers were not present in the officer's station for hours and not present in the booth for most of the day.  (Tab "11" - Dep. of Hart at pages 45-46)

## III.   Risk Of Serious Harm.

51.   Plaintiff Gelso was injured during a weekend lockdown when she was struck in the jaw while trying to stop an inmate from committing suicide in their cell.  (Tab "6" - Dep. of Gelso at pages 79-80, 84-85)

52.   Gelso was unable to eat for several days and is uncertain whether her jaw was fractured due to the fact that the Jail did not provide her with further medical attention.  (Tab "6" - Dep. of Gelso at pages 87-88)

53.   Plaintiff Koss, while pregnant, was injured during a weekend lockdown when her cellmate started a fight which lasted between 20 and 30 minutes.  The cellmate ripped Koss's hair out by the roots; punched her in the face, kicked Koss in the stomach; hit Koss; blackened the eyes of Koss; busted the lip of Hart and Hart's nose was bleeding. (Tab "7" - Dep. of Koss  at pages 43, 46-48, 76)

54.   Plaintiff Koss felt like committing suicide during the weekend lockdowns because it was very depressing and she did attempt to commit suicide during a weekend lockdown. (Tab "7" - Dep. of Koss  at pages 88-89, 99-100)

55.   Plaintiff Gandy had an asthma attack during a weekend lockdown, she couldn't breath and the asthma pump that she had was not working.  (Tab "9" - Dep. of Gandy at pages

78-79)

56. Plaintiff Gandy felt claustrophobic, was unable to sleep during the lockdowns, felt anxious and feeling of loss of self worth as a result of the weekend lockdowns. (Tab "17" Gandy's Answers to Interrog. No. 7 at page 3)

57. Plaintiff Morales was depressed and anxious as a result of the weekend lockdowns. Morales felt that she was being disciplined by the weekend lockdowns. (Tab "10" - Dep. of Morales at page 48)

58. Plaintiff Gelso was depressed and anxious and had anxiety attacks during the weekend lockdowns. (Tab "6" - Dep. of Gelso at page 103)

59. Plaintiff Hart was depressed and could not understand why she was being punished this way. (Defs. Fact 305; Tab "11" - Dep. of Hart at pages 35-36)

60. Lockdown weekends were dangerous because the guards and staff would leave and there were always fights. (Tab "7" - Dep. of Koss at page 57)

61. During prolonged lockdowns, at times inmates cause injury to their cellmates and some of the inmates suffer from mental duress. It would be particularly true in Division III that inmates would suffer from mental duress during long lockdowns as Division III contains women who have some mental disabilities. (Tab "4" - Dep. of Fasano at page 63)   Division III had female detainees with medical concerns, had detainees who were pregnant and detainees who had been diagnosed with mental health issues. (Tab "1" - Dep. of Allen at page 30)

62. During a lockdown, an inmate in a cell would be at risk of injury from her cellmate if the correctional officer was inside the monitor's station. (Tab "4" - Dep. of  Fasano at page 33)

63. During one weekend lockdown, an inmate had a baby and there was nobody to help

10

with the delivery and it took six hours for her to treatment and the baby died.  (Tab "7" - Dep. of Koss at pages 57-58)

64.  When crosswatching occurs, there can be violence, inmate to inmate.  (Tab "18" - Dep. of Singleton at pages 6, 49)

## IV. 30 Minute Security Checks Not Performed.

65.  During weekend lockdowns, the correctional officers would not check the cells every 30 minutes.  (Tab "6" - Dep. of Gelso at page 74, 111-112);  (Tab "7" - Dep. of Koss  at page 83); (Tab "9" - Dep. of Gandy at page 81)

66.  During weekend lockdowns, due to the shortage of correctional officers, tiers are not able to have security checks every 30 minutes.  (Tab "16" - Dep. of Addison at page 19)

67.  During weekend lockdowns, the correctional officers would only check the cells during shift change when the count (the number of inmates) was taken on the tier.  (Tab "6" - Dep. of Gelso at pages 74, 111)

68.  During a weekend lockdown, the Plaintiff Koss rigged her cell door not to lock and snuck into the dayroom for about 2 hours and during that time she saw no guard in the guard's booth.  (Tab "7" - Dep. of Koss at page 86)

69.  During weekend lockdowns, there are occasions when a correctional officer is not able to obtain backup to do a 30 minute security check on her tier.  (Tab "19" - Dep. of Sparks at page 12)

70.  During a weekend lockdown on February 1, 2002 during the 1500-2300 shift on tier M-1, there were no security checks done the tier after 1635 hours.  (Tab "12" - Dep. of Perkins at

pages 13, 15); (Tab "20" - bate stamp 1765-66)

71.  During a weekend lockdown on March 2, 2002 during the 1500-2300 shift on tier M-1, there were no security checks done the tier after 1835 hours.  (Tab "12" - Dep. of Perkins at pages 17-18); (Tab "20" - bate stamp 1549-50)

72.  During crosswatching a correctional officer cannot do proper security checks.  (Tab "21" - Dep. of Hughes at page 11); (Tab "20" - bate stamp 2536)

73.  It happens that security checks are not able to be performed every 30 minutes.  (Tab "22" - Dep. of Myers at page 21)

74.  There are occasions when a correctional officer was assigned to cross watching another tier and she was not able to perform the 30 minute security checks.  (Tab "23" - Dep. of Ganier at p. 21)

### V.  Living Unit Tier Logs Reflect That Security Checks Are Not Performed Every 30 Minutes.

75.  Correctional officer Addison testified that on May 25, 2002, she was assigned to a tier in Division IV during a weekend lockdown and during the shift 1500 to 2300 hours, there tier log reflected that there were no security checks completed on the tier after 1800 hours.  (Tab "16" - Dep. of Addison at pages 10-11); (Tab "20" - bate stamp 0742-43)   Addison was assigned to tier L-2 on January 13, 2003 and during the shift 1500 to 2300 hours, the tier logs reflects that three security checks occurred once every 60 minutes and that there were no security checks after 2100 hours.  (Tab "16" - Dep. of Addison at pages 13-18); (Tab "20" - bate stamp 4637-38)

76.  Addison was assigned to tier L-1 on January 18, 2003 and during the shift 1500 to

12

2300 hours, the tier logs reflect that one security check occurred 90 minutes after the prior

security check and that after 1930 hours, there were no security checks on tier L-1.  (Tab "16" -

Dep. of Addison  at pages 20-21); (Tab "20" - bate stamp 4643)


### VI.  No Medical Attention During Lockdown.

77.  Plaintiff Gelso told the correctional officer that her jaw hurt and she did not receive

any medical attention.   Due to her jaw being struck, Gelso was not able to eat for a few days.

(Tab "6" - Dep. of Gelso  at pages 86-88)

78.  Plaintiff Koss waited four hours to receive medical attention during prelabor, when

she felt like she was going into labor and had extremely sharp stomach pains and side pains. .

(Tab "7" - Dep. of Koss  at pages 63, 84)

79.  Plaintiff Gelso would not always receive her psychiatric medication during weekend

lockdowns.  (Tab "6" - Dep. of Gelso at pages 76-78)

80.  Plaintiff Koss would not always receive her antidepressant medications during

weekend lockdowns.  (Tab "7" - Dep. of Koss at page 63)

81.  Plaintiff Morales would not always receive her prenatal vitamins during weekend

lockdowns.  (Tab "10" - Dep. of Morales at pages 41-43)


### VII.  Crosswatching During Weekend Lockdowns

82.  Crosswatching occurs during weekend lockdowns.  (Tab "3" - Dep. of Harrison at

page 23); (Tab "14" - Dep. of Marshall at pages 11-12);  (Tab "2" - Dep. of Glinsey at page 8)

83.  Crosswatching is done on weekend lockdowns due to the shortage of correctional

staff.  (Tab "16" - Dep. of Addison at page 19)

84.  Crosswatching was virtually used by all the divisions at the CCDOC to manage

housing units on the 11:00 p.m. to 7:00 a.m. shift, as well as to provide housing unit officers with

relief for their one hour lunch breaks.  (Tab "24" - Dep. of Kurtovich at page 17)

85.  Crosswatching on a weekend lockdown is a major security risk because the

correctional officer cannot make regular 30 minute security checks on both tiers and every cell.

(Tab "19" - Dep. of Sparks at pages 12-13); (Tab "20" - bate stamp 1239-1240)

86.  Crosswatching is a major security risk for the inmates.  (Tab "12" - Dep. of Perkins

at page 22); (Tab "19" - Dep. of Sparks at pages 10, 17); (Tab "16" - Dep. of Addison at page

23); (Tab "2" - Dep. of Glinsey  at pages 10-11); (Tab "23" - Dep. of Ganiar at page 31); (Tab

"15" - Dep. of Bester at page 24-25)

87.  Asst. Executive Director Kurtovich of the CCDOC agrees in part with the statement

that crosswatching makes effective supervision of the detainees virtually impossible.  (Tab "24" -

Dep. of Kurtovich at pages 18-19)  Kurtovich agrees in part with the statement that the practical

impact of crosswatching is extremely minimal levels of detainees supervision at virtually every

division for a large portion of each day.  (Tab "24" - Dep. of Kurtovich at pages 19-20)  There is

some validity to the statement that crosswatching represents a dangerously diminished level of

supervision of the detainee population.  (Tab "24" - Dep. of Kurtovich at pages 16-17)

88.  Crosswatching was a security risk in Division IV because some detainees were

diabetic and they needed their insulin; some detainees were constant substance abusers and their

bodies were going through detox; and some detainees were pregnant and may go into labor.  (Tab

"3" - Dep. of Harrison at pages 50-51)

## VIII.  Shortage Of Guards

89.  At times during the weekend lockdowns the correctional staff is shorthanded.  (Tab "16" - Dep. of Addison at page 19)

90.  Crosswatching occurs during weekend lockdowns because correctional officers are pulled from their posts or positions to conduct searches of the tiers.  (Tab "19" - Dep. of Sparks at p. 11)

91.  During the period of 2001 and 2003, Division IV did not have adequate staff at times. (Tab "3" - Dep. of Harrison at pages 25-26)

92.  The Jail did not transfer correctional officers from other divisions to assist during the weekend lockdowns in Division IV.  (Tab "3" - Dep. of Harrision at page 45)

93.  Superintendent Harrison did not have the authority to call off a weekend lockdown if she was short of staff.  (Tab "3" - Dep. of Harrison at page 45)

94.  A superintendent of a division did not have the authority to require her staff to work overtime during weekend lockdowns. (Tab "3" - Dep. of Harrison at page 45)

95.  The decision when a lockdown weekend would occur in Division III and IV was made by the Executive Director.  (Tab "3" - Dep. of Harrison at page 45)

## IX.  No Backup

96.  During weekend lockdowns, there are occasions when a correctional officer is not able to obtain backup to do a 30 minute security check on her tier.  (Tab "19" - Dep. of Sparks at page 12)

15

97.  During weekend lockdowns in Division IV, correctional officer Guzman does not have backup, so the inmates must be lockdown in their cells.  (Tab "5" - Dep. of Guzman at pages 217, 220)

## X. Punishment

98.  An inmate being subjected to disciplinary action, would spend 23 hours in a cell and be let out of her cell for 1 hour per day. (Tab "2" - Dep. of Glinsey at pages 25-26)

99.  A female inmate in Division IV placed in segregation or solitary confinement would be locked in her cell for 23 hours and let out of her cell for 1 hour.  (Tab "16" - Dep. of Addison at pages 46-47); (Tab "3" - Dep. of Harrison at page 37)

100.  During weekend lockdowns, the women in Division IV were locked down in their cells for over 24 hours.  (Tab "3" - Dep. of Harrison at page 37)

101.  A female inmate in Division IV could be possibly be locked up for more than 24 hours at one time during a weekend lockdown.  (Tab "16" - Dep. of Addison at pages 47-48); (Tab "24" - Dep. of Kurtovich at page 28)

102.  Some female inmates in Divisions III and IV could be locked down in their cells for the entire weekend lockdown except for the brief period when they would be removed from their cell while their cell is searched.  (Tab "24" - Dep. of Kurtovich at page 44)

103.  Division III had female detainees with medical concerns, had detainees who were pregnant and detainees who had been diagnosed with mental health issues.  (Tab "1" - Dep. of Allen at page 30)

104.  For those inmates who had psychological issues in Division III, the correctional

16

officers were not allowed to put those inmates in disciplinary segregation where they would be lockdown for 23 hours in their cell and let out of their cell for 1 hour.  (Tab "2" - Dep. of Glinsey at pages 28-29)

105.  Division III would not put an inmate who had mental health issues in segregation or isolation for violating any of the rules and regulations of the Jail, unless the psychological doctor stated that is was ok.  (Tab "1" - Dep. of Allen at pages 40-42)

106.  Prior to any detainee being placed in Disciplinary Segregation, the detainee must be seem and/or evaluated by the medical and/or psych. staff.  (Tab "20" - bate stamp Discip 0003, 0004, 0006)

107.  The assigned correctional office must not leave the AB Segregation tier unattended under no circumstances.  (Tab "20" - bate stamp Discip 0005, 0007)

## XI.  Number Of Correctional Officers

108.  3,062 correctional officer are budgeted for the Cook County Department of Corrections for 2007 and all but 30 positions were filled.  2,873 correctional officers were budgeted for the CCDOC for 2006.  2,644 correctional officers were budgeted for the CCDOC for 2005.  2,426 correctional officers were budgeted for the CCDOC for 2004.  (Tab "24" - Dep. of Kurtovich at pages 8-10)

## XII.  Crosswatching Eliminated / Reduced.

109.  Due to the increased staffing levels resulting from the budget appropriations over the last 3 years, the practice of cross-watching which is prohibited in certain divisions by the

consent [*Duran*] decree, has for the most part been eliminated except that there are circumstances where it does happen, but it is few and far between.  (Tab "24" - Dep. of Kurtovich at page 11)

### XIII.  Living Unit Tiers.

110.  Division III has only six separate tiers (living units).  Division III has three levels and each floor has two tiers which are separated by a monitoring station.  (Tab "8" - Def. Answer to Plts. Compl. at par 18, page 11)

111.  Inmates who are in need of medical and/or psychological treatment are assigned to Division III, including women who are pregnant; women suffering from certain types of mental illness; and women with substance abuse.  (Tab "8" - Def. Answer to Plts. Compl. at par 19, page 11); (Defs. Fact 45)

112.  In Division III, there is no direct access from one tier (wing) to the other tier (wing) on the same floor.  (Tab "4" - Dep. of Fasano at page 15)

113.  In Division III, Fasano knows of no way for an inmate to pass contraband to from one dayroom in a tier to another dayroom in a tier.  (Tab "4" - Dep. of Fasano at pages 23-24)

114.  Division IV has two floors.  At the end of each floor, there are four double wings / tiers.  The double wings are separated by a monitors station.  (Tab "4" - Dep. of Fasano at page 25)  The end wings of Division IV share an interlock, while the other tiers have their own interlock.  (Tab "5" - Dep. of Guzman at page 43)  In Division IV, on each floor there are four single wings / tiers.  (Tab "4" Dep. of Fasaono at page 26)

115.  In order to enter a single wing / tier, a person has to go through an interlock which has an outer door and an inner door.  (Tab "4" - Dep. of Fasano at pages 26-27)

116.  At times in Division IV there are three inmates assigned to a cell during weekend lockdowns.  (Tab "5" - Dep. of Guzman at page 145)

117.  In Divisions III and IV, each tier has a dayroom area where prisoners receive some of their meals, have access to pay phones, a television and can socialize with other inmates.  (Tab "8" - Def. Answer to Plts. Compl. at par. 20, page 12)

118.  In Divisions III and IV, a correctional officer is capable of monitoring inmates in the dayroom from the interlock.  (Tab "8" - Def. Answer to Plts. Compl. at par. 20, page 12)

119.  In Divisions III and IV, the cells have a solid steel door with an opening in the cell door and a correctional officer cannot see directly through through a cell door from the tier monitoring station.  (Tab "8" - Def. Answer to Plts. Compl. at par. 21, page 12); (Tab "4" - Dep. of Fasano at page 31)

120.  In Division IV, there is only way for the inmate to leave tier I-1.  The inmate would exit I-1 by the correctional officer opening a door where the inmate would step into an interlock and then the first door shuts and then the second door would open in the interlock which opens into the hallway of Division IV.  (Tab "5" - Dep. of Guzman at pages 20-21, 26-27)

121.  It is not possible for an inmate in tier, I-1 to enter into J-1 without going through the interlock.  (Tab "5" - Dep. of Guzman at page 29)   Tier I-1 is adjacent to tier J-1.  (Tab "5" - Dep. of Guzman at pages 20-21)

122.  It is not possible for an inmate in tier I-1 to enter into tier J-1 without going through the interlock.  (Tab "5" - Dep. of Guzman at page 29)

123.  In Division IV, it is not possible for an inmate in the dayroom of I-1 to directly pass a knife or contraband to the inmate in the dayroom of J-1 without exiting the tier and going

through the interlock.  (Tab "5" - Dep. of Guzman at pages 29-31).

124.  In Division IV, it is virtually impossible for an inmate in the day room of a single wing / tier to pass paper contraband of any nature from that single wing to the adjacent wing across the hall.  (Tab "4" - Dep. of Fasano at pages 28-29)

Respectfully submitted,

*/s/ Thomas G. Morrissey*
One of the Attorneys for Plaintiffs

Thomas G. Morrissey
Thomas G. Morrissey, Ltd.
10249 S. Western Avenue
Chicago, IL 60652
Phone: 773-233-7900
Fax:    773-239-0387

Robert H. Farley, Jr.
Robert H. Farley, Jr., Ltd.
1155 S. Washington Street
Naperville, IL 60540
Phone: 630-369-0103
Fax:    630-369-0195

## CERTIFICATE OF SERVICE

I, Robert H. Farley, Jr., Attorney for the Plaintiffs, deposes and states that he caused the foregoing Plaintiffs Statement of Additional Facts Pursuant To Local Rule 56.1(b)(3)(B), to be served on counsel of record, by electronically filing said document with the Clerk of the Court using the CM/ECF system, this 14th day of April, 2008.

*/s/ Robert H. Farley, Jr.*

Attorneys for the Defendant

Mr. Bernard E. Jude Quinn
Hinshaw & Culbertson
222 N. LaSalle, Street, Suite 300
Chicago, IL 60601-1081

Mr. Patrick T. Driscoll, Jr.
Mr. Patrick Blandchard
Office of the State's Attorneys
500 Richard J. Daley Center
Chicago, IL 60602

21