# EXHIBIT 1

1

| | |
|---|---|
| 1 | IN THE DISTRICT COURT OF THE UNITED STATES |
| | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

3

```
GENISE HART, et al.,           )
    Plaintiff,                 )
                               )
    -vs-                       )   No. 03 C 1768
                               )
MICHAEL SHEAHAN, SHERIFF OF    )   Judge James B. Zagel
COOK COUNTY, ET AL.,           )
    Defendants.                )
```

        Deposition of PATRICIA ALLEN taken before NANCY K. SPEARE, C.S.R., and Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at Suite 300, 222 North LaSalle Street, in the City of Chicago, Cook County, Illinois at 10:00 o'clock a.m. on the 23rd day of January, A.D., 2008.

        There were present at the taking of this deposition the following counsel:

30

```
1    aware.
2        Q   Now, when you were the superintendent in the
3    year 2002 did Division Three house female detainees with
4    medical concerns?
5        A   Yes.
6        Q   Were pregnant women housed in Division Three
7    during the year 2002?
8        A   Yes.
9        Q   What floor or tier were pregnant women placed on
10   in the year 2002 of Division Three?
11       A   I can't recall.  It could have been either the
12   third or the first floor, I'm not sure.
13       Q   Were women in the year 2002 who would have been
14   diagnosed with mental health issues housed in Division
15   Three?
16       A   Yes.
17       Q   On what floor were women with mental health
18   issues housed in Division Three --
19       A   Again --
20       Q   -- in 2002?
21       A   -- again, I'll say they were housed there; but I
22   can't -- I can't remember what floor, 2002 and 2003.
23       Q   Okay.  Were women with other health issues
24   housed in Division Three during the year 2002?
```

TOOMEY REPORTING

1    correct?

2        MR. QUINN: Objection to form and

3    mischaracterization.

4        MR. MORRISSEY:  Q   Is that true?

5        THE WITNESS:  A   Well, Division Three didn't have

6    segregation.

7        Q   In 2002.

8        A   As far as for the mental health, we're still

9    talking about the mental health?

10       Q   Yes.

11       A   Okay, in 2002 I don't think -- and I'm not

12   sure -- but we wouldn't put a psychological person in

13   isolation, no.

14       Q   Why was that?

15       A   They had a mental problem.

16       Q   And just because a person --

17       A   But then the psych doctor would have to tell you

18   why that was.  I couldn't tell you.

19       Q   Okay.  If a person had a mental health issue, a

20   psych problem in 2002, what was your understanding why

21   the person would not be placed in segregation?

22       MR. QUINN: Objection to asked and answered.

23       THE WITNESS:  A   Because he had -- he or she had a

24   mental problem.

41

```
 1          MR. MORRISSEY:  Q   And was there a concern on the
 2     part of the sheriff's office that if a person had a
 3     psych problem that they may be a danger to themselves or
 4     to some other person if they were placed in segregation?
 5          MR. QUINN:  Objection to form.
 6          THE WITNESS:  A   You said the sheriff's office.
 7          MR. MORRISSEY:  Q   Well, I'm talking about -- you
 8     worked for the sheriff's office, correct?
 9          A   I understand that.
10          Q   And in 2002 you said that in Division Three a
11     person with a mental health issue would not be placed in
12     segregation, correct?
13          MR. QUINN:  Objection to form --
14          MR. MORRISSEY:  Q   You can answer.
15          MR. QUINN:  -- and objection to mischaracterization
16     of prior testimony.
17          MR. MORRISSEY:  Q   You can answer.
18          THE WITNESS:  A   Unless the psych doctor stated it
19     was okay.
20          Q   Okay, my question is:  Why as superintendent of
21     Division Two did you not place a person with a mental
22     health issue in segregation?
23          MR. QUINN:  Same objection.
24          THE WITNESS:  You're saying Division --
```

42

```
 1         MR. MORRISSEY:  Division Three.
 2         THE WITNESS:  You said Two.
 3         MR. MORRISSEY:  Well, I'm saying Division Three.
 4         MR. QUINN:  The same objection, it's been asked and
 5   answered in different forms.
 6         MR. MORRISSEY:  Q   You can answer.
 7         THE WITNESS:  A   Repeat it.
 8         Q   Okay.  As superintendent in the year 2002 of
 9   Division Three why was a person with a mental health
10   issue not placed in segregation if they violated one of
11   the rules and regulations?
12         A   You would have to talk with the psych doctor, as
13   I've stated before.
14         Q   Okay, is that because a person with a mental
15   health issue could have -- could be a danger to him or
16   herself or to other people if they were placed in
17   segregation?
18         MR. QUINN:  Same objection.
19         THE WITNESS:  A   You would have to talk to the
20   psych doctor to find out the reason why.
21         MR. MORRISSEY:  Q   And based upon whose
22   instructions did you have to refer the person to a psych
23   doctor before placing a person with a mental health
24   issue in segregation?
```

```
 1        A    Well, they have -- they had staff there; and
 2   they was evaluated and it's up to the medical
 3   psychological staff to say whether this person can go or
 4   not.
 5        Q    Okay.  In 2002 were there weekend lockdowns in
 6   Division Three?
 7        A    I'm sure there were.
 8        Q    Do you know what a weekend lockdown was?
 9        A    Yes, I do know what a weekend lockdown is.
10        Q    All right.  What what was a weekend lockdown in
11   Division Three?
12        A    When the detainees are locked in so the staff
13   can search for contraband.
14        Q    Now, in Division Three in the year 2002 at times
15   did the weekend lockdowns start on the 3:00 to 11:00
16   shift on Friday?
17        A    That's true.
18        Q    And at times in Division Three would the weekend
19   lockdowns that started on Friday afternoon extend
20   through Sunday?
21        A    That's true.
22        Q    In the year 2002 did you work Saturdays and
23   Sundays?
24        A    No.
```

56

1        THE COURT REPORTER:  M, as in Mary?

2        MR. MORRISSEY:  M, as in Mary, would have an officer

3   station, correct?

4        THE WITNESS:  A   Correct.

5        Q   And from that officer's station the officer

6   could look into the dayroom of tier four, correct?

7        A   True.

8        MR. QUINN:  "Tier four"?

9        MR. MORRISSEY:  Q   I'm sorry, in -- From the

10  officer's station in tier M the officer could look into

11  the dayroom in M, correct, in Division Four?

12       THE WITNESS:  A   Right, yes.

13       Q   The officer also -- Strike that.

14           In tier M there's two floors in which the

15  detainees' cells are positioned, correct?

16       MR. QUINN:  Objection to characterization of floors.

17  I think levels would be a better description.

18       MR. MORRISSEY:  Q   Do you understand the question?

19       THE WITNESS:  A   Yeah, after he explained it.

20       Q   Okay, so in each of the tiers in Division Four

21  there are two levels in which the cells are positioned,

22  correct?

23       A   That's true.

24       Q   Now, from the officer's station the officer

57

1   could not physically see into most of the cells,
2   correct?
3       A   Correct.
4       Q   And from -- if an officer was in the officer's
5   station in M, that officer could not physically see into
6   the cell area in tier N, correct?
7       A   In tier who?
8       Q   Tier N, across the hall.
9       A   Nancy?
10      Q   Yeah.
11      A   That's a separate tier, that is correct.
12      Q   Okay. And if an officer was stationed in the
13  officer's station in M --
14      THE COURT REPORTER:   In M?  Could you say Mary or
15  Nancy?
16      MR. MORRISSEY:   Mary, in M, as in Mary, that officer
17  could not hear a detainee that was in her cell in tier
18  N, as in Nancy, correct?
19      MR. QUINN:   Objection to form.
20      THE WITNESS:   A   That's correct.
21      MR. MORRISSEY:   Q   And the same would be true for
22  an officer that was stationed in K, in the officer's
23  station in K, that officer could not hear a detainee who
24  was housed in a cell in L if she cried out for help,

58

```
 1    correct?
 2         MR. QUINN:  Same objection.
 3         THE WITNESS:  A    True.
 4         MR. MORRISSEY:  Q   And an officer that was
 5    stationed in the officer's station in K could not
 6    physically see into the cells in tier L, correct, from
 7    the officer's station in K?
 8         A    As stated before, yes.
 9         Q    Okay.
10              Now, tier officers are required to maintain a
11    tier log, correct?
12         A    Correct.
13         Q    And on the tier log if an officer is required to
14    crosswatch the officer has to make a notation on the
15    tier log, correct?
16         A    Not necessarily.
17         MR. QUINN:  Are you talking about during weekend
18    lockdowns?
19         MR. MORRISSEY:  Q   So I understand your response
20         THE WITNESS:  A    You do?
21         Q    I just want to clarify -- So if an officer is
22    assigned to watch more than one tier, on his or her tier
23    log that officer doesn't have to state on that record,
24    that log, that he or she is watching another tier,
```

68

1   would you agree that you've had a great deal of
2   experience in working and supervising Division Three?
3       MR. QUINN: Objection.
4       MR. MORRISSEY: I'm asking her.
5       MR. QUINN: I know you're asking her, and I'm
6   objecting.
7       THE WITNESS: A  Yeah, yeah, it's a possibility.
8       MR. MORRISSEY: Q  And in your opinion it's
9   possible to conduct a search of the tiers on the first,
10  second, and third floors of Division Three within an
11  eight-hour shift?
12      MR. QUINN: Objection, she's not here as an opinion
13  witness. She's here as a fact witness. You told her --
14  you've been asking her questions and she said, yeah,
15  they're possibilities --
16      MR. MORRISSEY: Well, I'm asking her --
17      MR. QUINN: You're asking her questions over and
18  over again in different form and trying to get her to
19  say things are possibilities when she has no specific
20  recollection of these events --
21      MR. MORRISSEY: Well, I'm asking.
22      MR. QUINN: -- ever occurring.
23      MR. MORRISSEY: She indicated that --
24      MR. QUINN: She said it was a possibility.

| | |
|---|---|
| 1 | MR. MORRISSEY: -- she indicated that searches -- |
| 2 | MR. QUINN: It may have. |
| 3 | MR. MORRISSEY: -- in Division Three have happened |
| 4 | during one shift, she's indicated that on more than one |
| 5 | occasion. |
| 6 | MR. QUINN: She's indicated that on one occasion -- |
| 7 | MR. MORRISSEY: It could be up to 14 times. |
| 8 | Q I'm asking you can a shake of the tiers in |
| 9 | Division Three be done in an eight-hour period? |
| 10 | MR. QUINN: Same objection. |
| 11 | THE WITNESS: A Maybe it could be and maybe it |
| 12 | can't. |
| 13 | MR. MORRISSEY: Q Okay. |
| 14 | A It depends on the circumstances. |
| 15 | Q What does it depend upon? |
| 16 | A What we're looking for, what they're looking |
| 17 | for. |
| 18 | Q If the correctional officers were looking for |
| 19 | contraband -- |
| 20 | A Who? |
| 21 | Q -- contraband in the living cells in Division |
| 22 | Three, could a search be done within an eight-hour |
| 23 | period? |
| 24 | MR. QUINN: Objection to the hypothetical nature of |